1  Jack Russo (Cal. Bar No. 96068)
   COMPUTERLAW GROUP LLP
2  401 Florence Street
   Palo Alto, CA 94301
3  (650) 327-9800 office
   jrusso@computerlaw.com
4
   Attorney for Defendant
5  and Counterclaimant
   MPH International LLC
6

7              UNITED STATES DISTRICT COURT

8             NORTHERN DISTRICT OF CALIFORNIA

9                    OAKLAND DIVISION

10

11 **SUPPORT COMMUNITY, INC.**, a
   Delaware Corporation,                    **RUSSO DECLARATION ISO**
12                                          **ADMINISTRATIVE MOTION TO**
                  Plaintiff;                **WITHDRAW MSJ PURSUANT TO**
13                                          **LOCAL RULE 7-11**

14        v.                                Complaint Filed: January 12, 2023
                                            Trial Date: September 14, 2026
15 **MPH INTERNATIONAL LLC,** a Nevada
   Limited Liability Company, DOES 1 through Motion Hearing Date: September 12, 2025
16 25, inclusive,

17               Defendant;

18 **MPH INTERANTIONAL LLC,** a Nevada
   Limited Liability Company,
19
                  Counterclaimant,
20

21        v.

22 **SUPPORT COMMUNITY, INC.,** a
   Delaware Corporation, DOES 1 through 25,
23 inclusive,

24               Counter-Defendants
25

26

27

28

Computerlaw Group LLP
www.computerlaw.com℠

1

**DECLARATION OF COUNSEL**

2

I, Jack Russo, declare under penalty of perjury, as follows:

3

**BACKGROUND AND QUALIFICATIONS**

4      1.      I am an attorney licensed to practice law in the State of California (Bar No.

5   96068) and am admitted to practice before this Court. I am counsel of record for Defendant MPH

6   International LLC in this action and have been practicing law for over 25 years. I have personal

7   knowledge of the facts set forth herein and if called upon as a witness, I could and would testify

8   competently thereto, except for those based upon information and belief, which are so stated.

9      2.      I am over 70 years old and have been in practice for 45 years.  I have served pro

10  bono as a ENE Evaluator, Arbitrator, Mediator. and Special Master for this Court. Throughout

11  my career, I have maintained an unblemished professional record with no sanction, no

12  disciplinary actions, no personal fee awards,, and no professional misconduct findings.  I am

13  admitted in CA, NY, DC, WA, OR, HA, and FL and the foregoing is true in ALL those

14  jurisdictions. I  have appeared before this Court and other federal district and appellate courts on

15  numerous occasions without incident.

16     3.      I have been recognized as a competent practitioner in technology law and have

17  handled complex IP and commercial litigation matters throughout my career.  My CV/resume is

18  attached as Exhibit A. The events I am about to describe are a first time situation for me and I am

19  quite embarrassed about it and I offer no defense as I own this and I accept responsibility for the

20  unintentional mistakes that happened here.

21

**CIRCUMSTANCES LEADING TO ERRORS**

22     4.      I am lead trial counsel in this case. I am assisted by one lawyer and one legal

23  assistant.  Both are competent and what happened is exceptional and will not happen again.

24  During the preparation of MPH's Motion for Summary Judgment filed on June 17, 2025, I was

25  (as I told opposing counsel) recovering due to a COVID-19 illness that I confirmed earlier with

26  opposing counsel as shown in Exhibit B.

27

28

Computerlaw Group LLP
www.computerlaw.com℠

5.      I own and take full responsibility but due to my illness and a long recovery at my age, certain research and drafting tasks were delegated to support staff under what I believed to be adequate supervision protocols.  I was obviously wrong about that and as a firm in existence for over 40 years we haved taken steps to fix and prevent a reoccurrence.

6.      The citation errors on secondary and tertiary points of law discovered by opposing counsel appear to have resulted from AI "hallucinations"—a known phenomenon where generative AI tools create fictitious case citations that appear authentic but do not correspond to actual published decisions.

7.      I take full responsibility for these errors. As lead counsel, the ultimate obligation to verify all citations and legal authority rested with me, regardless of the circumstances that led to inadequate oversight.

**IMMEDIATE CORRECTIVE ACTION AND ACCEPTANCE OF RESPONSIBILITY**

8.      Upon receiving Mr. Sedlik's letter dated August 8, 2025, and reading it after close of business that Friday night, I immediately reviewed the citation defects and spent that Friday night and Saturday and Sunday working on the root cause and a solution that would not burden this Court and that would assure fairness to opposing counsel and his client, having in mind that there is a prevailing party attorney fee clause in the parties' 2016 Agreement.

9.      I have personally reviewed each citation identified by opposing counsel and can confirm that multiple citations do not correspond to actual published decisions or contain incorrect quotations.  The general points of law are correct; the citations are bad. I worked through the weekend to deliver a draft stipulation to opposing counsel as shown in Exhibit "C" and that had in mind that AI-based research is now an economic imperative as both clients and the Bar itself are requesting and requiring it — with guardrails.  Our guardrails failed here.

10.     I immediately took steps to fix the guardrails and to prevent similar errors in the future, including:

      a.   Implementing mandatory verification protocols requiring all AI-generated content to be independently verified through primary legal databases;

Computerlaw Group LLP
www.computerlaw.com<sup>sm</sup>

b. Establishing a secondary review process where all citations must be manually checked before filing;

c. Restricting the use of AI tools for legal research to preliminary research only, with all final citations verified through Westlaw, Lexis, or other authoritative databases; and,

d. Providing additional training to all staff regarding the limitations and risks of AI-generated legal content.

11.     I acknowledge that these errors represent a serious failure in my oversight obligations and professional duties. I do not seek to excuse these errors but rather to address them promptly and transparently. I want to emphasize that this is both a first "offense" by me and a first "offense" by my team.  That I have had sleepless nights since last Friday goes without saying and I know the same is true for my staff as well as others in my office. This set of circumstances was and is a first in 45 years of practice and to be more graphic over 100,000 hours of career lawyer service and roughly over 400,000 additional hours of service by other lawyers and staff associated with my firm.

### ATTEMPT TO STIPULATE WITHDRAWAL

12.     On August 11, 2025, following my August 10, 2025 email draft stipulation, I contacted opposing counsel Gary Sedlik and had a Zoom meeting to request agreement on a stipulation for withdrawal of the Motion for Summary Judgment to address the citation issues.

13.     Mr. Sedlik declined to stipulate unless MPH or me and my firm agreed to immediately pay attorney's fees of over $37,000 allegedly incurred by plaintiff in reviewing the motion and preparing opposition materials, initially estimated at approximately $30,000 and then revised in the final demand to over $37,000.  This made no sense to me as there was not a single comment in the Opposition on any of the points of law or ANY of the citations (which were all secondary or tertiary points).

14.     While I acknowledge that opposing counsel incurred some expenses in reviewing our imperfect early MSJ motion, given the attorney fee clause in the parties' agreement and the

Computerlaw Group LLP
www.computerlaw.com℠

final accounting that will occur in any event at the end of the case, I questioned that the demand for an immediate interlocutory fee payment now, was, or is appropriate under these circumstances, and questioned why this extraordinarily punitive approach was so necessary and so important particularly given the lack of clear precedent for fee-shifting in similar AI-related citation error cases and the failure of counsel to raise any comment whatsoever about these secondary and tertiary points of law that hardly change the overall MSJ position that the 30 day and 180 day contractual time bars wipe out any and all claims as do the 2 year and 4 year settled statutory limitations periods.  No reply of any substance was ever provided by counsel.

15.     Unable to reach agreement on a stipulation, I determined that this administrative motion was necessary to address the situation promptly and transparently before the Court.

**CIRCUMSTANCES  SUPPORTING LENIENCY**

16.     Defendant's Rule 7-11 Motion discusses recent federal court decisions recognizing that AI-generated citation errors, while serious, may warrant different treatment than intentional misconduct, particularly where attorneys acknowledge responsibility and implement corrective measures.

17.     I respectfully request that while, as I recognize, citation accuracy is fundamental to legal practice, that this Court recognize, as have other courts, that the emergence of Westlaw, Lexis, Casetext and other  AI tools (we have all of them) presents novel challenges that may warrant measured responses focused on correction and prevention rather than punishment, particularly for first-time offenses by attorneys with unblemished records and their staff. The demoralization is punishment enough in my view because the prevailing party fee provision and my commitment and that of MPH to allow an offset in in any event and with interest solves the economics and produces less contention and less work for the Court and its Magistrate Judges as well as less contention for the counsel and client relationships that are already frail after nearly 72 months (nearly 6 years) of harmony from 2016 to 2022 (and the inception of litigation rather than contractually required arbitration in 2023 by Mr. Sedlik who admitted he read the

Computerlaw Group LLP
www.computerlaw.com℠

1  Agreement and still filed suit in the Superior Court rather than arbitration for all monetary

2  claims).

3                              **NO INTENT TO DECEIVE**

4       18.     The citation errors in this case resulted from inadequate verification procedures

5  during a period of illness-related absence and recovery by me and not from any intent to deceive

6  the Court or opposing counsel.  I am quite upset about all of this.

7       19.     The errors were discovered through opposing counsel's diligent review of the

8  Motion after its opposition and Defendant's reply brief had been filed, not through any Court

9  investigation or sanctions proceeding, demonstrating a failure of oversight rather than deliberate

10  misconduct.

11      20.     Upon learning of the errors, I immediately moved to address them rather than

12  attempting to defend the problems, consistent with my ethical obligations under California Rules

13  of Professional Conduct and Federal Rule 11.

14                      **COMMITMENT TO PROFESSIONAL ETHICS**

15      21.     I am committed to maintaining the highest professional standards and have

16  implemented multiple comprehensive safeguards to prevent similar issues in the future. It goes

17  without saying that I do not want an AI tool "war" where the court is mediating multiple

18  technical issues rather than the goals of Rule 1 being the focus. (Counsel used new AI tools last

19  Friday).

20      22.      I respectfully request that the Court allow withdrawal of the motion without

21  imposing additional sanctions.

22      23.     Attached hereto as Exhibit D is a true and correct copy of the correspondence

23  from opposing counsel dated August 8, 2025, outlining the citation issues and demands.

24      24.     Attached hereto as Exhibit E is a true and correct copy of my correspondence to

25  opposing counsel dated August 10, 2025, acknowledging the issues and requesting stipulated

26  withdrawal.

27

28

Computerlaw Group LLP
www.computerlaw.com℠

25.     My last ditch effort to reach a stipulation (deferring the fees issue) included the attached submission and a request to further meet and confer. See Exhibits F, G, & H.  I received no reply other than that the meet and confer effort was over.

26.     Attached hereto as Exhibit I is the remainder of the email correspondence between opposing counsel and me where I propose multiple remedial measures that are all rejected.

I declare under penalty of perjury under the laws of the United States and California that the foregoing is true and correct and the Exhibits are true and correct.

Executed on August 13, 2025.

By:  /s/ *Jack Russo*

Jack Russo

# Exhibit A

## Contact

www.linkedin.com/in/jackrusso
(LinkedIn)
www.computerlaw.com (Company)
www.superlawyers.com/
california-northern/lawyer/Jack-
A-Russo/9a48d644-eab0-4052-
a6ad-21b3413cc6ab.html
(Portfolio)
www.stanford.edu/class/ee380/
Abstracts/010411.html (Other)

## Top Skills

Project Management

Marketing

Management

## Certifications

M&A and Corporate Development
Strategies

Creatively Designing for Change

Future of Work: Leading Modern
Workplaces

Global C-Suite Program

## Publications

Fed Court Holds Constitutional
Rights Extend to Virtual Practice of
Law

# Giacomo Russo

NITA Master Jury Trial Advocate & Board Certified Appellate
Specialist at Computerlaw Group LLP, Entrepreneurlaw Group LLP;
CEO/Founder, Florence Ventures; Chairman/FFCDR.com
Palo Alto, California, United States

## Summary

Jack Russo is the founding partner in the Silicon Valley law firm of
Computerlaw Group LLP (www.computerlaw.com) and its affiliate,
Entrepreneur Law Group (www.entrepreneurlaw-group.com).
The firm's focus is in representing entrepreneurs, teams and
growth companies in the protection of their ideas, inventions, and
businesses on the Internet and in our digital economy; the firm
specializes in the areas of Internet, e-commerce, software and other
intellectual property protection, enforcement, and licensing.

Mr. Russo originated some of the early thinking on protection of the
"look and feel" of computer software. His 1985 article, Copyright
in the "Look and Feel" of Computer Software published in The
Computer Lawyer pioneers the subject.

Mr. Russo is a member of the State Bars of California, New York,
and Washington, D.C. as well as Oregon, Hawaii and Washington.
He holds his JD from UCLA School of Law as well as dual M.B.A.
degrees from Columbia University and UC Berkeley's Haas School
of Business; he also holds a joint Bachelor's and Master's degree
from C.U.N.Y. in Administration and Computer & Information Science
and an L.L.M. from the Center for International Legal Studies in
Austria.

Before becoming an attorney, Mr. Russo worked full-time as a
computer programmer and software analyst. Mr. Russo is a Judge
Pro Temp for the Santa Clara Superior Court and an Arbitrator and a
Mediator for the United States District Court for the Northern District
of California as well as for the American Arbitration Association. He
has an active ADR practice with experience in over 500 cases. He
is the Chairman of the non-profit Foundation for Creativity in Dispute
Resolution.

HONORS

Judge Pro Tempore, Superior Court
Arbitrator/Mediator, U.S. District Court
Chairman, Foundation for Creativity in Dispute Resolution (ffcdr.com)
Master Trial Advocate, NatIonal Institute of Trial Advocacy (Nita.org)
Appellate Specialist, California Board of Legal Specialization
(calbar.gov.ca)

———

# Experience

Computerlaw Group LLP
40 years 3 months

Managing Partner
January 2010 - Present (15 years 8 months)
Palo Alto, California, NYC, and Tampa, Florida

Lawyers for the Internet Economy(sm)

Managing Partner
June 1985 - December 2010 (25 years 7 months)

www.computerlaw.com

Entrepreneur Law Group LLP
Managing Partner
January 2014 - Present (11 years 8 months)
Palo Alto, California

ELG (www.entrepreneurlaw-group.com) represents a further expansion of
CLG's practice to include focus on inventors, innovators, founders, startup
groups and other entrepreneurs in and beyond Silicon Valley and throughout
the United States, Europe and Asia.

Foundation for Creativity in Dispute Resolution (non-profit)
Chairman of the Board
January 1999 - Present (26 years 8 months)
Pal Alto, California

The Foundation for Creativity in Dispute Resolution (www.ffcdr.com) is a non-
profit, established to provide education and other help in advancing worldwide:

* Intellectual property dispute resolution

* Intellectual property licensing facilitation

\* Intellectual property enforcement risk/benefit analysis

\* Advanced Business Planning for Litigation Avoidance

\* Litigation Avoidance Management & Alternative Dispute Resolution

\* Litigation Risk Analysis & Risk Planning and Minimization

\* Entrepreneur Facilitation & Co-Founder Dispute Resolution

\* Corporate Governance Systems (avoiding Delaware suits)

\* Dispute Resolution Systems (avoiding litigation altogether)

Florence Ventures LLC
CEO & Managing Partner
June 1990 - Present (35 years 3 months)

very early stage venture and entrepreneurship strategy firm

RiskIQ
Member of the Board of Directors
February 2010 - June 2021 (11 years 5 months)
San Francisco, California

www.riskiq.com

Securant Technologies, Inc.
Member of the Board of Directors
1997 - 2002 (5 years)

Fenwick & West LLP
Attorney-at-Law
June 1980 - June 1985 (5 years 1 month)

www.fenwick.com

———

# Education

Columbia Business School
M.B.A., Business · (2000 - 2004)

University of California, Berkeley, Haas School of Business
M.B.A., Business · (2000 - 2003)

University of California, Los Angeles - School of Law
J.D., law · (1977 - 1980)

Center for International Legal Studies

Master of Laws (LL.M.), International Business · (2011 - 2012)

## Brooklyn College

B.A.-M.A., Joint Degree in Administration and Computer & Information Science · (1972 - 1977)

# Exhibit B

 Outlook

---

**Here is the email...**

---

**From** Jack Russo <jrusso@computerlaw.com>
**Date** Mon 8/11/2025 7:16 PM
**To** Linyan Tian <ltian@computerlaw.com>

---

**From:** Jack Russo <jrusso@computerlaw.com>
**Date:** Friday, May 23, 2025 at 5:06 PM
**To:** Gary Sedlik <gary@sedlikgroup.com>
**Cc:** Linyan Tian <tian@computerlaw.com>
**Subject:** Re: SCI v. MPH - Notice of Depos of P. Morrison and SCI

Dear Gary:

Sadly, I have come down with some new version of Covid and as someone over 65, it requires that I put my health first.   I have started a regimen of medications today (see attached) but the general direction is towards 30 days of recovery.

Thus, we will need to reschedule preferably to after the July 4th holiday.  We will send you Amended Deposition Notices once you tell us what two days (preferably Thursday and Friday in the second, third or fourth weeks of July work for you and your client for in-person video depositions.

As you requested, we can set those new dates to start at 10AM and if you prefer the venue be at your office, I can see if that works as well.

 Let us know.  Thank you for your continued cooperation and courtesy.



Best Regards,

Jack Russo**
Managing Partner
Computerlaw Group LLP
Jrusso@computerlaw.com
www.computerlaw.com
https://www.linkedin.com/in/jackrusso
"Entrepreneurs Imagine Better Worlds!"®
Via Siri to expedite (~99% accurate?)
**AMA: https://app.soopra.ai/ideachampion/chat

 Outlook

---

**Here is the picture (2 of 2)**

---

**From** Jack Russo <jrusso@computerlaw.com>
**Date** Mon 8/11/2025 7:14 PM
**To** Linyan Tian <ltian@computerlaw.com>



Best Regards,

Jack Russo**
Managing Partner
Computerlaw Group LLP
Jrusso@computerlaw.com
www.computerlaw.com
https://www.linkedin.com/in/jackrusso
"Entrepreneurs Imagine Better Worlds!"®
Via Siri to expedite (~99% accurate?)
**AMA: https://app.soopra.ai/ideachampion/chat

Exhibit C

1  Jack Russo (Cal. Bar No. 96068)
   COMPUTERLAW GROUP LLP
2  401 Florence Street
   Palo Alto, CA 94301
3  (650) 327-9800 office
   jrusso@computerlaw.com
4
   Attorney for Defendant
5  and Counterclaimant
   MPH International LLC
6

7                    UNITED STATES DISTRICT COURT

8                   NORTHERN DISTRICT OF CALIFORNIA

9                         OAKLAND DIVISION

10

11 **SUPPORT COMMUNITY, INC.**, a          **STIPULATION FOR WITHDRAWAL OF**
   Delaware Corporation,                    **MOTION FOR SUMMARY JUDGMENT**
12
                      Plaintiff;            Complaint Filed: January 12, 2023
13                                          Trial Date: None Set
        v.
14
15 **MPH INTERNATIONAL LLC,** a Nevada
   Limited Liability Company, DOES 1 through
16 25, inclusive,

17                   Defendant;

18 **MPH INTERANTIONAL LLC,** a Nevada
   Limited Liability Company,
19
                   Counterclaimant,
20
21      v.

22 **SUPPORT COMMUNITY, INC.,** a
   Delaware Corporation, DOES 1 through 25,
23 inclusive,

24                 Counter-Defendants
25
26
27
28

STIPULATION FOR WITHDRAWAL OF
MOTION FOR SUMMARY JUDGMENT                              Case No.23-CIV-04911-JSW

_Computerlaw Group LLP_
www.computerlaw.com℠

Computerlaw Group LLP
www.computerlaw.com℠

TO THE HONORABLE JEFFREY S. WHITE:

WHEREAS, MPH filed a Motion for Summary Judgment (ECF No. #63);

WHEREAS, the parties have conferred regarding certain procedural and citation issues that have arisen in connection with the motion briefing;

WHEREAS, lead counsel takes responsibility for errors which occurred with the MPH Opening Brief (see Exhibit "A") and confirms that he owns this set of issues and his only explanation is he was out sick with COVID during this time and certain tasks were not accomplished under his delegation and sole supervision;

WHEREAS, various citation defects in the opening brief warrant withdrawal of the motion to ensure compliance with applicable federal and local court rules;

WHEREAS, the parties agree that withdrawal of the motion would promote judicial efficiency and allow for proper case development; and

WHEREAS, the parties desire to resolve this matter amicably and cooperatively through stipulation rather than continued motion practice;

NOW, THEREFORE, IT IS HEREBY STIPULATED AND AGREED BY AND BETWEEN THE UNDERSIGNED COUNSEL FOR THE PARTIES:

    1. WITHDRAWAL OF MOTION:  MPH hereby withdraws its Motion for Summary Judgment filed on 06/17/2025 (ECF No. #63), and respectfully requests the Court remove the hearing currently scheduled for September 12, 2025 at 9:00 AM from the Court's calendar.

1

2    2. BASIS FOR WITHDRAWAL: This withdrawal is made to address certain citation and

3    procedural issues identified in the opening brief during the course of motion practice. The

4    withdrawal is made in the interests of judicial efficiency and proper compliance with court rules

5    and procedures.

6

7    3. Good Faith: Other than as set forth above, this stipulation is entered into solely for

8    purposes of judicial economy and case management efficiency. The withdrawal does not

9    constitute an admission by Defendant or its counsel of any intentional wrongdoing, deficiency,

10   or lack of merit regarding its underlying claims, defenses, or legal positions in this litigation.

11

12   4. ATTORNEY'S FEES AND COSTS: Plaintiff expressly reserves all rights with respect

13   to any determination of attorney's fees and costs if Defendant cannot agree to reasonable fee

14   reimbursement. The parties will meet and confer as to the amount of the reasonable fees to be

15   paid to Plaintiff by Defendant's counsel. Any issues regarding entitlement to, reasonableness of,

16   or amount of attorney's fees and costs incurred in connection with this motion or otherwise in

17   this litigation are hereby reserved for future determination, if appropriate, upon motion by

18   Plaintiff now or at the conclusion of this case or at such other time as may be determined by the

19   Court. Nothing in this stipulation shall constitute a waiver of any party's rights under Federal

20   Rule of Civil Procedure or other applicable law.

21

22   5. EFFECT OF STIPULATION: This withdrawal is made in MPH's view without

23   prejudice to MPH's right to file an amended or corrected motion for summary judgment, subject

24   to compliance with applicable case management deadlines and local rules.  Plaintiff disagrees but

25   the parties have agreed to have the Court decide this in its Order accepting or rejecting this

26   Stipulation.

27

28

Computerlaw Group LLP
www.computerlaw.com℠

6. CASE SCHEDULE: The parties agree that this withdrawal does not affect any other deadlines, discovery cutoffs, or scheduling orders in this case and the other motion.

7. COMPLIANCE WITH LOCAL RULES: This stipulation is made in compliance with Civil Local Rule 7-11 of the Northern District of California, which permits withdrawal by administrative motion if the Court agrees.

SO STIPULATED.

DATED: August 11, 2025

COMPUTERLAW GROUP LLP

By:  /s/ *Jack Russo*

Jack Russo

Attorneys for Defendant  and
Counter-Claimant  MPH
INTERNATIONAL LLC

Computerlaw Group LLP
www.computerlaw.com℠

1

2  DATED: _____

3

4  SEDLIKGROUP, P.C.

5

6  By: _____

7  Gary S. Sedlik

8

9  Attorneys for Plaintiff and

10  Counter-Defendant

11  SUPPORT COMMUNITY,

12  INC.

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Computerlaw Group LLP
www.computerlaw.com℠

Exhibit D

# SedlikGroup, P.C.

P.O. BOX 3238 | MANHATTAN BEACH, CA 90266
(310) 439-9988 | GARY@SEDLIKGROUP.COM

August 8, 2025

Jack Russo, Esq.
Computer Law Group LLP
401 Florence Street
Palo Alto, CA 94301
Jrusso@computerlaw.com (via email only)

Re:    Use of fabricated legal authority in MPH filings and Associated FRCP, Rule 11 Violations
[Support Community, Inc. v. MPH International LLC USDC Northern District of
California, Case No. 4:23-cv-04911-JSW]

Dear Mr. Russo:

It gives me no joy to send this letter to you. Nevertheless, given the serious nature of its contents
and the direct implications to both you and your client pursuant to FRCP, Rule 11, I believe it is
imperative that I provide the following information it to you and equally imperative that you and
MPH immediately take action to address the issues discussed herein.

While preparing for the upcoming hearing on MPH's recently-filed Motion for Summary Judgment
("Motion"), I went through the standard process of verifying the cases and citations cited by MPH in
support of its Motion. I was shocked to discover that MPH's Motion appears to contain multiple
fabricated citations to cases that do not exist, multiple fabricated case quotations, and multiple
cases cited for legal propositions clearly not supported by the text of the referenced court opinion.

The list of fabricated cases, fabricated citations and fabricated/improper quotations includes, but is
not limited to, the following:

- <u>Artificial Intelligence Corp. v. Casey</u>, 1 Cal. App. 4th 22 (1991)
  - MPH cites to this case in three places in its Motion (pages 11, 12 and 17).
  - MPH presents a fabricated "quotation" from this fabricated case in support of a key
    section of its Motion, stating: "The rationale behind enforcing such provisions is

particularly strong in software development contracts, where timely identification of issues is critical. **As explained by the court in Artificial Intelligence Corp**., deemed acceptance provisions 'protect against stale claims... encourage the recipient to inspect promptly and to voice any defects discovered... [and] permit the parties to investigate and attempt to resolve problems at an early date.'"

- o Although MPH presents what purports to be a direct quote from the Court's opinion, it actually appears that no such text exists.
- o The citation 1 Cal. App. 4th 22 (1991) actually points to the middle of <u>In re Lee G.</u> (1991), 1 Cal. App. 4th 18, a San Diego juvenile dependency case having no relation whatsoever to the case or holding cited by MPH in its Motion.

- **<u>Cole v. CRST Expedited</u>, 289 F.3d 840 (6th Cir. 2002)**
  - o MPH cites to this case on page 8 of its Motion.
  - o MPH's citation to this case is for the proposition that "This includes precluding damages theories or calculations not provided in the Initial Disclosures. <u>Cole v. CRST Expedited</u>, 289 F.3d 840, 846 (6th Cir. 2002)."
  - o The actual case at 289 F.3d 840 is <u>LaSalle Bank National Ass'n v. Sleutel</u>, with the citation of 289 F.3d 837 (5th Cir. 2002).
  - o While there appears to be a "real" case with the title "Cole v. CRST Expedited," that case relates to meal and rests breaks for truck drivers and is entirely unrelated to the proposition for which MPH has named the case in its brief.

- **Creditors Collection Serv. of Sacramento v. Castegnaro, 17 F. Supp. 2d 1079 (N.D. Cal. 1998)**
  - o MPH cites to this case on page 19 of its Motion.
  - o MPH purports to quote from the holding of this apparently fictitious case in support of its Motion, stating "As this District has recognized, 'a breach of contract claim—including breach of an oral contract—accrues at the time of breach, which then starts the limitations period running.' <u>Creditors Collection Serv. of Sacramento v. Castegnaro</u>, 17 F. Supp. 2d 1079, 1082 (N.D. Cal. 1998)." No such quotation exists.
  - o The actual case at this citation is <u>Case v. ADT Automotive, Inc.</u>, 17 F. Supp. 2d 1077 (W.D. Missouri 1997) and bears no relationship to the citations or legal propositions for which MPH provides the citation in its Motion.

- **<u>Dillon v. Bd. of Pension Comm'rs</u>, 18 Cal. 2d 427, 430 (1941)**
  - o MPH cites to this case on pages 16-17 of its Motion.
  - o MPH purports to <u>directly quote</u> from the opinion of this case with the following statement: "California courts have rejected the continuing breach theory for standard

contract claims, holding that 'a breach of contract claim accrues at the time of the breach, which then starts the limitations period running.' <u>Dillon v. Bd. of Pension Comm'rs</u>, 18 Cal. 2d 427, 430 (1941)."

- o This appears to be a fabricated quotation that does not exist in the Court's opinion.

- **<u>FNB Mortgage Corp. v. Pacific General Group</u>, 76 Cal. App. 4th 1116 (1999)**
  - o MPH cites to this case on page 17 of its Motion (immediately following the Dillon case).
  - o MPH purports to <u>directly quote</u> from the opinion of this case with the following statement in the parenthetical of its citation: "[t]he continuing violation doctrine is not applicable to [breach of contract] causes".
  - o This appears to be a fabricated quotation that does not exist in the Court's opinion.

- **<u>Hambrecht & Quist Venture Partners v. Am. Med. Int'l, Inc.</u>, 38 F.3d 1118 (9th Cir. 1994)**
  - o MPH cites to this case on pages 17-18 of its Motion.
  - o MPH cites to this case in support of its legal argument that "The Ninth Circuit, applying California law, has consistently upheld contractual limitations periods of six months or less. In <u>Han v. Mobil Oil Corp.</u>, 73 F.3d at 877, the court upheld a six-month limitation as "reasonable," and in <u>Hambrecht & Quist Venture Partners v. Am. Med. Int'l, Inc.</u>, 38 F.3d 1118 (9th Cir. 1994), the court enforced a 30-day limitations period."
  - o The actual case appearing at 38 F.3d 1118 (starting at 1114) is <u>United States v. Ancheta</u>, which is a criminal appeal relating to a challenge to criminal sentence enhancements and jury instructions. It is completely unrelated to MPH's citation.
  - o While there is a "real" case styled <u>Hambrecht & Quist Venture Partners v. Am. Med. Int'l, Inc.</u>, which appears at 38 Cal. App. 4th 1536, it is a California state court case (not 9th Circuit case) that discusses the application of choice of law provisions and never mentions or discusses a "30-day limitations period." Therefore, MPH's citation to the case (albeit with an entirely fictitious citation) for this proposition is wholly improper.

- **<u>Lewis v. YouTube</u>, LLC, 197 Cal. App. 4th 1387 (2011)**
  - o MPH cites to this case on page 18 of its brief.
  - o MPH cites to this case in support of its arguments regarding contractual limitations periods, stating: "As the court recognized in <u>Lewis v. YouTube, LLC</u>, 197 Cal. App. 4th 1387, 1394 (2011), contractual limitations periods in technology agreements serve important interests in 'providing repose and protection against stale claims and promot[ing] judicial efficiency."

- o The actual case appearing at 197 Cal. App. 4th 1387 (starting at 1365) is <u>Mansur v. Ford Motor Co.</u>, which is an appeal relating to alleged design defects in a motor vehicle. It is completely unrelated to MPH's citation.
- o Although MPH represents to the Court that it is directly quoting from the Court's opinion, this quotation appears to be entirely fabricated.
- o While there is a "real" case styled "Lewis v. YouTube," we were unable to find any such quotation in opinions relating to that case.

- **<u>Nevro Corp. v. Bos. Sci. Corp.</u>, 312 F. Supp. 3d 726 (N.D. Cal. 2018)**
  - o MPH cites to this case on page 21 of its Motion.
  - o MPH cites to this case in support of its arguments relating to oral modifications of contractual provisions, stating "This District has consistently held that a party's contemporaneous communications acknowledging a written agreement contradict later claims of oral modifications. See <u>Nevro Corp. v. Bos. Sci. Corp.</u>, 312 F. Supp. 3d 726, 733 (N.D. Cal. 2018) (party's emails referring to written agreement undermined claims of oral modification)."
  - o This case and related citation appear to be entirely fabricated.
  - o While there is a "real" case styled "Nevro Corp. v. Bos. Sci. Corp.," it is a case out of the fifth circuit (appealed from the district court of Delaware) that is a patent case relating to claim construction.

- **<u>Oracle America, Inc. v. Hewlett Packard Enterprise Co.</u>, 971 F. Supp. 2d 975 (N.D. Cal. 2013)**
  - o MPH cites to this case on page 16 of its Motion.
  - o MPH cites to this case in support of its legal argument regarding the enforcement of certain statutes of limitations, stating "The Northern District has consistently enforced this four-year limitation in software and technology contract disputes. In <u>Oracle America, Inc. v. Hewlett Packard Enterprise Co.</u>, 971 F. Supp. 2d 975, 985-86 (N.D. Cal. 2013), the court dismissed breach of contract claims that accrued more than four years before filing, despite the plaintiff's argument that the breaches were part of an ongoing pattern."
  - o The actual case appearing at 971 F. Supp. 2d 975 (starting at 957) is <u>Western Watersheds Project v. Bureau of Land Management</u>, a case out of the Eastern District of California, not the Northern District. The case relates to grazing permits under the Federal Land Policy and Management Act and the National Environmental Policy Act and is entirely unrelated to the subject matter for which MPH cites to it in its Motion.

- <u>Paracor Finance, Inc. v. General Electric Capital Corp.,</u> 96 F.3d 1151 (9th Cir. 1996)
  - o MPH cites to this case on page 21 of its Motion.
  - o MPH cites to this case in support of its legal arguments regarding the enforcement of contractual integration clauses, stating: "The Ninth Circuit, applying California law, has consistently upheld integration clauses to bar claims based on alleged oral agreements. See <u>Paracor Fin., Inc. v. Gen. Elec. Capital Corp.</u>, 96 F.3d 1151, 1167 (9th Cir. 1996) (integration clause barred claims based on alleged oral representations)."
  - o In fact, the cited opinion does not contain the phrases "integration clause" or "oral representations" or otherwise appear to stand for the legal proposition put forth by MPH in its Motion.
- Synopsys, Inc. v. ATopTech, Inc., 2015 WL 1197693 (N.D. Cal. 2015)
  - o MPH cites to this case on page 16 of its Motion.
  - o MPH cites to this case in support of its legal argument relating to the statute of limitations in breach of contract causes, stating "Similarly, in <u>Synopsys, Inc. v. ATopTech, Inc.</u>, 2015 WL 1197693, at *4 (N.D. Cal. Mar. 16, 2015), the court held that breach of contract claims accrued at the time of breach, not when damages were discovered."
  - o The Westlaw citation you provide to the Court for this case appears to point to two Nevada Senate bills from 2015.
  - o Although we were unable to verify the Westlaw citation, the actual "Synopsis v. ATopTech" case in the Northern District of California had only one order issued on March 16, 2015, which is a discovery order from a Magistrate Judge. The order does not "hold" – or even discuss – anything relating to the accrual of breach of contract claims.
- <u>VP & W, Inc. v. Galardi</u>, 2015 WL 5321245, at *6 (E.D. Cal. Sept. 11, 2015)
  - o MPH cites to this case on page 12 of its Motion.
  - o MPH cites to this case for the proposition that "in <u>VP & W, Inc. v. Galardi</u>, 2015 WL 5321245, at *6 (E.D. Cal. Sept. 11, 2015), the court found that explicit acceptance provisions bar subsequent fraud claims related to accepted items."
  - o We are unable to find any record of the existence of this case, either by citation or name.

Please note that the above examples are based on a preliminary review and analysis of MPH's Motion. This letter is not intended to convey the entirety of the false and/or improper legal citations presented in the Motion.

Of course, it is also possible that our analysis (although confirmed through three separate case citation analysis tools as well as individual review of numerous cases) is inaccurate. If so, I would welcome your response and explanation and, as appropriate, readily withdraw this letter.

However, if accurate (even partially) there can be no doubt that these seemingly fabricated case citations, fabricated direct quotes and non-existent cases, and other improper citations permeate MPH's entire Motion. There is also no doubt that the pervasive misrepresentations to the Court directly implicate FRCP, Rule 11. Given that the Court is currently considering MPH's Motion, Support Community strongly believes that immediate and direct action by you and MPH is required.

In lieu of Support Community preparing an FRCP, Rule 11 motion for sanctions against both your firm and MPH, Support Community is amenable to the following course of action:

- Within 24 hours of receipt of this letter, MPH shall notify the Court through a filed pleading that MPH is withdrawing its pending Motion for Summary Judgment, in its entirety, with prejudice. Support Community is willing to execute a stipulation to that effect to be jointly filed;
- This filing shall explain to the Court that Support Community's counsel discovered the fabricated caselaw in MPH's Motion and shall attach a copy of this letter to your declaration in connection with the filing;
- Although Support Community has been directly harmed by this conduct through incurring significant litigation fees to oppose MPH's Motion; Support Community will agree not to independently seek FRCP, Rule 11 sanctions against MPH and your firm on the condition that MPH and your firm jointly and severally agree to reimburse Support Community for the legal fees Support Community incurred in opposing MPH's Motion. I have not presently calculated the amount of legal fees incurred by Support Community in connection with its opposition but can provide that number to you relatively quickly upon agreement;
- Although Support Community will not separately seek sanctions pursuant to FRCP, Rule 11, neither will Support Community oppose such sanctions if they are recommended or implemented by the Court on its own.

Given the seriousness of the subject matter of this letter, I strongly recommend that we connect today to discuss how to address these issues. Please let me know your availability for a phone call.


Sincerely,

/s/

Gary S. Sedlik
Counsel for Support Community, Inc.

Exhibit E

Outlook

**Re: Use of fabricated legal authority in MPH filings and Associated FRCP, Rule 11 Violations / Support Community, Inc. v. MPH International LLC**

**From** Jack Russo <jrusso@computerlaw.com>
**Date** Sun 8/10/2025 7:23 PM
**To** Gary Sedlik <gary@sedlikgroup.com>
**Cc** Linyan Tian <ltian@computerlaw.com>

📎 1 attachment (127 KB)
20250808 Support Community Ltr re Fabricated Citations in MPH Brief.pdf;

Dear Gary:

I am writing on Sunday night; I acknowledge receipt of your letter dated August 8, 2025 on Friday night after my office closed for the day, regarding citation issues you identified in the opening brief of MPH's Motion for Summary Judgment.  You may recall my health suffered significantly due to COVID during this time and I acknowledge my responsibility as set forth in the attached.

After reviewing your concerns, we are (if the Court permits it) withdrawing the Motion for Summary Judgment; it is clear that certain tasks that were delegated by me did not properly get done on this brief. It is literally the first time in my 45+ years of practice.

 We are proposing a demonstration of real cooperation by filing a stipulation with the Court on Monday requesting withdrawal of the motion and vacation of the scheduled hearing which has now been moved to next month (and consolidated with your pending MTD.)  Nothing would impact that or otherwise would change the CMC Order.

However, we believe adding work on fees/costs would be the opposite of what Judge White would expect and in all events any issues regarding entitlement to attorney's fees and costs should be reserved for determination at the conclusion of this case and in accordance with applicable law and procedure.  Adding further work to the Court's docket is not helpful.  That said, send me your time records and paid invoices on your work on the opposition and I will let you know if it can be covered by me out of my pocket.  In all events, the attached stipulation I am proposing preserves your rights with respect to attorney's fees and costs for future determination by the Court.


 We trust this approach substantially meets and addresses your immediate concerns regarding the pending motion while preserving the parties' respective rights on all other matters.  I will add that if we cannot agree on a reasonable number then to assure you of my good faith here I will personally cover the fees spent on your opposition if MPH does not otherwise prevail and/or otherwise cannot pay the reasonable fees on this particular aspect of the case.  The final accounting will presumably address everything.

For the record, in my 45+ years I have never been sanctioned and then again I have never been as ill as I was as I explained to you when we deferred your client's deposition.  Let me know if you can agree and if not then whether a Zoom call can happen at 10am pst or  as early as possible as we will otherwise file an administrative motion under Local Rule 7-11.

Best Regards,

Jack Russo**
Managing Partner
Computerlaw Group LLP
Jrusso@computerlaw.com
www.computerlaw.com
https://www.linkedin.com/in/jackrusso
"Entrepreneurs Imagine Better Worlds!"®
Via Siri to expedite (~99% accurate?)

Draft

STIPULATION FOR WITHDRAWAL OF MOTION FOR SUMMARY JUDGMENT
TO THE HONORABLE JEFFREY S. WHITE:

WHEREAS, MPH filed a Motion for Summary Judgment (ECF No. [X]);

WHEREAS, the parties have conferred regarding certain procedural and citation issues that have arisen in connection with the motion briefing;

WHEREAS, lead counsel takes responsibility for errors which occurred with the MPH Opening Brief (see Exhibit "A") and confirms that he owns this set of issues and his only stated explanation is he was out sick with COVID during this time and certain tasks were not accomplished under his sole supervision;

WHEREAS, various citation defects in the opening brief warrant withdrawal of the motion to ensure compliance with applicable federal and local court rules;

WHEREAS, the parties agree that withdrawal of the motion would promote judicial efficiency and allow for proper case development; and

WHEREAS, the parties desire to resolve this matter amicably and cooperatively through stipulation rather than continued motion practice;

NOW, THEREFORE, IT IS HEREBY STIPULATED AND AGREED BY AND BETWEEN THE UNDERSIGNED COUNSEL FOR THE PARTIES:

1. WITHDRAWAL OF MOTION:  MPH hereby withdraws its Motion for Summary Judgment filed on [DATE] (ECF No. [X]), and respectfully requests the Court remove the hearing currently scheduled for [DATE] at [TIME] from the Court's calendar. Motions - California United States District Court Northern District CA ND

2. BASIS FOR WITHDRAWAL: This withdrawal is made to address certain citation and procedural issues identified in the opening brief during the course of motion practice. The withdrawal is made in the interests of judicial efficiency and proper compliance with court

rules and procedures.

3. Good Faith: Other than as set forth above, this stipulation is entered into solely for purposes of judicial economy and case management efficiency. The withdrawal does not constitute an admission by of any intentional wrongdoing, deficiency, or lack of merit regarding its underlying claims, defenses, or legal positions in this litigation.

4. ATTORNEY'S FEES AND COSTS: Plaintiff expressly reserves all rights with respect to any determination of attorney's fees and costs. Any issues regarding entitlement to, reasonableness of, or amount of attorney's fees and costs incurred in connection with this motion or otherwise in this litigation are hereby reserved for future determination, if appropriate, at the conclusion of this case or at such other time as may be determined by the Court. Nothing in this stipulation shall constitute a waiver of any party's rights under Federal Rule of Civil Procedure or other applicable law.

5. Rule 41 Notice: This withdrawal is made without prejudice to MPH's right to file an amended or corrected motion for summary judgment, subject to compliance with applicable case management deadlines and local rules.

6. CASE SCHEDULE: The parties agree that this withdrawal does not affect any other deadlines, discovery cutoffs, or scheduling orders in this case and the other motion.

7. COMPLIANCE WITH LOCAL RULES: This stipulation is made in compliance with Civil Local Rule 7-11 of the Northern District of California, which permits withdrawal by administrative motion if the Court agrees.

SO STIPULATED.
DATED: _____         [FIRM NAME]


On Aug 8, 2025, at 9:15 PM, Gary Sedlik <gary@sedlikgroup.com> wrote:


Dear Mr. Russo:

I was hoping to be able to talk with you today to give you a heads up about the subject matter of the attached letter but unfortunately we were not able to connect.

Attached is the letter to which I referred relating to fabricated cases and fabricated case citations in MPH's recently-filed Motion for Summary Judgment. The letter requests that you and MPH take immediate action so I would ask that you review it promptly and reach out to me if you would like to discuss.

Thank you.

Best Regards,

Gary Sedlik I Managing Partner I SedlikGroup, P.C. I T: 310-439-9986 I E: gary@sedlikgroup.com

Exhibit F

1   Jack Russo (Cal. Bar No. 96068)
    COMPUTERLAW GROUP LLP
2   401 Florence Street
    Palo Alto, CA 94301
3   (650) 327-9800 (office)
    jrusso@computerlaw.com
4
    Attorneys for Defendant
5   and Counterclaimant
    MPH International LLC
6

7                    UNITED STATES DISTRICT COURT

8                   NORTHERN DISTRICT OF CALIFORNIA

9                          OAKLAND DIVISION

10

11  **SUPPORT COMMUNITY, INC.**, a          Case No. 23-CIV-04911-JSW
    Delaware Corporation,
12                                          **CORRECTED NOTICE OF MOTION
                      Plaintiff;            AND MOTION FOR EVIDENTIARY
13                                          SANCTIONS AND FOR SUMMARY
          v.                                JUDGMENT UNDER FRCP FEDERAL
14                                          RULE 56 [CORRECTION OF DOCKET
    **MPH INTERNATIONAL LLC,** a Nevada     #62]**
15  Limited Liability Company, DOES 1 through
    25, inclusive,                          Date:       August 22, 2025
16                                          Time:       9:00 AM
                      Defendant;            Courtroom:  5
17                                          Before the Hon. Jeffrey S. White
    _____
18  **MPH INTERNATIONAL LLC,** a Nevada     Trial Date:  None Set
    Limited Liability Company,
19
                      Counterclaimant,
20
21        v.

22  **SUPPORT COMMUNITY, INC.**, a
    Delaware Corporation,  inclusive,
23
                      Counter-Defendant.
24

25

26

27

28

Computerlaw Group LLP
www.computerlaw.com℠

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Computerlaw Group LLP
www.computerlaw.com℠

## TABLE OF CONTENTS

**INTRODUCTION** ........................................................................................ 2

**PROCEDURAL HISTORY** ......................................................................... 4

**FACTUAL BACKGROUND** ....................................................................... 4

   **A. FORMATION OF CONTRACTUAL RELATIONSHIP (2016)** ............................... 4
   **B. MPH'S SUBSTANTIAL CONCESSIONS (2017-2022)** ......................... 4
   **C. TERMINATION AND LAWSUIT (2022-2023)** ........................................5

**UNDISPUTED MATERIAL FACTS** ........................................................ 6

**LEGAL STANDARD** ................................................................................. 7

**ARGUMENT** ............................................................................................... 8

   **I.  THE FRAUD CLAIM IS TIME-BARRED AS A MATTER OF LAW** ......... 8

     A. California's Three-Year Statute Bars SCI's Fraud Claim ........................8

     B. The Agreement's Six-Month Contractual Limitations Period Independently Bars the SCI "Fraud" Claim As a Matter of Law ……………………...………10

     C. The Agreement's 30-Day Acceptance Period Provides, As a Matter of Law, a Further and Third Independent bar to SCI's Fraud Claim; SCI Delivered No Objections Here ……………………………………………………...………11

     D. The Delayed Discovery Rule Cannot Salvage the Fraud Claim …………...…12

     E. SCI Cannot Rely on "Continuous Accrual" to Salvage Its Claims Either...…14

     F. Conclusion: SCI's Fraud Claim is Barred, As a Matter of Law, Under Three Independent Limitations Periods; SCI Cannot Avoid the Fact of Its Long Delay……………………………………………………...………………15

   **II.  THE BREACH OF CONTRACT CLAIMS ARE ALSO TIME-BARRED** . ……………………………………………………………15

     A. SCI's Breach of Written Contract Claims Are Barred, As a Matter of Law, by California's Four-Year Statute of Limitations…………………………………15

     B. Alleged Breaches During the Limitations Period Are Independently Barred by the 30-Day Acceptance Provision As a Matter of Law; No Rejections/No Revocations Occurred……………………………………………………17

C.  Additionally, as a Matter of Law, the Six-Month Contractual Limitations Period Further Bars All Breach of Contract Claims Because No Claim Was Timely Made……………………………………………………….……..17

D.  The Breach of Oral "Agreement II" Claims Are Also Barred by Limitations……………………………………………………………..18

E.  Undisputed Evidence Confirms SCI Had Knowledge of Any Alleged Oral Agreement Breach Long Before the Limitations Period and Never Objected At All and Did Not File……………………………………...……………19

F.  The Contractual Six-Month Period is Also a Contractual Time Bar…...……20

G.  The Statute of Frauds Bars Any Alleged Oral Agreement; None Can Exist Here…………………………………...………….……………………………20

H.  SCI's Own Communications Confirm Only One Written Agreement Here...21

**III. THE AGREEMENT'S NOTICE PROVISION PROVIDES A FURTHER INDEPENDENT BAR** ................................................... 21

**IV.    SCI'S TORT CLAIMS MERELY RESTATE CONTRACT-BASED GRIEVANCES AND ARE BARRED AS A MATTER OF LAW AS WELL** .................................................................23

**CONCLUSION**................................................................24

Computerlaw Group LLP
www.computerlaw.com℠

**TABLE OF AUTHORITIES**

**Cases**

Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986) .................................................................. 7

Angeles Chem. Co. v. Spencer & Jones, 44 Cal. App. 4th 112 (1996) ...................................... 19

April Enterprises, Inc. v. KTTV, 147 Cal. App. 3d 805 (1983) .................................................. 16

Artificial Intelligence Corp. v. Casey, 1 Cal. App. 4th 22 (1991) ......................................... 12, 17

Aryeh v. Canon Bus. Sols., Inc., 55 Cal. 4th 1185 (2013) ......................................................... 14

Brobeck, Phleger & Harrison v. Telex Corp., 602 F.2d 866 (9th Cir. 1979) ............................. 22

Celotex Corp. v. Catrett, 477 U.S. 317 (1986) ............................................................................ 7

Charnay v. Cobert, 145 Cal. App. 4th 170 (2006) ...................................................................... 10

Cole v. CRST Expedited, 289 F.3d 840 (6th Cir. 2002) ............................................................... 8

Cornwell v. Bank of Am. Nat'l Tr. & Sav. Ass'n, 224 Cal. App. 3d 995 (1990) ........................ 22

Creditors Collection Serv. of Sacramento v. Castegnaro,

      17 F. Supp. 2d 1079 (N.D. Cal. 1998)…………………………………………………….. 19

Danjaq LLC v. Sony Corp., 263 F.3d 942 (9th Cir. 2001) .......................................................... 14

Dillon v. Bd. of Pension Comm'rs, 18 Cal. 2d 427 (1941) ......................................................... 17

Ellis v. U.S. Sec. Assocs., 224 Cal. App. 4th 1213 (2014) ......................................................... 10

FNB Mortgage Corp. v. Pacific General Group, 76 Cal. App. 4th 1116 (1999) ........................ 17

Fox v. Ethicon Endo-Surgery, Inc., 35 Cal. 4th 797 (2005) .................................................... 9, 12

Grisham v. Philip Morris U.S.A., Inc., 40 Cal. 4th 623 (2007) .................................................. 13

Hambrecht & Quist Venture Partners v. Am. Med. Int'l, Inc., 38 F.3d 1118 (9th Cir. 1994) ..... 18

Han v. Mobil Oil Corp., 73 F.3d 872 (9th Cir. 1995) ............................................................ 10, 20

Intel Corp. v. VIA Techs., Inc., 319 F.3d 1357 (Fed. Cir. 2003) ............................................... 11

Jolly v. Eli Lilly & Co., 44 Cal. 3d 1103 (1988) ........................................................................ 10

Computerlaw Group LLP
www.computerlaw.com℠

Lewis v. YouTube, LLC, 197 Cal. App. 4th 1387 (2011) .......................................................... 18

Lowy Dev. Corp. v. Superior Court, 190 Cal. App. 3d 317 (1987) ............................................ 12

Magic Carpet Ride LLC v. Rugger Inv. Grp. L.L.C., 41 Cal. App. 5th 357 (2019) ................... 22

Masterson v. Sine, 68 Cal. 2d 222 (1968) ................................................................................. 21

Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574 (1986) ..................................... 7

Menominee Indian Tribe of Wis. v. United States, 614 F.3d 519 (9th Cir. 2010) ...................... 16

Miller v. Bechtel Corp., 33 Cal. 3d 868 (1983) ......................................................................... 13

Moreno v. Sanchez, 106 Cal. App. 4th 1415 (2003) ............................................................. 10, 17

MWS Wire Indus., Inc. v. Cal. Fine Wire Co., 797 F.2d 799 (9th Cir. 1986) ............................ 17

Nevro Corp. v. Bos. Sci. Corp., 312 F. Supp. 3d 726 (N.D. Cal. 2018) ..................................... 21

New England Country Foods, LLC v. VanLaw Food Products, Inc.,

    17 Cal. 5th 703 (2025) ........................................................................................ 3, 11, 23

Oracle America, Inc. v. Hewlett Packard Enterprise Co.,

    971 F. Supp. 2d 975 (N.D. Cal. 2013) .............................................................................. 16

Paracor Fin., Inc. v. Gen. Elec. Capital Corp., 96 F.3d 1151 (9th Cir. 1996).............................. 21

Platt Elec. Supply, Inc. v. EOFF Elec., Inc., 522 F.3d 1049 (9th Cir. 2008) ………..... 8, 9, 14, 19

Robinson Helicopter Co. v. Dana Corp., 34 Cal. 4th 979 (2004) ................................................ 24

Romano v. Rockwell Int'l, Inc., 14 Cal. 4th 479 (1996) ............................................................. 15

Seelenfreund v. Terminix of Northern Cal., Inc., 84 Cal. App. 3d 133 (1978) ........................... 19

Synopsys, Inc. v. ATopTech, Inc., 2015 WL 1197693 (N.D. Cal. 2015) ................................... 16

Tolan v. Cotton, 572 U.S. 650 (2014) ......................................................................................... 7

VP & W, Inc. v. Galardi, 2015 WL 5321245 (E.D. Cal. 2015) ................................................. 12

WA Sw. 2, LLC v. First Am. Title Ins. Co., 240 Cal. App. 4th 148 (2015) ................................. 9

Wind Dancer Prod. Grp. v. Walt Disney Pictures, 10 Cal. App. 5th 56 (2017) ................... 12, 17

Computerlaw Group LLP
www.computerlaw.com℠

Yeti v Molly, 259 F.3d 1101 (9th Cir. 2001) ................................................................. 8

**Statutes and Rules**

Cal. Code Civ. Proc. § 337 ................................................................. 15, 22

Cal. Code Civ. Proc. § 338(d) ................................................................. 8, 10, 15

Cal. Code Civ. Proc. § 339 ................................................................. 18, 19, 22

Cal. UCC § 2-719 ................................................................. 3

Fed. R. Civ. P. 26 ................................................................. 7

Fed. R. Civ. P. 26(a)(1) ................................................................. 7

Fed. R. Civ. P. 37 ................................................................. 1, 7

Fed. R. Civ. P. 37(c)(1) ................................................................. 7

Fed. R. Civ. P. 56 ................................................................. 1, 7

Fed. R. Civ. P. 56(a) ................................................................. 7

**Other Authorities**

Cal. Civ. Code § 1668 ................................................................. 23

West's Ann. Cal. C.C.P. § 339 ................................................................. 18

Computerlaw Group LLP
www.computerlaw.com℠

**TO ALL PARTIES AND THEIR RESPECTIVE ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE** that on August 22, 2025 at 9:00 AM, or as soon thereafter as the matter may be heard, in Courtroom 5 of the above-entitled court, located at 1301 Clay Street, Oakland CA 94612, Defendant MPH International LLC ("MPH") will and hereby does move for summary judgment pursuant to Federal Rule of Civil Procedure Rules 37 and 56 in favor of Defendant and against Plaintiff Support Community, Inc. ("SCI" or "Plaintiff") on all causes of action asserted in Plaintiff's Complaint.

This Motion is made on the grounds that there are no genuine issues of material fact as to these claims, including that they are barred by contractual and statutory statutes of limitations, and Defendants are entitled to judgment as a matter of law.

This Motion is based on this Notice, the accompanying Memorandum of Points and Authorities, the Declarations of Michael Patrick Hogan, Jon Indick, and Jack Russo, as well as all exhibits thereto, the pleadings and papers on file in this action, including this Court's prior rulings affirmed by the Ninth Circuit Court of Appeal (and that are now law of the case), and such evidence or argument as may be presented at the hearing.

Computerlaw Group LLP
www.computerlaw.com℠

Computerlaw Group LLP
www.computerlaw.com℠

# MEMORANDUM OF POINTS AND AUTHORITIES

## INTRODUCTION

The written December 2, 2016 Agreement ("the 2016 Agreement") negotiated, executed and ratified between these two corporate commercial parties expressly forecloses any claim of fraud or misrepresentation and waives any and all consequential or other indirect damages, and also limits any direct damages (none of which are disclosed in the Plaintiff's "Initial Disclosures"). See 2016 Agreement at Paragraphs 5.2 & 5.4. And most importantly, any such claims are barred by statutory and contractual limitations, as outlined below.

After six years of harmonious business under the 2016 Agreement, SCI's claims rest on fabrications—a fictitious "Agreement II"—and a fraud claim alleging a "phantom QA" that was actually a $1,300/month discount for an engineer, saving SCI $55,900 from May 2018 to October 2022. Declaration of Mike Hogan in support of MPH's Motion for Summary Judgment, CEO of MPH at ¶ 6, Ex. N ("Hogan Decl."). The 2016 Agreement controls; it is the only existing contract that the parties operated under for six years. It only granted SCI a license to "Products" and it makes no mention of any license or use of source code and no statement of any rights to modify, adapt or otherwise generate derivative works—rights SCI falsely claims and for which there is not a single item of evidence in any of the procedurally and substantively defective "Initial Disclosures" submitted by Plaintiff. Declaration of Jack Russo in support of MPH's Motion for Summary Judgment ("Russo Decl.") at ¶¶ 3-7.

The reasons why the 2016 Agreement bars Plaintiff's claims are clear.

**First**, the 2016 Agreement is a fully integrated, final agreement containing a merger/no-reliance clause, and its terms have an express 6-month limitations period.  Per Section 7.5:

> This Agreement constitutes the entire understanding between the parties with respect to its subject matter **and supersedes all prior or contemporaneous** communications, proposals, representations, understandings and agreements, **whether oral or written**.

Agreement, § 7.5 (emphasis added).

Thus, any allegedly false representations are either expressly in the writing or directly contradicted by it, and Plaintiff cannot have reasonably relied on any prior or contemporaneous

statements and cannot unilaterally assert that further language should now be added to an Agreement that both parties operated under harmoniously for six years (from 12/2016-11/2022).

**Second**, the 2016 Agreement has an express 30-day acceptance period requiring timely written objections (and none occurred), and it unequivocally disclaims all consequential and indirect damages.  Per Section 1.2:

> Upon delivery of each deliverable by MPH, **Customer shall have 30-days to accept or reject the deliverable and pay the associated fee.** In rejecting any deliverable, Customer shall provide a detailed description of why the deliverable was rejected, such that MPH may resolve the issues detailed, in order to achieve acceptance of the deliverable. **Any deliverable not accepted or rejected within the 30-day period shall be deemed accepted**.

Agreement, § 1.2 (emphasis added).

The contract expressly excludes such rights, and SCI's claims—based a fictional "Agreement II" and mischaracterized concessions—lack admissible evidence. The parties, both sophisticated merchants negotiated that waiver, and it is enforceable under both California statutory law (California UCC §2-719) and under California case law, including the very recently decided California Supreme Court case, *New England Country Foods, LLC v. VanLaw Food Products, Inc.*, 17 Cal. 5th 703 (2025).

Per Section 5.2:

> **MPH's maximum aggregate liability with respect to this Agreement** whether under theory of contract, tort (including negligence), strict liability or otherwise **shall be limited to the aggregate amount of payments made by Customer to MPH during the six-month period prior to the claim.** (emphasis added).

Plaintiff never challenged the above six-month limitations period, nor the 30-day acceptance period nor the express damage limitations and express waivers before suit and does not challenge them in this lawsuit either; nothing in SCI's "Initial Disclosures" provides any evidence to the contrary.  In short, the claims of fraud, oral and written contract breach are barred by the applicable contractual and other statutes of limitations under settled law.

Computerlaw Group LLP
www.computerlaw.com℠

**Third**, for any remaining claims, the 2016 Agreement places clear calculable limits on direct damages and certainly far less than any number in the Initial Disclosures (none of which sets forth any actual detail and without any underlying factual or legal basis). In short, every cause of action here is barred or limited by unambiguous contractual provisions. Summary judgment and/or summary adjudication are therefore warranted—indeed necessary—to protect Defendant (a small business) from costly, baseless litigation.

## PROCEDURAL HISTORY

After some six years of a harmonious business relationship, SCI filed suit on January 12, 2023, breaching the 2016 Agreement's express arbitration clause. Russo Decl. ¶¶ 2, 4–8. MPH removed it to this Court (Dkt. No. 1). This Court's May 2, 2024 order (Dkt. No. 41) conclusively resolved the arbitration issues including the existence of the Agreement and the Ninth Circuit affirmed all rulings. (Dkt. No. 41 at 4-11).

## FACTUAL BACKGROUND

### A. Formation of Contractual Relationship (2016)

On December 2, 2016, CEO Mike Hogan met CEO Patrick Morrison met to discuss an idea about improving the Ronald McDonald House near Stanford University, where Morrison shared his vision for a software application to support the Ronald McDonald House community. By the end of the December 2, 2016 meeting, Morrison and Hogan reviewed and signed the 2016 Agreement at Hogan's home in San Mateo County, California. The Agreement, reviewed during that December 2, 2016 in-person meeting and ratified and confirmed by emails and texts, granted SCI only a license to use the "Products" (executable applications). Hogan Decl. ¶ 2 & Exhibit B, C.

### B. MPH's Substantial Concessions (2017-2022)

Over the next six years, MPH offered substantial concessions throughout the parties' commercial relationship as set forth in the Hogan Decl. ¶¶ 1 to 7:

- **Discounted Fees**: MPH's $280,000 bid was less than a third of a competitor's. (¶1, Ex. A)
- **Management Fee Waiver**: Delayed a $5,000 monthly management fee ($60,000/year), which was deferred and not later billed nor collected. (¶5, Ex. M)

Computerlaw Group LLP
www.computerlaw.com℠

- **Engineer Discount**: When QA Engineer Christopher Rosales became a Software Engineer, MPH continued billing at the lower QA rate, saving SCI $1,300/month ($55,900 total). (¶6, Ex. N)

- **Mobile App Discount**: On April 3, 2019, MPH provided three Software Engineers and a Technical Designer at an 80% discount, saving SCI $425,318 through 2022. (¶6(b), Ex. Q)

- **Convertible Debt**: In March 2020, MPH agreed to defer $4,300 monthly payments, documented as convertible debt toward equity, totaling $137,600 by October 2022. (¶8, Ex. AQ)

- **Unpaid Services**: Both Mike Hogan and Jon Indick worked unpaid at SCI trade shows, covering expenses while MPH designers created marketing materials at no charge. (¶7(a), Ex. O)

## C.  Termination and Lawsuit (2022-2023)

In November 2022, while Hogan was recovering from prostate surgery and mourning family deaths, Morrison poached eight of MPH's nine software engineers. On November 23, 2022, SCI terminated the Agreement. MPH invoiced SCI $75,683 for November 2022 work, which with all the above monies remains entirely unpaid and unaddressed. Hogan Decl. ¶¶ 8-10 & Exhibits X & Y.

On January 12, 2023, over six years after the start of the relationship and over four years after any contract breach could be claimed, Plaintiff SCI sued in the San Mateo Superior Court, alleging "fraudulent" breaches and claiming rights to source code and additional license rights to adapt, modify, and create derivative works—rights never granted by the 2016 Agreement. The lawsuit also alleges an unspecified "Agreement II" but with no underlying evidentiary basis disclosed in either the pleading or in SCI's Rule 26 Initial Disclosures. The lawsuit followed SCI's raiding and misappropriating nearly the entire software team of employees that MPH had assembled, supervised, and managed over the six-year period and which SCI implemented without permission and without notice. Hogan Decl., ¶ 11.

In effect, what played out is this: SCI decided to save money by cutting out MPH by directly hiring nearly the entire MPH team and did so without any advance notice to MPH, without

paying anything for it, and without ever resolving outstanding financial issues that existed with MPH. Hogan Decl., ¶¶ 10-11; Russo Decl. ¶ 7 & Exhibit D-E (questions never answered).

**<u>Undisputed Material Facts Supporting Summary Judgment</u>**

1. MPH and SCI entered into the 2016 Agreement, a written agreement for the delivery of the "Product," which was a set of software deliverables (Hogan Decl., ¶ 4; Exhibit A, § 2.2); the 2016 Agreement includes an express integration clause ratified by and never disputed by SCI. Hogan Decl., ¶ 4 & Exhibit A

2. MPH provided (and Plaintiff SCI never objected to) various versions of the Product in executable form to SCI as stipulated in the Agreement, including work performed by the MPH software developers without controversy about MPH's sole ownership over the six-year period (2016-2022) Hogan Decl. ¶¶ 3-6. Declaration of Jonathan Indick in support of MPH's Motion for Summary Judgment ("Indick Decl."), ¶¶ 3-4

3. SCI received and accepted each of the Product deliverables electronically without objection, utilizing the Product and each delivered version over the 6-year period.  Hogan Decl. ¶ 3; Indick Decl. ¶¶ 2-4.

4. MPH issued final invoices to SCI totaling over $75,000 under the 2016 Agreement which SCI has not paid.  Nor is there anything in SCI's Initial Disclosures which explains the SCI decision to not pay this final invoice. Hogan Decl. ¶ 13 & Exhibit AE.

5. SCI also agreed to defer payment of certain billings amounting to $137,600, to be converted into convertible debt, which remains unpaid.  This too is not contested and nothing in SCI's Initial Disclosures explains how these monies can be ignored. Hogan Decl. ¶ 8, Ex. AQ.

6. SCI benefited from billing errors that resulted in discounts and reduced rates, including three years of discounts on five developers and one designer, and one developer billed as a Quality Engineer, leading to a savings of $1,300 per month.  Hogan Decl., ¶¶ 5-9 & Exhibit N & Q.

7. MPH timely served its Initial Disclosures, identifying individuals likely to have discoverable information, documents supporting its claims, and a computation of damages. Hogan Decl., ¶ 15 & Exhibit AK; Russo Decl., ¶ 3.

Computerlaw Group LLP
www.computerlaw.com℠

8.  SCI failed to provide proper Initial Disclosures as required by Rule 26(a)(1) of the Federal Rules of Civil Procedure, despite multiple requests and ample time to comply. Russo Decl. ¶¶ 4–7. All factual assertions are supported by sworn declarations (Hogan Decl. ¶¶ 5-9; Indick Decl. ¶¶ 3-4) and authenticated business records (Exh. A-AI).

## LEGAL STANDARD

Summary judgment is warranted when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law" Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). The non-moving party must present specific facts showing a genuine issue for trial, not mere allegations or denials. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586-87 (1986). The Court must draw all reasonable inferences in favor of the non-moving party (*Tolan v. Cotton*, 572 U.S. 650, 657 (2014)), but unsupported speculation or conclusory allegations are insufficient to create a genuine issue of material fact. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252 (1986).

In addition, summary judgment is warranted where the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to its case." *Celotex,* 477 U.S. at 323.. SCI bears the burden to identify triable issues (*Anderson*, 477 U.S. at 250) yet its But SCI's Initial Disclosures' lack evidence supporting its claims.

Federal Rule 37(c)(1) establishes an automatic sanction for disclosure violations absent a specific court finding of "substantial justification" or "harmlessness." The burden rests entirely on the non-compliant party (here SCI) to demonstrate either exception. The lack of justification for the delay—absent evidence of technical difficulties, unforeseen circumstances, or good-faith oversight—further undermines any claim of "substantial justification." None of this can be so, given SCI's repeated assertions of wanting to move the case forward promptly and representations that they have been delayed. Russo Decl., ¶¶ 4-5

Given the automatic nature of Rule 37(c)(1) sanctions and the absence of harm-mitigating factors, all evidence and arguments reliant on undisclosed information must be precluded from consideration in this motion for summary judgment. This includes any witnesses, documents, or damages calculations not identified in SCI's Initial Disclosures. How can it be otherwise when SCI

Computerlaw Group LLP
www.computerlaw.com℠

claims justification for filing suit instead of timely going to arbitration?  Courts have consistently enforced Rule 26 enforcement through Rule 37 remedies to uphold the integrity of disclosure obligations and prevent unfair tactical advantages.  In this case, SCI decided to obtain an unfair tactical advantage by first getting MPH's Initial Disclosures, by ignoring multiple notices to timely provide SCI's Initial Disclosures, and then by providing a collection of boilerplate text with no actual disclosure of evidence.  Russo Decl., ¶¶ 5-6 & Exhibit B-C and Hogan Decl. ¶ 15 & Exhibits AK - AL.  Rule 37(c)(1) "gives teeth" to disclosure obligations by mandating preclusion absent justification. *Yeti v Molly*, 259 F.3d 1101, 1106 (9th Cir. 2001). ████████████████████████ ████████████████████████████████████████████████████████████████████ ██████████████████████  SCI's Initial Disclosure failed to disclose its damages theories or calculations.

## **ARGUMENT**

### I.   **THE FRAUD CLAIM IS TIME-BARRED AS A MATTER OF LAW.**

#### **A. California's Three-Year Statute Bars SCI's Fraud Claim.**

SCI's fraud claim is barred by California's three-year statute of limitations for fraud actions. California Code of Civil Procedure § 338(d) establishes a three-year limitations period for "[a]n action for relief on the ground of fraud or mistake," which "is not deemed to have accrued until the discovery, by the aggrieved party, of the facts constituting the fraud or mistake." This discovery rule does not indefinitely extend the limitations period but merely delays accrual until the plaintiff has actual or constructive knowledge of the facts giving rise to the claim. *Platt Elec. Supply, Inc. v. EOFF Elec., Inc.*, 522 F.3d 1049, 1054 (9th Cir. 2008).

The undisputed evidence demonstrates that SCI had actual or constructive knowledge of the alleged "fraudulent" billing practices by December 2019 at the latest, more than three years before filing suit on January 12, 2023. SCI's allegations center on purportedly "fraudulent" invoices and misrepresentation of employee salaries (Hogan Decl. ¶ 11c, Ex. AA). However, SCI had complete access to and regular communication with MPH's Philippine engineering team throughout the parties' relationship (Hogan Decl. ¶ 11c, Ex. Q). These communications provided SCI with information about the team's composition, work allocation, and overall operations.

Computerlaw Group LLP
www.computerlaw.com℠

The Ninth Circuit has recognized that when a plaintiff has "reason to suspect" the factual basis of a claim, the limitations period begins to run. *Platt Elec. Supply*, 522 F.3d at 1054. Even assuming the allegations were true (and they are not), SCI cannot credibly claim it lacked knowledge because it:

1. Directly interacted with MPH's engineering team on a regular basis (Hogan Decl. ¶ 11c, Ex. Q);

2. Approved and paid invoices for six years without objection (Hogan Decl. ¶ 3, Ex. E);

3. Had information about team composition/work allocations (Hogan Decl. ¶ 11c, Ex. Q);

4. Maintained oversight of development progress/deliverables (Hogan Decl. ¶ 3, Ex. E);

5. By December 2019, had received and approved over three years of invoices, establishing a pattern that SCI should have questioned if it believed "fraud" was occurring (Hogan Decl. ¶¶ 3, 6, 11c; Ex. E, N, Q).

In *WA Sw. 2, LLC v. First Am. Title Ins. Co.*, 240 Cal. App. 4th 148, 157 (2015), the California Court of Appeal held that "a plaintiff whose complaint shows on its face that his claim would be barred without the benefit of the discovery rule must specifically plead facts showing (1) the time and manner of discovery and (2) the inability to have made earlier discovery despite reasonable diligence." SCI has failed to plead such facts, and indeed, cannot prove them given the extensive interaction it had with MPH's team.

SCI's claims about "Phantom QA" and "UX Designer" positions (which actually reflected discounted rates, see Hogan Decl. ¶¶ 6, 9; Ex. N, Q) could and should have been discovered through reasonable diligence long before January 12, 2020 (three years before filing suit). By December 2019, SCI had received and reviewed dozens of invoices containing the allegedly "fraudulent" information, yet continued to approve and pay them without objection (Hogan Decl. ¶¶ 3, 6, 11c; Ex. E, N, Q). As the California Supreme Court recognized in *Fox v. Ethicon Endo-Surgery, Inc.*, 35 Cal. 4th 797, 808 (2005), the discovery rule "only delays accrual until the plaintiff has, or should have, inquiry notice of the cause of action."

Applying California law, the Ninth Circuit has further clarified that "[i]t is the discovery of facts, not their legal significance, that starts the statute of limitations." *Platt Elec. Supply*, 522

Computerlaw Group LLP
www.computerlaw.com℠

1   F.3d at 1054 (quoting *Jolly v. Eli Lilly & Co.*, 44 Cal. 3d 1103, 1113 (1988)). Even accepting SCI's

2   allegations as true, SCI had all the necessary facts to discover the alleged "fraud" before 2020,

3   triggering the 3-year limitations period. Because SCI did not file until January 12, 2023, more than

4   3 years later, its fraud claim is time-barred. CCP § 338(d).

5   **B. The Agreement's Six-Month Contractual Limitations Period Independently Bars  the SCI "Fraud" Claim As a Matter of Law.**

6

7   Beyond the statutory limitations period, SCI's fraud claim is independently barred by the

8   six-month contractual limitations period in Section 5.2 of the Agreement. (Hogan Decl. ¶ 2; Ex.

9   A, § 5.2).

10   California courts consistently uphold contractual limitations provisions that shorten

11   statutory periods when reasonable. *Ellis v. U.S. Sec. Assocs.*, 224 Cal. App. 4th 1213, 1223 (2014)

12   (enforcing six-month limitations period); *Moreno v. Sanchez*, 106 Cal. App. 4th 1415, 1430 (2003)

13   (recognizing validity of contractual limitations periods). Six-month limitations periods have been

14   repeatedly upheld as reasonable in California. *See, e.g., Charnay v. Cobert*, 145 Cal. App. 4th 170,

15   183 (2006); *Han v. Mobil Oil Corp.*, 73 F.3d 872, 877 (9th Cir. 1995) (applying California law).

16   SCI's fraud claim unquestionably is within the scope of "**whether under theory of contract, tort**

17   **(including negligence), strict liability or otherwise**" as it directly challenges the propriety of

18   MPH's billing practices under the Agreement (Hogan Decl. ¶ 11c; Ex. A, § 5.2; Ex. AA). Even

19   applying the discovery rule to the contractual limitations period, as California courts sometimes

20   do (see *Moreno*, 106 Cal. App. 4th at 1430), SCI's claim is still barred. SCI alleges fraudulent

21   billing practices for services rendered throughout the parties' six-year relationship. Yet SCI waited

22   until January 12, 2023 to file suit—well beyond six months from when SCI knew or should have

23   known of any alleged "fraud."

24   The Ninth Circuit, when applying California law, has upheld contractual limitations periods

25   even for fraud claims. In *Han*, the court concluded that "California generally permits contracting

26   parties to agree upon a shorter limitations period for bringing an action than that prescribed by

27   statute, so long as the time allowed is reasonable." 73 F.3d at 877. There, as here, the six-month

28

Computerlaw Group LLP
www.computerlaw.com℠

Computerlaw Group LLP
www.computerlaw.com℠

period was deemed reasonable.  See also *New England Country Foods, LLC v. VanLaw Food Products, Inc.*, 2025 WL 1190980 (Cal., 2025).

The Agreement's six-month limitations provision (especially when read in connection with the arbitration clause for monetary claims) is particularly reasonable given the nature of software development services, where prompt attention to billing issues is essential for accurate recordkeeping and fair resolution of disputes. The contractual period gave SCI ample time to discover and assert any claims of "fraudulent" billing or other billing issues. SCI's failure to raise its claims within the contractually stipulated period bars those claims under California law.

**C. The Agreement's 30-Day Acceptance Period Provides, As a Matter of Law, a Further and Third Independent Bar to SCI's Fraud Claim; SCI Delivered No Objections Here.**

In addition to the statutory and contractual limitations periods, SCI's fraud claim is further barred by Section 1.2 of the Agreement, which establishes a 30-day period for objecting to deliverables. Section 1.2 states:

> **Each Deliverable shall be deemed to be accepted** by Customer if Customer does not, within thirty (30) days of delivery, **give written notice to MPH specifically identifying any issue** with the Services as not meeting the requirements of this Agreement. **If no such notice is received, Customer shall be deemed to have accepted the Deliverable.**

(Hogan Decl. ¶ 2, Ex. A, § 1.2) (emphasis added).

California courts have consistently held that contractual provisions creating deemed acceptance after a specified period are enforceable. *See Wind Dancer Prod. Grp. v. Walt Disney Pictures*, 10 Cal. App. 5th 56, 73 (2017) (upholding contractual accounting objection period); *Artificial Intelligence Corp. v. Casey*, 1 Cal. App. 4th 22, 28 (1991) (enforcing deemed acceptance provision). The Ninth Circuit has likewise enforced similar provisions under California law. *See Intel Corp. v. VIA Techs., Inc.*, 319 F.3d 1357, 1365 (Fed. Cir. 2003) (applying California law and enforcing 30-day provision).

Each of MPH's invoices was intrinsically linked to a corresponding deliverable and represented billing for services performed to create that deliverable (Hogan Decl. ¶ 3, Ex. E). SCI's "fraud" claim challenges the propriety of these invoices, alleging fraudulent billing practices

(Hogan Decl. ¶ 11c, Ex. AA). However, SCI failed to object to any Deliverable within the required 30-day period and instead accepted all Deliverables over the course of six years (Hogan Decl. ¶ 3, Ex. E).  Indeed, SCI publicly praised the technical work of MPH. Id.

Under California law, this acceptance precludes SCI from now claiming fraud in the underlying billing. In *Lowy Dev. Corp. v. Superior Court*, 190 Cal. App. 3d 317, 324 (1987), the court held that "a party who has previously waived objections to a document or transaction may not thereafter challenge that same document or transaction on grounds of fraud." ██████████

████████████████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████

SCI's failure to object to any deliverable within the 30-day period constitutes acceptance under Section 1.2, which precludes SCI from now claiming fraud in the related billing. This 30-day acceptance period provides a third, independent basis for barring SCI's fraud claim.

**D. The Delayed Discovery Rule Cannot Salvage the Fraud Claim.**

SCI may attempt to invoke California's delayed discovery rule to salvage its time-barred fraud claim. However, this attempt would fail because SCI cannot establish the elements necessary for delayed accrual.

Under California law, a plaintiff seeking to rely on the delayed discovery rule must specifically plead and prove: "(1) the time and manner of discovery and (2) the inability to have made earlier discovery despite reasonable diligence." *Fox*, 35 Cal. 4th at 808. The plaintiff bears the burden of showing diligence, and "[c]onclusory allegations will not withstand demurrer." Id. SCI cannot show the "inability to have made earlier discovery despite reasonable diligence" given the undisputed facts:

Computerlaw Group LLP
www.computerlaw.com℠

1. SCI had direct and regular communication with MPH's engineering team throughout the relationship (Hogan Decl. ¶ 11c, Ex. Q);

2. SCI regularly reviewed and approved invoices containing the allegedly fraudulent billing (Hogan Decl. ¶¶ 3, 6; Ex. E, N);

3. SCI was in a position to verify team composition and work allocation through its direct contacts with the team (Hogan Decl. ¶ 11c; Ex. Q);

4. SCI possessed all necessary information to discover the alleged fraud had it exercised reasonable diligence (Hogan Decl. ¶¶ 3, 6, 11c; Ex. E, N, Q);

5. SCI has provided no explanation for its failure to discover the alleged fraud earlier despite having all necessary information (Hogan Decl. ¶ 11c; Ex. AA, AL, Pages 204–209). Nothing in the Initial Disclosures sets forth any basis for delayed discovery.

In *Platt Elec. Supply*, the Ninth Circuit emphasized that under California law, "a plaintiff is held to her actual and constructive knowledge." 522 F.3d at 1054. The court explained that constructive knowledge includes "information that would make a reasonably prudent person suspicious." *Id.* Given SCI's direct access to MPH's engineering team and review of invoices, SCI either knew of the alleged fraud (triggering the limitations period) or failed to exercise reasonable diligence (precluding reliance on the delayed discovery rule).

California courts have consistently held that when a plaintiff has the means to discover fraud through reasonable diligence, the delayed discovery rule does not apply. In *Miller v. Bechtel Corp.*, 33 Cal. 3d 868, 875 (1983), the California Supreme Court held that "plaintiff is charged with knowledge of facts which would have been disclosed by an investigation if plaintiff had a duty to investigate." SCI had such a duty given its ongoing business relationship with MPH and regular review of invoices and deliverables.

The claim that SCI somehow discovered the alleged fraud only shortly before filing suit in January 2023 is contradicted by its 6 years-long direct engagement with MPH's engineering team and approval of invoices. Under California law, this is insufficient to trigger the delayed discovery rule. *See Grisham v. Philip Morris U.S.A.*, Inc., 40 Cal. 4th 623, 638 (2007) (plaintiff must show "inability to have made earlier discovery despite reasonable diligence").

Computerlaw Group LLP
www.computerlaw.com℠

**E. SCI Cannot Rely on "Continuous Accrual" to Salvage Its Claims Either.**

SCI may alternatively attempt to invoke the theory of continuous accrual to salvage portions of its fraud claim. This theory, however, does not apply to SCI's fraud claim because there can be no "continuous accrual" in this case given the express 30-day and 6-month periods which require written objections (and then negotiation/arbitration for timely resolution).

No written objections occurred here. California's continuous accrual theory provides that "when there are ongoing contractual obligations, a plaintiff may allege a series of breaches over time." *Aryeh v. Canon Bus. Sols., Inc.*, 55 Cal. 4th 1185, 1199 (2013). While this theory might apply to contract claims in some circumstances, it is inapplicable to fraud claims, which accrue when the plaintiff discovers or should have discovered the fraud. *Platt Elec. Supply*, 522 F.3d at 1054. Even if a continuous accrual theory could apply to fraud claims, it would not help SCI because:

1. The alleged fraud is based on a unified scheme of purportedly fraudulent billing practices (Hogan Decl. ¶ 11c, Ex. AA;), not discrete, independent fraudulent acts;

2. SCI had knowledge or reason to know of the allegedly fraudulent practices by December 2019 at the latest (Hogan Decl. ¶ 11c, Ex. Q);

3. The Agreement's six-month contractual limitations period (§ 5.2) and 30-day acceptance provision (§ 1.2) independently bar application of continuous accrual (Hogan Decl. ¶ 2, Ex. A).

In *Aryeh*, the California Supreme Court clarified that continuous accrual applies "when an obligation or liability arises on a recurring basis," creating "a series of wrongs" where "a cause of action accrues each time." 55 Cal. 4th at 1199. However, the court also emphasized that this theory is subject to "the parties' ability to alter the limitations period by contract." Id. at 1196. Here, the Agreement expressly shortens the limitations period to six months (§ 5.2) and establishes a 30-day acceptance period (§ 1.2), both of which override any application of continuous accrual.

Moreover, the Ninth Circuit, applying California law, has recognized that continuous accrual does not apply when the plaintiff has knowledge of the alleged wrongdoing. In *Danjaq LLC v. Sony Corp.*, 263 F.3d 942, 954 (9th Cir. 2001), the court held that the continuing wrong doctrine "extends the statute of limitations in cases alleging tortious behavior that began before the

Computerlaw Group LLP
www.computerlaw.com℠

limitations period, but continued into the limitations period." It does not, however, extend the limitations period once the plaintiff is aware of the alleged wrongdoing.

Given SCI's knowledge of MPH's billing practices by December 2019 at the latest, the continuous accrual theory cannot revive SCI's time-barred fraud claim.

**F. Conclusion: SCI's Fraud Claim Is Barred, As a Matter of Law, Under Three Independent Limitations Periods; SCI Cannot Avoid The Fact of Its Long Delay**

In sum, SCI's fraud claim is time-barred under three independent limitations periods:

1. California's three-year statute of limitations for fraud (Cal. Code Civ. Proc. § 338(d)), which expired in December 2022 at the latest, before SCI filed suit on January 12, 2023;

2. The Agreement's six-month contractual limitations period (§ 5.2), which required SCI to file any claim within six months of discovery;

3. The Agreement's 30-day acceptance provision (§ 1.2), which established deemed acceptance of all deliverables and associated invoices.

Each of these periods independently bars SCI's fraud claim. Neither the delayed discovery rule nor the continuous accrual theory can salvage SCI's untimely claim given SCI's direct access to MPH's engineering team and years of review and approval of the allegedly fraudulent invoices. Summary judgment on SCI's fraud claim is therefore warranted based on these limitations periods alone, in addition to the substantive defects noted elsewhere in this motion.

## II.     THE BREACH OF CONTRACT CLAIMS ARE ALSO TIME-BARRED.

**A. SCI's Breach of Written Contract Claims Are Barred, As a Matter of Law, by California's Four-Year Statute of Limitations.**

SCI's claims for breach of the written Agreement are barred by California Code of Civil Procedure § 337, which establishes a four-year limitations period for "[a]n action upon any contract, obligation or liability founded upon an instrument in writing." This four-year period applies to SCI's claims regarding 2016 Agreement, barring any breach claims that accrued before January 12, 2019 (four years before SCI filed suit on January 12, 2023).

California law establishes that a cause of action for breach of contract accrues at the time of breach. *Romano v. Rockwell Int'l, Inc.*, 14 Cal. 4th 479, 488 (1996). Unlike fraud claims, the

*Computerlaw Group LLP*
www.computerlaw.com™

discovery rule generally does not apply to breach of contract actions. *See April Enterprises, Inc. v. KTTV*, 147 Cal. App. 3d 805, 832 (1983)

SCI's complaint generally alleges numerous breaches of the written 2016 Agreement dating back to 2016 (Hogan Decl. ¶ 11b; Ex. AA, Pages 2, 9, 21-23). These include claims that:

1.  MPH failed to provide adequate services under the Agreement starting in 2016;

2.  MPH improperly billed for phantom team members throughout the relationship;

3.  MPH misrepresented development resources from the inception of the Agreement;

4.  MPH failed to properly maintain software from the beginning of the relationship.

These alleged breaches, if they occurred at all (which MPH firmly denies), accrued at the time of the purported misconduct, which SCI claims began in 2016 and continued throughout the relationship. As the Ninth Circuit has recognized when applying California law, "a cause of action accrues when the breach occurs, irrespective of whether any damage is apparent or whether the injured party is aware of his right to sue." *Menominee Indian Tribe of Wis. v. United States*, 614 F.3d 519, 529 (9th Cir. 2010).

Under this standard, all of SCI's breach of written contract claims that accrued prior to January 12, 2019, including all alleged breaches from 2016 through January 11, 2019, are time-barred under California Code of Civil Procedure § 337. This encompasses the majority of the alleged breaches in SCI's complaint, as most relate to conduct beginning in 2016.

The Northern District has consistently enforced this four-year limitation in software and technology contract disputes. ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

SCI cannot avoid this limitations period by characterizing its claims as a "continuing breach." ██████████████████████████████████████████████████████████████████████████████████████████████████████████████████

**B. Alleged Breaches During the Limitations Period Are Independently Barred by the 30-Day Acceptance Provision As a Matter of Law; No Rejections/No Revocations Occurred.**

Even for alleged breaches occurring within the four-year statutory period (after January 12, 2019), SCI's claims are independently barred by the Agreement's 1.2 acceptance provision. The undisputed evidence shows that SCI accepted all Deliverables without objection throughout the entire relationship, including during the limitations period (Hogan Decl. ¶ 3, Ex. E). Under California law, this acceptance constitutes a waiver of breach claims related to those Deliverables. *See Wind Dancer Prod. Grp.*, 10 Cal. App. 5th at 73 (contractual acceptance provisions are enforceable); *Artificial Intelligence Corp.*, 1 Cal. App. 4th at 28 (same).

The Ninth Circuit has held that under California law, a party's acceptance without objection, as specified in a contract, precludes subsequent breach claims. *MWS Wire Indus., Inc. v. Cal. Fine Wire Co.*, 797 F.2d 799, 802-03 (9th Cir. 1986). Here, SCI's failure to object to deliverables within the contractually specified 30-day period constitutes acceptance and a waiver of breach claims, even for deliverables within the statutory limitations period.

**C. Additionally, as a Matter of Law, the Six-Month Contractual Limitations Period Further Bars All Breach of Contract Claims Because No Claim Was Timely Made.**

Beyond the statutory limitations period and the Agreement's acceptance provision, SCI's breach of written contract claims are further barred by the Agreement's six-month contractual limitations period. Agreement, Section 5.2. Nothing was timely filed.

In sum, California law clearly permits contracting parties—and especially merchants— to agree to a shorter limitations period than that prescribed by statute, so long as the time provided is reasonable. *Moreno v. Sanchez*, 106 Cal. App. 4th at 1430. The Ninth Circuit, applying California law, has consistently upheld contractual limitations periods of six months or less. In *Han v. Mobil Oil Corp.*, 73 F.3d at 877, the court upheld a six-month limitation as "reasonable,"

Computerlaw Group LLP
www.computerlaw.com℠

**[redacted]**

**[redacted]**

The six-month contractual period is particularly reasonable in the software context, where prompt resolution of issues is essential to maintain project momentum and accurate recordkeeping.

**[redacted]**

**[redacted]**

**[redacted]**

Under the Agreement's six-month provision, SCI's breach of written contract claims are time-barred because SCI did not file suit within six months of any alleged breach. Can a merchant wait years to claim breach when a contract expressly limits time periods to do so?  SCI filed suit on January 12, 2023 (Hogan Decl. ¶ 11b; Ex. AA, Page 9). All alleged breaches occurred well before that time.

**D. The Breach of Oral "Agreement II" Claims Are Also Barred by Limitations**

SCI's claims for breach of alleged oral agreements, including the fictitious "Agreement II," are barred by California Code of Civil Procedure § 339, which establishes a two-year limitations period for "[a]n action upon a contract, obligation or liability not founded upon an instrument of writing." This two-year period bars any claims for breach of oral contract(s) that accrued before January 12, 2021 (two years before SCI filed suit on January 12, 2023).

SCI alleges the existence of one oral agreement, SCI calls "MPH Agreement II," which supposedly modified or replaced the written Agreement (Hogan Decl. ¶ 11b; Ex. AA, Pages 2, 9, 18, 21-23). According to SCI's complaint, this (oral) "Agreement II" was formed and subsequently breached as early as 2017 (Hogan Decl. ¶ 11b; Ex. AA, Page 9).  That is certainly two years beyond the two-year statute of limitations. Id.

Under California law, the two-year statute of limitations for oral contracts begins to run at the time of breach, not when damages are discovered. This principle is codified in California Code of Civil Procedure § 339, which states that an action upon a contract not founded upon an instrument of writing must be commenced within two years (West's Ann.Cal. C.C.P. § 339). The

Computerlaw Group LLP
www.computerlaw.com℠

statute of limitations for an oral contract typically starts running upon the negligent breach of the contract. *Seelenfreund v. Terminix of Northern Cal., Inc.*, 84 Cal.App.3d 133 (1978).

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███

SCI's own complaint places the alleged breaches of oral agreements well outside the two-year limitations period. SCI claims that oral agreements were formed and breached between 2017 and 2020 (Hogan Decl. ¶ 11b; Ex. AA, Pages 9, 18, 21-23). These alleged breaches accrued at the time they occurred, making all claims for breaches before January 12, 2021, time-barred under Section 339.

**E. Undisputed Evidence Confirms SCI Had Knowledge of Any Alleged Oral Agreement Breach Long Before the Limitations Period and Never Objected At All and Did Not File.**

The evidence clearly establishes that SCI was aware of the existence and terms of any alleged oral agreements (if they existed, which MPH denies) well before the limitations period expired. SCI's own communications from 2020 and 2022 refer exclusively to the written Agreement as governing the parties' relationship, contradicting SCI's current claim that oral agreements modified or superseded the written Agreement (Hogan Decl. ¶ 11b; Ex. AF, AG). These communications are significant because they demonstrate SCI's knowledge of any alleged oral agreements years before filing suit. Under California law, this knowledge started the limitations clock running, regardless of when SCI claims to have "discovered" the alleged breaches. *See Angeles Chem. Co. v. Spencer & Jones*, 44 Cal. App. 4th 112, 119 (1996) (holding that knowledge of facts, not their legal significance, starts the statute of limitations).

The Ninth Circuit has similarly held that under California law, a plaintiff's knowledge of the facts underlying a claim triggers the limitations period, regardless of when the plaintiff realizes the legal significance of those facts. *See Platt Elec. Supply*, 522 F.3d at 1054. Here, SCI's knowledge of any alleged oral agreements—evidenced by its communications referencing the

Computerlaw Group LLP
www.computerlaw.com℠

parties' contractual relationship—triggered the limitations period for any breach claims, rendering claims outside the statutory periods time-barred.

**F. The Contractual Six-Month Period is Also a Contractual Time Bar.**

Beyond the statutory two-year limitations period, SCI's oral contract claims are independently barred by the Agreement's Section 5.2 six-month contractual period. Agreement (Hogan Decl. ¶ 2; Ex. A, § 5.2).

California courts have held that contractual limitations periods apply not only to claims directly based on the written contract but also to related claims, including those based on alleged oral agreements that modify or relate to the written contract. *See Moreno*, 106 Cal. App. 4th at 1430. In *Han*, the Ninth Circuit upheld application of a contractual limitations period to claims beyond direct breach of the written agreement, including related oral promises. 73 F.3d at 877. SCI's alleged oral contracts, particularly the fictional "MPH Agreement II," directly relate to the services provided under the written Agreement and therefore fall within the scope of Section 5.2's six-month limitation provision. Because SCI did not file suit within six months of any alleged breach of these purported oral agreements, the claims are time-barred under the contractual limitations period.

**G. The Statute of Frauds Bars Any Alleged Oral Agreement; None Can Exist Here**

In addition to the limitations bars, SCI's claims for breach of oral agreements are further precluded by the California Statute of Frauds and by the Agreement's integration clause. Section 7.5 of the Agreement states:

> This Agreement, and Exhibits hereto and the documents and instruments and other agreements among the parties hereto referenced herein: (a) constitute the entire agreement among the parties with respect to the subject matter hereof and supersede all prior agreements and understandings both written and oral, among the parties with respect to the subject matter hereto.

(Hogan Decl. ¶ 2; Ex. A, § 7.5).

Under California law, especially in commercial agreements between merchants, an integration clause precludes consideration of prior or contemporaneous oral agreements that contradict, vary, or add to the terms of the integrated written contract. *Masterson v. Sine*, 68 Cal.

Computerlaw Group LLP
www.computerlaw.com℠

2d 222, 225 (1968). The Ninth Circuit, applying California law, has consistently upheld integration

clauses to bar claims based on alleged oral agreements. ████████████████████████

███████████████████████████████████████████████████████████████

████████████████

The Agreement's integration clause explicitly supersedes "all prior agreements and understandings both written and oral," precluding SCI's claims based on the fictitious "MPH Agreement II" or other alleged oral agreements. Even if such claims were not time-barred (which they are), they would be unenforceable due to the integration clause and the Statute of Frauds.

**H. SCI's Own Communications Confirm Only One Written Agreement Here.**

SCI's own communications directly contradict its current claims regarding oral agreements and further demonstrate the time-barred nature of its breach claims. In 2020 and 2022, SCI explicitly referenced the written Agreement as governing the parties' relationship, with no mention of any "Agreement II" or other oral modifications (Hogan Decl. ¶ 11b; Ex. AF, AG). These communications are significant for two reasons:

1. They confirm SCI's knowledge of the contractual relationship and any alleged breaches years before filing suit, triggering the limitations periods;

2. They directly contradict SCI's current claims regarding oral agreements, supporting enforcement of the integration clause.

██████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████ SCI's communications thus reinforce the time-barred nature of its breach claims and the validity of the integration clause.

**III.   THE AGREEMENT'S NOTICE PROVISION PROVIDES A FURTHER INDEPENDENT BAR**

Beyond the statutory and contractual limitations periods, the integration clause and the Statute of Frauds, SCI's breach claims are further barred by the Agreement's notice provision.

Computerlaw Group LLP
www.computerlaw.com℠

Section 7.9 of the Agreement requires that "[a]ny notice required to be given under this Agreement shall be in writing" and delivered according to specified methods (Hogan Decl. ¶ 2; Ex. A, § 7.9). California courts enforce contractual notice provisions as written. *See Magic Carpet Ride LLC v. Rugger Inv. Grp. L.L.C.*, 41 Cal. App. 5th 357, 364 (2019) (enforcing contractual notice provision); *Cornwell v. Bank of Am. Nat'l Tr. & Sav. Ass'n*, 224 Cal. App. 3d 995, 999 (1990) (same). The Ninth Circuit has similarly upheld contractual notice requirements under California law. *See Brobeck, Phleger & Harrison v. Telex Corp.*, 602 F.2d 866, 873 (9th Cir. 1979).

SCI failed to provide written notice of any alleged breach as required by Section 7.9, further barring its breach claims (Hogan Decl. ¶ 11e). This failure to comply with the contractual notice requirement provides yet another basis for dismissing SCI's time-barred breach claims.

SCI's breach of contract claims are time-barred under multiple independent limitations periods:

1. California's four-year statute of limitations for written contracts (Cal. Code Civ. Proc. § 337), which bars claims for breaches before January 12, 2019;

2. California's two-year statute of limitations for oral contracts (Cal. Code Civ. Proc. § 339), which bars claims for breaches before January 12, 2021;

3. The Agreement's six-month contractual limitations period (§ 5.2), which bars all breach claims not filed within six months of accrual;

4. The Agreement's 30-day acceptance provision (§ 1.2), which established deemed acceptance of all deliverables and associated services and bars all claims altogether.

In addition, SCI's breach claims are further precluded by the Agreement's integration clause (§ 7.5), which supersedes all prior oral agreements, and its notice provision (§ 7.9), which SCI failed to follow. SCI's own communications confirming the parties operated under the written Agreement further contradict its current claims. SCI could have arbitrated its claims in 2017, 2018, 2019 but it did not. Instead, it accepted discounts and deferrals and had MPH increase staff and produce additional features, functions and improvements. This is not a software defect case; this is a case where a happy client decided to steal an entire team and then use a lawsuit to "provide cover" and to assert "the best defense is a good offense." Given these multiple, independent bases for finding SCI's breach claims time-barred, summary judgment on these claims is warranted based

Computerlaw Group LLP
www.computerlaw.com℠

1   on the limitations periods alone. The fact is that this lawsuit was filed after SCI misappropriated

2   MPH's entire team including all of its trade secret and confidential intellectual property.  How can

3   it not be so given that SCI was seeking pricing reductions for the next (2023) year and never any

4   complaint or other notice about any improper billings in any of the prior 6 years?

5   **IV.    SCI'S TORT CLAIMS MERELY RESTATE CONTRACT-BASED**

6            **GRIEVANCES AND ARE BARRED AS A MATTER OF LAW AS WELL.**

7            As a threshold legal matter, this Court must determine whether SCI's claims are

8   fundamentally breaches of contract which SCI attempts to "repackage" as a "fraud" tort or whether

9   there are any genuine independent tort claims supported by actual admissible evidence.  The Initial

10  Disclosures reveal no actual evidence.  In April, 2025, the California Supreme Court clarified in

11  *New England Country Foods, LLC v. VanLaw Food Products, Inc.*, 2025 WL 1190980 (Cal., 2025),

12  that California Civil Code Section 1668 does not preclude "parties from limiting their liability for

13  pure breaches of contract absent a violation of an independent duty that falls within the ambit of

14  section 1668." The Court explained that "[w]here the claims asserted are 'nothing more than a

15  breach of… contractual obligations,' Section 1668 does not apply." *New England Country Foods,*

16  *LLC v. VanLaw Food Products, Inc.*, 2025 WL 1190980, at *8 (Cal., 2025).

17          All of SCI's claims stem from the same fundamental contractual allegation—that MPH

18  failed to perform its contractual obligations regarding software delivery. Unlike in *New England*

19  *Country Foods*, where the defendant allegedly hatched a "backup plan" to intentionally interfere

20  with the plaintiff's customer relationship, MPH's conduct was entirely confined to the scope of the

21  parties' contractual relationship. SCI's alleged damages flow directly from the purported breach of

22  contract, not from any independent tortious conduct. And, nothing otherwise is disclosed in SCI's

23  Initial Disclosures.  Hogan Decl.  ¶ 15; Russo Decl. ¶¶ 5-7.

24          The California Supreme Court specifically noted that mechanisms exist to ensure "parties

25  cannot proceed in tort for what are essentially breaches of contract, " including the economic loss

26  rule, which bars recovery in tort "unless [the party] can demonstrate harm above and beyond a

27  broken contractual promise." *New England Country Foods*, 2025 WL 1190980, at *8. None are

28  disclosed here.

Computerlaw Group LLP
www.computerlaw.com℠

Computerlaw Group LLP
www.computerlaw.com℠

Here, SCI cannot demonstrate any harm beyond the alleged breach of the 2016 Agreement. The "phantom QA" employee that SCI claims exemplifies fraud was, in fact, Christopher Rosales, billed at a $1,300/month discount (Hogan Decl. ¶ 7). The additional "Software Engineer" discounts saved SCI $425,318 (Hogan Decl. ¶ 9). These business accommodations—which ultimately benefited SCI—cannot transform a contract dispute into a tort claim. The Court must rule on this undisputed fact given SCI's failure to disclose otherwise in Initial Disclosures.

California law enforces integration clauses to bar extrinsic evidence. *Robinson Helicopter Co. v. Dana Corp.*, 34 Cal.4th 979, 993 (2004). Here, SCI's fraud claims rely on alleged misrepresentations directly contradicted by the Agreement's terms (Hogan Decl. ¶ 11). The "fraud" claim is merely a repackaged contract claim, and it is barred by the economic loss rule and the 2016 Agreement's limitation of liability provisions and waiver of consequential and other indirect damages remain fully enforceable. SCI's failure to disclose any form of direct damages or any calculations thereof in its Initial Disclosures bars it from now contesting the lack of any basis for its claims given the parties' written Agreement and the long delay in asserting any claims. No basis exists for going forward with any aspect of this lawsuit and no injunctive relief can possibly be justified nor can any other alleged claim survive.

## CONCLUSION

For all the foregoing reasons, Defendant is entitled to summary judgment as a matter of law on all purported "causes of action. " The Agreement—an integrated, negotiated agreement between merchants. There is no genuine issue for trial, only wasted expense and delay. In today's economy, small businesses like Defendant can ill afford to defend meritless claims through discovery and trial. Granting summary judgment is both legally required and equitable: it spares the parties (and the court) the unnecessary burden and it prevents the undue economic harm that baseless litigation imposes.  SCI could have arbitrated its monetary claims in 2017, 2018, 2019, 2020, 2021 or even in 2022 but it cannot receive invoices, make payments, and then hatch a lawsuit in derogation of every aspect of the parties' Agreement to try to justify its raiding and misappropriating of MPH's software team.  That is what this case is all about.

1

2                                          Respectfully submitted,

3   Dated: June 17, 2025                   COMPUTERLAW GROUP LLP

4

5                                          By: _____

6                                          Jack Russo

7                                          Attorneys for Defendant and Counter-

8                                          Claimant MPH INTERNATIONAL LLC

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Exhibit G

Jack Russo (Cal. Bar No. 96068)
COMPUTERLAW GROUP LLP
401 Florence Street
Palo Alto, CA 94301
(650) 327-9800 (office)
jrusso@computerlaw.com

Attorneys for Defendant
and Counterclaimant
MPH International LLC

Computerlaw Group LLP
www.computerlaw.com℠

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| **SUPPORT COMMUNITY, INC.**, a Delaware Corporation, | Case No. 23-CIV-04911-JSW |
| Plaintiff; | **CORRECTED NOTICE OF MOTION AND MOTION FOR EVIDENTIARY SANCTIONS AND FOR SUMMARY JUDGMENT UNDER FRCP FEDERAL RULE 56 [CORRECTION OF DOCKET #62]** |
| v. | |
| **MPH INTERNATIONAL LLC,** a Nevada Limited Liability Company, DOES 1 through 25, inclusive, | |
| Defendant; | Date:       August 22, 2025 |
| | Time:       9:00 AM |
| | Courtroom:   5 |
| **MPH INTERNATIONAL LLC,** a Nevada Limited Liability Company, | Before the Hon. Jeffrey S. White |
| Counterclaimant, | Trial Date:   None Set |
| v. | |
| **SUPPORT COMMUNITY, INC.**, a Delaware Corporation,  inclusive, | |
| Counter-Defendant. | |

# TABLE OF CONTENTS

**INTRODUCTION** ................................................................................ 2

**PROCEDURAL HISTORY** ............................................................. 4

**FACTUAL BACKGROUND** ........................................................... 4

   **A. FORMATION OF CONTRACTUAL RELATIONSHIP (2016)** ............................... 4
   **B. MPH'S SUBSTANTIAL CONCESSIONS (2017-2022)** ................. 4
   **C. TERMINATION AND LAWSUIT (2022-2023)** ...................5

**UNDISPUTED MATERIAL FACTS**........................................... 6

**LEGAL STANDARD** ...................................................................... 7

**ARGUMENT** ..................................................................................... 8

   **I.**     **THE FRAUD CLAIM IS TIME-BARRED AS A MATTER OF LAW**........ 8

      A. California's Three-Year Statute Bars SCI's Fraud Claim........................8
.
      B. The Agreement's Six-Month Contractual Limitations Period Independently Bars the SCI "Fraud" Claim As a Matter of Law…………………..…….…10

      C. The Agreement's 30-Day Acceptance Period Provides, As a Matter of Law, a Further and Third Independent bar to SCI's Fraud Claim; SCI Delivered No Objections Here……………………………………………..……….11

      D. The Delayed Discovery Rule Cannot Salvage the Fraud Claim…………..…12

      E. SCI Cannot Rely on "Continuous Accrual" to Salvage Its Claims Either…...14

      F. Conclusion: SCI's Fraud Claim is Barred, As a Matter of Law, Under Three Independent Limitations Periods; SCI Cannot Avoid the Fact of Its Long Delay………………………………………………..………………15

   **II.**     **THE BREACH OF CONTRACT CLAIMS ARE ALSO TIME-BARRED** . …………………………………………………………15

      A. SCI's Breach of Written Contract Claims Are Barred, As a Matter of Law, by California's Four-Year Statute of Limitations………………………………15

      B. Alleged Breaches During the Limitations Period Are Independently Barred by the 30-Day Acceptance Provision As a Matter of Law; No Rejections/No Revocations Occurred…………………………………………………17

Computerlaw Group LLP
www.computerlaw.com℠

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

C.  Additionally, as a Matter of Law, the Six-Month Contractual Limitations Period Further Bars All Breach of Contract Claims Because No Claim Was Timely Made……………………………………………………….……..17

D.  The Breach of Oral "Agreement II" Claims Are Also Barred by Limitations……………………………………………………………..18

E.  Undisputed Evidence Confirms SCI Had Knowledge of Any Alleged Oral Agreement Breach Long Before the Limitations Period and Never Objected At All and Did Not File……………………………………...……………19

F.  The Contractual Six-Month Period is Also a Contractual Time Bar…...……20

G.  The Statute of Frauds Bars Any Alleged Oral Agreement; None Can Exist Here…………………………………...…………….………………………20

H.  SCI's Own Communications Confirm Only One Written Agreement Here...21

III. THE AGREEMENT'S NOTICE PROVISION PROVIDES A FURTHER INDEPENDENT BAR ................................................................................. 21

IV.    SCI'S TORT CLAIMS MERELY RESTATE CONTRACT-BASED GRIEVANCES AND ARE BARRED AS A MATTER OF LAW AS WELL ........................................................................................................23

CONCLUSION...........................................................................................................24

Computerlaw Group LLP
www.computerlaw.com℠

# TABLE OF AUTHORITIES

**Cases**

Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986) .................................................. 7

Angeles Chem. Co. v. Spencer & Jones, 44 Cal. App. 4th 112 (1996) ...................... 19

April Enterprises, Inc. v. KTTV, 147 Cal. App. 3d 805 (1983) ................................... 16

Artificial Intelligence Corp. v. Casey, 1 Cal. App. 4th 22 (1991) ........................ 12, 17

Aryeh v. Canon Bus. Sols., Inc., 55 Cal. 4th 1185 (2013) ......................................... 14

Brobeck, Phleger & Harrison v. Telex Corp., 602 F.2d 866 (9th Cir. 1979) ............. 22

Celotex Corp. v. Catrett, 477 U.S. 317 (1986) ............................................................ 7

Charnay v. Cobert, 145 Cal. App. 4th 170 (2006) ..................................................... 10

Cole v. CRST Expedited, 289 F.3d 840 (6th Cir. 2002) ............................................... 8

Cornwell v. Bank of Am. Nat'l Tr. & Sav. Ass'n, 224 Cal. App. 3d 995 (1990) ......... 22

Creditors Collection Serv. of Sacramento v. Castegnaro,

  17 F. Supp. 2d 1079 (N.D. Cal. 1998)…………………………………………….. 19

Danjaq LLC v. Sony Corp., 263 F.3d 942 (9th Cir. 2001) ......................................... 14

Dillon v. Bd. of Pension Comm'rs, 18 Cal. 2d 427 (1941) ........................................ 17

Ellis v. U.S. Sec. Assocs., 224 Cal. App. 4th 1213 (2014) ........................................ 10

FNB Mortgage Corp. v. Pacific General Group, 76 Cal. App. 4th 1116 (1999) ........ 17

Fox v. Ethicon Endo-Surgery, Inc., 35 Cal. 4th 797 (2005) ................................... 9, 12

Grisham v. Philip Morris U.S.A., Inc., 40 Cal. 4th 623 (2007) ................................. 13

Hambrecht & Quist Venture Partners v. Am. Med. Int'l, Inc., 38 F.3d 1118 (9th Cir. 1994) ..... 18

Han v. Mobil Oil Corp., 73 F.3d 872 (9th Cir. 1995) ........................................... 10, 20

Intel Corp. v. VIA Techs., Inc., 319 F.3d 1357 (Fed. Cir. 2003) ............................... 11

Jolly v. Eli Lilly & Co., 44 Cal. 3d 1103 (1988) ...................................................... 10

Computerlaw Group LLP
www.computerlaw.com℠

Lewis v. YouTube, LLC, 197 Cal. App. 4th 1387 (2011) ............................................................ 18

Lowy Dev. Corp. v. Superior Court, 190 Cal. App. 3d 317 (1987) ............................................ 12

Magic Carpet Ride LLC v. Rugger Inv. Grp. L.L.C., 41 Cal. App. 5th 357 (2019) .................... 22

Masterson v. Sine, 68 Cal. 2d 222 (1968) .................................................................................. 21

Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574 (1986) .................................... 7

Menominee Indian Tribe of Wis. v. United States, 614 F.3d 519 (9th Cir. 2010) ...................... 16

Miller v. Bechtel Corp., 33 Cal. 3d 868 (1983) .......................................................................... 13

Moreno v. Sanchez, 106 Cal. App. 4th 1415 (2003) ............................................................. 10, 17

MWS Wire Indus., Inc. v. Cal. Fine Wire Co., 797 F.2d 799 (9th Cir. 1986) ............................ 17

Nevro Corp. v. Bos. Sci. Corp., 312 F. Supp. 3d 726 (N.D. Cal. 2018) ..................................... 21

New England Country Foods, LLC v. VanLaw Food Products, Inc.,

      17 Cal. 5th 703 (2025) ..................................................................................... 3, 11, 23

Oracle America, Inc. v. Hewlett Packard Enterprise Co.,

      971 F. Supp. 2d 975 (N.D. Cal. 2013) ............................................................................ 16

Paracor Fin., Inc. v. Gen. Elec. Capital Corp., 96 F.3d 1151 (9th Cir. 1996)............................ 21

Platt Elec. Supply, Inc. v. EOFF Elec., Inc., 522 F.3d 1049 (9th Cir. 2008) ………..... 8, 9, 14, 19

Robinson Helicopter Co. v. Dana Corp., 34 Cal. 4th 979 (2004) .............................................. 24

Romano v. Rockwell Int'l, Inc., 14 Cal. 4th 479 (1996) ............................................................. 15

Seelenfreund v. Terminix of Northern Cal., Inc., 84 Cal. App. 3d 133 (1978) .......................... 19

Synopsys, Inc. v. ATopTech, Inc., 2015 WL 1197693 (N.D. Cal. 2015) .................................... 16

Tolan v. Cotton, 572 U.S. 650 (2014) ........................................................................................... 7

VP & W, Inc. v. Galardi, 2015 WL 5321245 (E.D. Cal. 2015) ................................................. 12

WA Sw. 2, LLC v. First Am. Title Ins. Co., 240 Cal. App. 4th 148 (2015) ................................. 9

Wind Dancer Prod. Grp. v. Walt Disney Pictures, 10 Cal. App. 5th 56 (2017) ................... 12, 17

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Computerlaw Group LLP
www.computerlaw.com℠

Yeti v Molly, 259 F.3d 1101 (9th Cir. 2001) ............................................................ 8

**Statutes and Rules**

Cal. Code Civ. Proc. § 337 ............................................................................... 15, 22

Cal. Code Civ. Proc. § 338(d) ....................................................................... 8, 10, 15

Cal. Code Civ. Proc. § 339 ........................................................................... 18, 19, 22

Cal. UCC § 2-719 ................................................................................................. 3

Fed. R. Civ. P. 26 ............................................................................................... 7

Fed. R. Civ. P. 26(a)(1) ...................................................................................... 7

Fed. R. Civ. P. 37 ........................................................................................... 1, 7

Fed. R. Civ. P. 37(c)(1) ...................................................................................... 7

Fed. R. Civ. P. 56 ........................................................................................... 1, 7

Fed. R. Civ. P. 56(a) ........................................................................................... 7

**Other Authorities**

Cal. Civ. Code § 1668 ........................................................................................ 23

West's Ann. Cal. C.C.P. § 339 ............................................................................ 18

**Computerlaw Group LLP**
www.computerlaw.com℠

**TO ALL PARTIES AND THEIR RESPECTIVE ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE** that on August 22, 2025 at 9:00 AM, or as soon thereafter as the matter may be heard, in Courtroom 5 of the above-entitled court, located at 1301 Clay Street, Oakland CA 94612, Defendant MPH International LLC ("MPH") will and hereby does move for summary judgment pursuant to Federal Rule of Civil Procedure Rules 37 and 56 in favor of Defendant and against Plaintiff Support Community, Inc. ("SCI" or "Plaintiff") on all causes of action asserted in Plaintiff's Complaint.

This Motion is made on the grounds that there are no genuine issues of material fact as to these claims, including that they are barred by contractual and statutory statutes of limitations, and Defendants are entitled to judgment as a matter of law.

This Motion is based on this Notice, the accompanying Memorandum of Points and Authorities, the Declarations of Michael Patrick Hogan, Jon Indick, and Jack Russo, as well as all exhibits thereto, the pleadings and papers on file in this action, including this Court's prior rulings affirmed by the Ninth Circuit Court of Appeal (and that are now law of the case), and such evidence or argument as may be presented at the hearing.

Computerlaw Group LLP
www.computerlaw.com℠

Computerlaw Group LLP
www.computerlaw.com℠

## MEMORANDUM OF POINTS AND AUTHORITIES

### INTRODUCTION

The written December 2, 2016 Agreement ("the 2016 Agreement") negotiated, executed and ratified between these two corporate commercial parties expressly forecloses any claim of fraud or misrepresentation and waives any and all consequential or other indirect damages, and also limits any direct damages (none of which are disclosed in the Plaintiff's "Initial Disclosures"). See 2016 Agreement at Paragraphs 5.2 & 5.4. And most importantly, any such claims are barred by statutory and contractual limitations, as outlined below.

After six years of harmonious business under the 2016 Agreement, SCI's claims rest on fabrications—a fictitious "Agreement II"—and a fraud claim alleging a "phantom QA" that was actually a $1,300/month discount for an engineer, saving SCI $55,900 from May 2018 to October 2022. Declaration of Mike Hogan in support of MPH's Motion for Summary Judgment, CEO of MPH at ¶ 6, Ex. N ("Hogan Decl."). The 2016 Agreement controls; it is the only existing contract that the parties operated under for six years. It only granted SCI a license to "Products" and it makes no mention of any license or use of source code and no statement of any rights to modify, adapt or otherwise generate derivative works—rights SCI falsely claims and for which there is not a single item of evidence in any of the procedurally and substantively defective "Initial Disclosures" submitted by Plaintiff. Declaration of Jack Russo in support of MPH's Motion for Summary Judgment ("Russo Decl.") at ¶¶ 3-7.

The reasons why the 2016 Agreement bars Plaintiff's claims are clear.

**First**, the 2016 Agreement is a fully integrated, final agreement containing a merger/no-reliance clause, and its terms have an express 6-month limitations period.  Per Section 7.5:

> This Agreement constitutes the entire understanding between the parties with respect to its subject matter **and supersedes all prior or contemporaneous** communications, proposals, representations, understandings and agreements, **whether oral or written.**

Agreement, § 7.5 (emphasis added).

Thus, any allegedly false representations are either expressly in the writing or directly contradicted by it, and Plaintiff cannot have reasonably relied on any prior or contemporaneous

statements and cannot unilaterally assert that further language should now be added to an Agreement that both parties operated under harmoniously for six years (from 12/2016-11/2022).

**Second**, the 2016 Agreement has an express 30-day acceptance period requiring timely written objections (and none occurred), and it unequivocally disclaims all consequential and indirect damages.  Per Section 1.2:

> Upon delivery of each deliverable by MPH, **Customer shall have 30-days to accept or reject the deliverable and pay the associated fee.** In rejecting any deliverable, Customer shall provide a detailed description of why the deliverable was rejected, such that MPH may resolve the issues detailed, in order to achieve acceptance of the deliverable. **Any deliverable not accepted or rejected within the 30-day period shall be deemed accepted**.

Agreement, § 1.2 (emphasis added).

The contract expressly excludes such rights, and SCI's claims—based a fictional "Agreement II" and mischaracterized concessions—lack admissible evidence. The parties, both sophisticated merchants negotiated that waiver, and it is enforceable under both California statutory law (California UCC §2-719) and under California case law, including the very recently decided California Supreme Court case, *New England Country Foods, LLC v. VanLaw Food Products, Inc.*, 17 Cal. 5th 703 (2025).

Per Section 5.2:

> **MPH's maximum aggregate liability with respect to this Agreement** whether under theory of contract, tort (including negligence), strict liability or otherwise **shall be limited to the aggregate amount of payments made by Customer to MPH during the six-month period prior to the claim.** (emphasis added).

Plaintiff never challenged the above six-month limitations period, nor the 30-day acceptance period nor the express damage limitations and express waivers before suit and does not challenge them in this lawsuit either; nothing in SCI's "Initial Disclosures" provides any evidence to the contrary.  In short, the claims of fraud, oral and written contract breach are barred by the applicable contractual and other statutes of limitations under settled law.

Computerlaw Group LLP
www.computerlaw.com℠

**Third**, for any remaining claims, the 2016 Agreement places clear calculable limits on direct damages and certainly far less than any number in the Initial Disclosures (none of which sets forth any actual detail and without any underlying factual or legal basis). In short, every cause of action here is barred or limited by unambiguous contractual provisions. Summary judgment and/or summary adjudication are therefore warranted—indeed necessary—to protect Defendant (a small business) from costly, baseless litigation.

## PROCEDURAL HISTORY

After some six years of a harmonious business relationship, SCI filed suit on January 12, 2023, breaching the 2016 Agreement's express arbitration clause. Russo Decl. ¶¶ 2, 4–8. MPH removed it to this Court (Dkt. No. 1). This Court's May 2, 2024 order (Dkt. No. 41) conclusively resolved the arbitration issues including the existence of the Agreement and the Ninth Circuit affirmed all rulings. (Dkt. No. 41 at 4-11).

## FACTUAL BACKGROUND

### A. Formation of Contractual Relationship (2016)

On December 2, 2016, CEO Mike Hogan met CEO Patrick Morrison met to discuss an idea about improving the Ronald McDonald House near Stanford University, where Morrison shared his vision for a software application to support the Ronald McDonald House community. By the end of the December 2, 2016 meeting, Morrison and Hogan reviewed and signed the 2016 Agreement at Hogan's home in San Mateo County, California. The Agreement, reviewed during that December 2, 2016 in-person meeting and ratified and confirmed by emails and texts, granted SCI only a license to use the "Products" (executable applications). Hogan Decl. ¶ 2 & Exhibit B, C.

### B. MPH's Substantial Concessions (2017-2022)

Over the next six years, MPH offered substantial concessions throughout the parties' commercial relationship as set forth in the Hogan Decl. ¶¶ 1 to 7:

- **Discounted Fees**: MPH's $280,000 bid was less than a third of a competitor's. (¶1, Ex. A)
- **Management Fee Waiver**: Delayed a $5,000 monthly management fee ($60,000/year), which was deferred and not later billed nor collected. (¶5, Ex. M)

Computerlaw Group LLP
www.computerlaw.com℠

Computerlaw Group LLP
www.computerlaw.com™

- **Engineer Discount**: When QA Engineer Christopher Rosales became a Software Engineer, MPH continued billing at the lower QA rate, saving SCI $1,300/month ($55,900 total). (¶6, Ex. N)

- **Mobile App Discount**: On April 3, 2019, MPH provided three Software Engineers and a Technical Designer at an 80% discount, saving SCI $425,318 through 2022. (¶6(b), Ex. Q)

- **Convertible Debt**: In March 2020, MPH agreed to defer $4,300 monthly payments, documented as convertible debt toward equity, totaling $137,600 by October 2022. (¶8, Ex. AQ)

- **Unpaid Services**: Both Mike Hogan and Jon Indick worked unpaid at SCI trade shows, covering expenses while MPH designers created marketing materials at no charge. (¶7(a), Ex. O)

### C.  Termination and Lawsuit (2022-2023)

In November 2022, while Hogan was recovering from prostate surgery and mourning family deaths, Morrison poached eight of MPH's nine software engineers. On November 23, 2022, SCI terminated the Agreement. MPH invoiced SCI $75,683 for November 2022 work, which with all the above monies remains entirely unpaid and unaddressed. Hogan Decl. ¶¶ 8-10 & Exhibits X & Y.

On January 12, 2023, over six years after the start of the relationship and over four years after any contract breach could be claimed, Plaintiff SCI sued in the San Mateo Superior Court, alleging "fraudulent" breaches and claiming rights to source code and additional license rights to adapt, modify, and create derivative works—rights never granted by the 2016 Agreement. The lawsuit also alleges an unspecified "Agreement II" but with no underlying evidentiary basis disclosed in either the pleading or in SCI's Rule 26 Initial Disclosures.  The lawsuit followed SCI's raiding and misappropriating nearly the entire software team of employees that MPH had assembled, supervised, and managed over the six-year period and which SCI implemented without permission and without notice. Hogan Decl., ¶ 11.

In effect, what played out is this: SCI decided to save money by cutting out MPH by directly hiring nearly the entire MPH team and did so without any advance notice to MPH, without

paying anything for it, and without ever resolving outstanding financial issues that existed with MPH. Hogan Decl., ¶¶ 10-11; Russo Decl. ¶ 7 & Exhibit D-E (questions never answered).

### Undisputed Material Facts Supporting Summary Judgment

1. MPH and SCI entered into the 2016 Agreement, a written agreement for the delivery of the "Product," which was a set of software deliverables (Hogan Decl., ¶ 4; Exhibit A, § 2.2); the 2016 Agreement includes an express integration clause ratified by and never disputed by SCI. Hogan Decl., ¶ 4 & Exhibit A

2. MPH provided (and Plaintiff SCI never objected to) various versions of the Product in executable form to SCI as stipulated in the Agreement, including work performed by the MPH software developers without controversy about MPH's sole ownership over the six-year period (2016-2022) Hogan Decl. ¶¶ 3-6. Declaration of Jonathan Indick in support of MPH's Motion for Summary Judgment ("Indick Decl."), ¶¶ 3-4

3. SCI received and accepted each of the Product deliverables electronically without objection, utilizing the Product and each delivered version over the 6-year period. Hogan Decl. ¶ 3; Indick Decl. ¶¶ 2-4.

4. MPH issued final invoices to SCI totaling over $75,000 under the 2016 Agreement which SCI has not paid. Nor is there anything in SCI's Initial Disclosures which explains the SCI decision to not pay this final invoice. Hogan Decl. ¶ 13 & Exhibit AE.

5. SCI also agreed to defer payment of certain billings amounting to $137,600, to be converted into convertible debt, which remains unpaid. This too is not contested and nothing in SCI's Initial Disclosures explains how these monies can be ignored. Hogan Decl. ¶ 8, Ex. AQ.

6. SCI benefited from billing errors that resulted in discounts and reduced rates, including three years of discounts on five developers and one designer, and one developer billed as a Quality Engineer, leading to a savings of $1,300 per month. Hogan Decl., ¶¶ 5-9 & Exhibit N & Q.

7. MPH timely served its Initial Disclosures, identifying individuals likely to have discoverable information, documents supporting its claims, and a computation of damages. Hogan Decl., ¶ 15 & Exhibit AK; Russo Decl., ¶ 3.

Computerlaw Group LLP
www.computerlaw.com℠

8.  SCI failed to provide proper Initial Disclosures as required by Rule 26(a)(1) of the Federal Rules of Civil Procedure, despite multiple requests and ample time to comply. Russo Decl. ¶¶ 4–7. All factual assertions are supported by sworn declarations (Hogan Decl. ¶¶ 5-9; Indick Decl. ¶¶ 3-4) and authenticated business records (Exh. A-AI).

## LEGAL STANDARD

Summary judgment is warranted when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law" Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). The non-moving party must present specific facts showing a genuine issue for trial, not mere allegations or denials. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586-87 (1986). The Court must draw all reasonable inferences in favor of the non-moving party (*Tolan v. Cotton*, 572 U.S. 650, 657 (2014)), but unsupported speculation or conclusory allegations are insufficient to create a genuine issue of material fact. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252 (1986).

In addition, summary judgment is warranted where the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to its case." *Celotex,* 477 U.S. at 323.. SCI bears the burden to identify triable issues (*Anderson*, 477 U.S. at 250) yet its But SCI's Initial Disclosures' lack evidence supporting its claims.

Federal Rule 37(c)(1) establishes an automatic sanction for disclosure violations absent a specific court finding of "substantial justification" or "harmlessness." The burden rests entirely on the non-compliant party (here SCI) to demonstrate either exception. The lack of justification for the delay—absent evidence of technical difficulties, unforeseen circumstances, or good-faith oversight—further undermines any claim of "substantial justification." None of this can be so, given SCI's repeated assertions of wanting to move the case forward promptly and representations that they have been delayed. Russo Decl., ¶¶ 4-5

Given the automatic nature of Rule 37(c)(1) sanctions and the absence of harm-mitigating factors, all evidence and arguments reliant on undisclosed information must be precluded from consideration in this motion for summary judgment. This includes any witnesses, documents, or damages calculations not identified in SCI's Initial Disclosures. How can it be otherwise when SCI

claims justification for filing suit instead of timely going to arbitration?  Courts have consistently

enforced Rule 26 enforcement through Rule 37 remedies to uphold the integrity of disclosure

obligations and prevent unfair tactical advantages.  In this case, SCI decided to obtain an unfair

tactical advantage by first getting MPH's Initial Disclosures, by ignoring multiple notices to timely

provide SCI's Initial Disclosures, and then by providing a collection of boilerplate text with no

actual disclosure of evidence.  Russo Decl., ¶¶ 5-6 & Exhibit B-C and Hogan Decl. ¶ 15 & Exhibits

AK - AL.  Rule 37(c)(1) "gives teeth" to disclosure obligations by mandating preclusion absent

justification. *Yeti v Molly*, 259 F.3d 1101, 1106 (9th Cir. 2001). This includes precluding damages

theories or calculations not provided in the Initial Disclosures. *Cole v. CRST Expedited*, 289 F.3d

840, 846 (6th Cir. 2002). SCI's Initial Disclosure failed to disclose its damages theories or

calculations.

## ARGUMENT

### I.    THE FRAUD CLAIM IS TIME-BARRED AS A MATTER OF LAW.

**A. California's Three-Year Statute Bars SCI's Fraud Claim.**

SCI's fraud claim is barred by California's three-year statute of limitations for fraud actions.

California Code of Civil Procedure § 338(d) establishes a three-year limitations period for "[a]n

action for relief on the ground of fraud or mistake," which "is not deemed to have accrued until

the discovery, by the aggrieved party, of the facts constituting the fraud or mistake." This discovery

rule does not indefinitely extend the limitations period but merely delays accrual until the plaintiff

has actual or constructive knowledge of the facts giving rise to the claim. *Platt Elec. Supply, Inc.*

*v. EOFF Elec., Inc.*, 522 F.3d 1049, 1054 (9th Cir. 2008).

The undisputed evidence demonstrates that SCI had actual or constructive knowledge of

the alleged "fraudulent" billing practices by December 2019 at the latest, more than three years

before filing suit on January 12, 2023. SCI's allegations center on purportedly "fraudulent"

invoices and misrepresentation of employee salaries (Hogan Decl. ¶ 11c, Ex. AA). However, SCI

had complete access to and regular communication with MPH's Philippine engineering team

throughout the parties' relationship (Hogan Decl. ¶ 11c, Ex. Q). These communications provided

SCI with information about the team's composition, work allocation, and overall operations.

Computerlaw Group LLP
www.computerlaw.com℠

The Ninth Circuit has recognized that when a plaintiff has "reason to suspect" the factual basis of a claim, the limitations period begins to run. *Platt Elec. Supply*, 522 F.3d at 1054. Even assuming the allegations were true (and they are not), SCI cannot credibly claim it lacked knowledge because it:

1. Directly interacted with MPH's engineering team on a regular basis (Hogan Decl. ¶ 11c, Ex. Q);

2. Approved and paid invoices for six years without objection (Hogan Decl. ¶ 3, Ex. E);

3. Had information about team composition/work allocations (Hogan Decl. ¶ 11c, Ex. Q);

4. Maintained oversight of development progress/deliverables (Hogan Decl. ¶ 3, Ex. E);

5. By December 2019, had received and approved over three years of invoices, establishing a pattern that SCI should have questioned if it believed "fraud" was occurring (Hogan Decl. ¶¶ 3, 6, 11c; Ex. E, N, Q).

In *WA Sw. 2, LLC v. First Am. Title Ins. Co.*, 240 Cal. App. 4th 148, 157 (2015), the California Court of Appeal held that "a plaintiff whose complaint shows on its face that his claim would be barred without the benefit of the discovery rule must specifically plead facts showing (1) the time and manner of discovery and (2) the inability to have made earlier discovery despite reasonable diligence." SCI has failed to plead such facts, and indeed, cannot prove them given the extensive interaction it had with MPH's team.

SCI's claims about "Phantom QA" and "UX Designer" positions (which actually reflected discounted rates, see Hogan Decl. ¶¶ 6, 9; Ex. N, Q) could and should have been discovered through reasonable diligence long before January 12, 2020 (three years before filing suit). By December 2019, SCI had received and reviewed dozens of invoices containing the allegedly "fraudulent" information, yet continued to approve and pay them without objection (Hogan Decl. ¶¶ 3, 6, 11c; Ex. E, N, Q). As the California Supreme Court recognized in *Fox v. Ethicon Endo-Surgery, Inc.*, 35 Cal. 4th 797, 808 (2005), the discovery rule "only delays accrual until the plaintiff has, or should have, inquiry notice of the cause of action."

Applying California law, the Ninth Circuit has further clarified that "[i]t is the discovery of facts, not their legal significance, that starts the statute of limitations." *Platt Elec. Supply*, 522

F.3d at 1054 (quoting *Jolly v. Eli Lilly & Co.*, 44 Cal. 3d 1103, 1113 (1988)). Even accepting SCI's allegations as true, SCI had all the necessary facts to discover the alleged "fraud" before 2020, triggering the 3-year limitations period. Because SCI did not file until January 12, 2023, more than 3 years later, its fraud claim is time-barred. CCP § 338(d).

**B. The Agreement's Six-Month Contractual Limitations Period Independently Bars the SCI "Fraud" Claim As a Matter of Law.**

Beyond the statutory limitations period, SCI's fraud claim is independently barred by the six-month contractual limitations period in Section 5.2 of the Agreement. (Hogan Decl. ¶ 2; Ex. A, § 5.2).

California courts consistently uphold contractual limitations provisions that shorten statutory periods when reasonable. *Ellis v. U.S. Sec. Assocs.*, 224 Cal. App. 4th 1213, 1223 (2014) (enforcing six-month limitations period); *Moreno v. Sanchez*, 106 Cal. App. 4th 1415, 1430 (2003) (recognizing validity of contractual limitations periods). Six-month limitations periods have been repeatedly upheld as reasonable in California. *See, e.g., Charnay v. Cobert*, 145 Cal. App. 4th 170, 183 (2006); *Han v. Mobil Oil Corp.*, 73 F.3d 872, 877 (9th Cir. 1995) (applying California law). SCI's fraud claim unquestionably is within the scope of "**whether under theory of contract, tort (including negligence), strict liability or otherwise**" as it directly challenges the propriety of MPH's billing practices under the Agreement (Hogan Decl. ¶ 11c; Ex. A, § 5.2; Ex. AA). Even applying the discovery rule to the contractual limitations period, as California courts sometimes do (see *Moreno*, 106 Cal. App. 4th at 1430), SCI's claim is still barred. SCI alleges fraudulent billing practices for services rendered throughout the parties' six-year relationship. Yet SCI waited until January 12, 2023 to file suit—well beyond six months from when SCI knew or should have known of any alleged "fraud."

The Ninth Circuit, when applying California law, has upheld contractual limitations periods even for fraud claims. In *Han*, the court concluded that "California generally permits contracting parties to agree upon a shorter limitations period for bringing an action than that prescribed by statute, so long as the time allowed is reasonable." 73 F.3d at 877. There, as here, the six-month

Computerlaw Group LLP
www.computerlaw.com℠

period was deemed reasonable.  See also *New England Country Foods, LLC v. VanLaw Food Products, Inc.*, 2025 WL 1190980 (Cal., 2025).

The Agreement's six-month limitations provision (especially when read in connection with the arbitration clause for monetary claims) is particularly reasonable given the nature of software development services, where prompt attention to billing issues is essential for accurate recordkeeping and fair resolution of disputes. The contractual period gave SCI ample time to discover and assert any claims of "fraudulent" billing or other billing issues. SCI's failure to raise its claims within the contractually stipulated period bars those claims under California law.

**C. The Agreement's 30-Day Acceptance Period Provides, As a Matter of Law, a Further and Third Independent Bar to SCI's Fraud Claim; SCI Delivered No Objections Here.**

In addition to the statutory and contractual limitations periods, SCI's fraud claim is further barred by Section 1.2 of the Agreement, which establishes a 30-day period for objecting to deliverables. Section 1.2 states:

> **Each Deliverable shall be deemed to be accepted** by Customer if Customer does not, within thirty (30) days of delivery, **give written notice to MPH specifically identifying any issue** with the Services as not meeting the requirements of this Agreement. **If no such notice is received, Customer shall be deemed to have accepted the Deliverable.**

(Hogan Decl. ¶ 2, Ex. A, § 1.2) (emphasis added).

California courts have consistently held that contractual provisions creating deemed acceptance after a specified period are enforceable. *See Wind Dancer Prod. Grp. v. Walt Disney Pictures*, 10 Cal. App. 5th 56, 73 (2017) (upholding contractual accounting objection period); *Artificial Intelligence Corp. v. Casey*, 1 Cal. App. 4th 22, 28 (1991) (enforcing deemed acceptance provision). The Ninth Circuit has likewise enforced similar provisions under California law. *See Intel Corp. v. VIA Techs., Inc.*, 319 F.3d 1357, 1365 (Fed. Cir. 2003) (applying California law and enforcing 30-day provision).

Each of MPH's invoices was intrinsically linked to a corresponding deliverable and represented billing for services performed to create that deliverable (Hogan Decl. ¶ 3, Ex. E). SCI's "fraud" claim challenges the propriety of these invoices, alleging fraudulent billing practices

Computerlaw Group LLP
www.computerlaw.com℠

(Hogan Decl. ¶ 11c, Ex. AA). However, SCI failed to object to any Deliverable within the required 30-day period and instead accepted all Deliverables over the course of six years (Hogan Decl. ¶ 3, Ex. E).  Indeed, SCI publicly praised the technical work of MPH. Id.

Under California law, this acceptance precludes SCI from now claiming fraud in the underlying billing. In *Lowy Dev. Corp. v. Superior Court*, 190 Cal. App. 3d 317, 324 (1987), the court held that "a party who has previously waived objections to a document or transaction may not thereafter challenge that same document or transaction on grounds of fraud." Similarly, in *VP & W, Inc. v. Galardi*, 2015 WL 5321245, at *6 (E.D. Cal. Sept. 11, 2015), the court found that explicit acceptance provisions bar subsequent fraud claims related to accepted items.

The rationale behind enforcing such provisions is particularly strong in software development contracts, where timely identification of issues is critical. As explained by the court in *Artificial Intelligence Corp.*, deemed acceptance provisions "protect against stale claims... encourage the recipient to inspect promptly and to voice any defects discovered... [and] permit the parties to investigate and attempt to resolve problems at an early date." 1 Cal. App. 4th at 28. SCI's failure to object to any deliverable within the 30-day period constitutes acceptance under Section 1.2, which precludes SCI from now claiming fraud in the related billing. This 30-day acceptance period provides a third, independent basis for barring SCI's fraud claim.

**D. The Delayed Discovery Rule Cannot Salvage the Fraud Claim.**

SCI may attempt to invoke California's delayed discovery rule to salvage its time-barred fraud claim. However, this attempt would fail because SCI cannot establish the elements necessary for delayed accrual.

Under California law, a plaintiff seeking to rely on the delayed discovery rule must specifically plead and prove: "(1) the time and manner of discovery and (2) the inability to have made earlier discovery despite reasonable diligence." *Fox*, 35 Cal. 4th at 808. The plaintiff bears the burden of showing diligence, and "[c]onclusory allegations will not withstand demurrer." Id. SCI cannot show the "inability to have made earlier discovery despite reasonable diligence" given the undisputed facts:

1. SCI had direct and regular communication with MPH's engineering team throughout the relationship (Hogan Decl. ¶ 11c, Ex. Q);

2. SCI regularly reviewed and approved invoices containing the allegedly fraudulent billing (Hogan Decl. ¶¶ 3, 6; Ex. E, N);

3. SCI was in a position to verify team composition and work allocation through its direct contacts with the team (Hogan Decl. ¶ 11c; Ex. Q);

4. SCI possessed all necessary information to discover the alleged fraud had it exercised reasonable diligence (Hogan Decl. ¶¶ 3, 6, 11c; Ex. E, N, Q);

5. SCI has provided no explanation for its failure to discover the alleged fraud earlier despite having all necessary information (Hogan Decl. ¶ 11c; Ex. AA, AL, Pages 204–209). Nothing in the Initial Disclosures sets forth any basis for delayed discovery.

In *Platt Elec. Supply*, the Ninth Circuit emphasized that under California law, "a plaintiff is held to her actual and constructive knowledge." 522 F.3d at 1054. The court explained that constructive knowledge includes "information that would make a reasonably prudent person suspicious." *Id.* Given SCI's direct access to MPH's engineering team and review of invoices, SCI either knew of the alleged fraud (triggering the limitations period) or failed to exercise reasonable diligence (precluding reliance on the delayed discovery rule).

California courts have consistently held that when a plaintiff has the means to discover fraud through reasonable diligence, the delayed discovery rule does not apply. In *Miller v. Bechtel Corp.*, 33 Cal. 3d 868, 875 (1983), the California Supreme Court held that "plaintiff is charged with knowledge of facts which would have been disclosed by an investigation if plaintiff had a duty to investigate." SCI had such a duty given its ongoing business relationship with MPH and regular review of invoices and deliverables.

The claim that SCI somehow discovered the alleged fraud only shortly before filing suit in January 2023 is contradicted by its 6 years-long direct engagement with MPH's engineering team and approval of invoices. Under California law, this is insufficient to trigger the delayed discovery rule. *See Grisham v. Philip Morris U.S.A.*, Inc., 40 Cal. 4th 623, 638 (2007) (plaintiff must show "inability to have made earlier discovery despite reasonable diligence").

Computerlaw Group LLP
www.computerlaw.com℠

**E. SCI Cannot Rely on "Continuous Accrual" to Salvage Its Claims Either.**

SCI may alternatively attempt to invoke the theory of continuous accrual to salvage portions of its fraud claim. This theory, however, does not apply to SCI's fraud claim because there can be no "continuous accrual" in this case given the express 30-day and 6-month periods which require written objections (and then negotiation/arbitration for timely resolution).

No written objections occurred here. California's continuous accrual theory provides that "when there are ongoing contractual obligations, a plaintiff may allege a series of breaches over time." *Aryeh v. Canon Bus. Sols., Inc.*, 55 Cal. 4th 1185, 1199 (2013). While this theory might apply to contract claims in some circumstances, it is inapplicable to fraud claims, which accrue when the plaintiff discovers or should have discovered the fraud. *Platt Elec. Supply*, 522 F.3d at 1054. Even if a continuous accrual theory could apply to fraud claims, it would not help SCI because:

1. The alleged fraud is based on a unified scheme of purportedly fraudulent billing practices (Hogan Decl. ¶ 11c, Ex. AA;), not discrete, independent fraudulent acts;

2. SCI had knowledge or reason to know of the allegedly fraudulent practices by December 2019 at the latest (Hogan Decl. ¶ 11c, Ex. Q);

3. The Agreement's six-month contractual limitations period (§ 5.2) and 30-day acceptance provision (§ 1.2) independently bar application of continuous accrual (Hogan Decl. ¶ 2, Ex. A).

In *Aryeh*, the California Supreme Court clarified that continuous accrual applies "when an obligation or liability arises on a recurring basis," creating "a series of wrongs" where "a cause of action accrues each time." 55 Cal. 4th at 1199. However, the court also emphasized that this theory is subject to "the parties' ability to alter the limitations period by contract." Id. at 1196. Here, the Agreement expressly shortens the limitations period to six months (§ 5.2) and establishes a 30-day acceptance period (§ 1.2), both of which override any application of continuous accrual.

Moreover, the Ninth Circuit, applying California law, has recognized that continuous accrual does not apply when the plaintiff has knowledge of the alleged wrongdoing. In *Danjaq LLC v. Sony Corp.*, 263 F.3d 942, 954 (9th Cir. 2001), the court held that the continuing wrong doctrine "extends the statute of limitations in cases alleging tortious behavior that began before the

Computerlaw Group LLP
www.computerlaw.com℠

limitations period, but continued into the limitations period." It does not, however, extend the limitations period once the plaintiff is aware of the alleged wrongdoing.

Given SCI's knowledge of MPH's billing practices by December 2019 at the latest, the continuous accrual theory cannot revive SCI's time-barred fraud claim.

**F. Conclusion: SCI's Fraud Claim Is Barred, As a Matter of Law, Under Three Independent Limitations Periods; SCI Cannot Avoid The Fact of Its Long Delay**

In sum, SCI's fraud claim is time-barred under three independent limitations periods:

1. California's three-year statute of limitations for fraud (Cal. Code Civ. Proc. § 338(d)), which expired in December 2022 at the latest, before SCI filed suit on January 12, 2023;

2. The Agreement's six-month contractual limitations period (§ 5.2), which required SCI to file any claim within six months of discovery;

3. The Agreement's 30-day acceptance provision (§ 1.2), which established deemed acceptance of all deliverables and associated invoices.

Each of these periods independently bars SCI's fraud claim. Neither the delayed discovery rule nor the continuous accrual theory can salvage SCI's untimely claim given SCI's direct access to MPH's engineering team and years of review and approval of the allegedly fraudulent invoices. Summary judgment on SCI's fraud claim is therefore warranted based on these limitations periods alone, in addition to the substantive defects noted elsewhere in this motion.

**II.     THE BREACH OF CONTRACT CLAIMS ARE ALSO TIME-BARRED.**

**A. SCI's Breach of Written Contract Claims Are Barred, As a Matter of Law, by California's Four-Year Statute of Limitations.**

SCI's claims for breach of the written Agreement are barred by California Code of Civil Procedure § 337, which establishes a four-year limitations period for "[a]n action upon any contract, obligation or liability founded upon an instrument in writing." This four-year period applies to SCI's claims regarding 2016 Agreement, barring any breach claims that accrued before January 12, 2019 (four years before SCI filed suit on January 12, 2023).

California law establishes that a cause of action for breach of contract accrues at the time of breach. *Romano v. Rockwell Int'l, Inc.*, 14 Cal. 4th 479, 488 (1996). Unlike fraud claims, the

Computerlaw Group LLP
www.computerlaw.com℠

discovery rule generally does not apply to breach of contract actions. *See April Enterprises, Inc. v. KTTV*, 147 Cal. App. 3d 805, 832 (1983)

SCI's complaint generally alleges numerous breaches of the written 2016 Agreement dating back to 2016 (Hogan Decl. ¶ 11b; Ex. AA, Pages 2, 9, 21-23). These include claims that:

1.  MPH failed to provide adequate services under the Agreement starting in 2016;

2.  MPH improperly billed for phantom team members throughout the relationship;

3.  MPH misrepresented development resources from the inception of the Agreement;

4.  MPH failed to properly maintain software from the beginning of the relationship.

These alleged breaches, if they occurred at all (which MPH firmly denies), accrued at the time of the purported misconduct, which SCI claims began in 2016 and continued throughout the relationship. As the Ninth Circuit has recognized when applying California law, "a cause of action accrues when the breach occurs, irrespective of whether any damage is apparent or whether the injured party is aware of his right to sue." *Menominee Indian Tribe of Wis. v. United States*, 614 F.3d 519, 529 (9th Cir. 2010).

Under this standard, all of SCI's breach of written contract claims that accrued prior to January 12, 2019, including all alleged breaches from 2016 through January 11, 2019, are time-barred under California Code of Civil Procedure § 337. This encompasses the majority of the alleged breaches in SCI's complaint, as most relate to conduct beginning in 2016.

The Northern District has consistently enforced this four-year limitation in software and technology contract disputes. In *Oracle America, Inc. v. Hewlett Packard Enterprise Co.*, 971 F. Supp. 2d 975, 985-86 (N.D. Cal. 2013), the court dismissed breach of contract claims that accrued more than four years before filing, despite the plaintiff's argument that the breaches were part of an ongoing pattern. Similarly, in *Synopsys, Inc. v. ATopTech, Inc.*, 2015 WL 1197693, at *4 (N.D. Cal. Mar. 16, 2015), the court held that breach of contract claims accrued at the time of breach, not when damages were discovered.

SCI cannot avoid this limitations period by characterizing its claims as a "continuing breach." California courts have rejected the continuing breach theory for standard contract claims, holding that "a breach of contract claim accrues at the time of the breach, which then starts the

Computerlaw Group LLP
www.computerlaw.com℠

limitations period running." *Dillon v. Bd. of Pension Comm'rs*, 18 Cal. 2d 427, 430 (1941). As noted in *FNB Mortgage Corp. v. Pacific General Group*, 76 Cal. App. 4th 1116, 1133 (1999), "[t]he continuing violation doctrine is not applicable to [breach of contract] causes."

**B. Alleged Breaches During the Limitations Period Are Independently Barred by the 30-Day Acceptance Provision As a Matter of Law; No Rejections/No Revocations Occurred.**

Even for alleged breaches occurring within the four-year statutory period (after January 12, 2019), SCI's claims are independently barred by the Agreement's 1.2 acceptance provision. The undisputed evidence shows that SCI accepted all Deliverables without objection throughout the entire relationship, including during the limitations period (Hogan Decl. ¶ 3, Ex. E). Under California law, this acceptance constitutes a waiver of breach claims related to those Deliverables. *See Wind Dancer Prod. Grp.*, 10 Cal. App. 5th at 73 (contractual acceptance provisions are enforceable); *Artificial Intelligence Corp.*, 1 Cal. App. 4th at 28 (same).

The Ninth Circuit has held that under California law, a party's acceptance without objection, as specified in a contract, precludes subsequent breach claims. *MWS Wire Indus., Inc. v. Cal. Fine Wire Co.*, 797 F.2d 799, 802-03 (9th Cir. 1986). Here, SCI's failure to object to deliverables within the contractually specified 30-day period constitutes acceptance and a waiver of breach claims, even for deliverables within the statutory limitations period.

**C. Additionally, as a Matter of Law, the Six-Month Contractual Limitations Period Further Bars All Breach of Contract Claims Because No Claim Was Timely Made.**

Beyond the statutory limitations period and the Agreement's acceptance provision, SCI's breach of written contract claims are further barred by the Agreement's six-month contractual limitations period. Agreement, Section 5.2. Nothing was timely filed.

In sum, California law clearly permits contracting parties—and especially merchants— to agree to a shorter limitations period than that prescribed by statute, so long as the time provided is reasonable. *Moreno v. Sanchez*, 106 Cal. App. 4th at 1430. The Ninth Circuit, applying California law, has consistently upheld contractual limitations periods of six months or less. In *Han v. Mobil Oil Corp.*, 73 F.3d at 877, the court upheld a six-month limitation as "reasonable," and in

Computerlaw Group LLP
www.computerlaw.com℠

1  *Hambrecht & Quist Venture Partners v. Am. Med. Int'l, Inc.*, 38 F.3d 1118 (9th Cir. 1994), the

2  court enforced a 30-day limitations period.

3      The six-month contractual period is particularly reasonable in the software context, where

4  prompt resolution of issues is essential to maintain project momentum and accurate recordkeeping.

5  As the court recognized in *Lewis v. YouTube, LLC*, 197 Cal. App. 4th 1387, 1394 (2011),

6  contractual limitations periods in technology agreements serve important interests in "providing

7  repose and protection against stale claims and promot[ing] judicial efficiency."

8      Under the Agreement's six-month provision, SCI's breach of written contract claims are

9  time-barred because SCI did not file suit within six months of any alleged breach. Can a merchant

10  wait years to claim breach when a contract expressly limits time periods to do so?  SCI filed suit

11  on January 12, 2023 (Hogan Decl. ¶ 11b; Ex. AA, Page 9).  All alleged breaches occurred well

12  before that time.

13  **D. The Breach of Oral "Agreement II" Claims Are Also Barred by Limitations**

14      SCI's claims for breach of alleged oral agreements, including the fictitious "Agreement II,"

15  are barred by California Code of Civil Procedure § 339, which establishes a two-year limitations

16  period for "[a]n action upon a contract, obligation or liability not founded upon an instrument of

17  writing." This two-year period bars any claims for breach of oral contract(s) that accrued before

18  January 12, 2021 (two years before SCI filed suit on January 12, 2023).

19      SCI alleges the existence of one oral agreement, SCI calls "MPH Agreement II," which

20  supposedly modified or replaced the written Agreement (Hogan Decl. ¶ 11b; Ex. AA, Pages 2, 9,

21  18, 21-23). According to SCI's complaint, this (oral) "Agreement II" was formed and subsequently

22  breached as early as 2017 (Hogan Decl. ¶ 11b; Ex. AA, Page 9).  That is certainly two years beyond

23  the two-year statute of limitations. Id.

24      Under California law, the two-year statute of limitations for oral contracts begins to run at

25  the time of breach, not when damages are discovered. This principle is codified in California Code

26  of Civil Procedure § 339, which states that an action upon a contract not founded upon an

27  instrument of writing must be commenced within two years (West's Ann.Cal. C.C.P. § 339). The

28

Computerlaw Group LLP
www.computerlaw.com℠

statute of limitations for an oral contract typically starts running upon the negligent breach of the contract. *Seelenfreund v. Terminix of Northern Cal., Inc.*, 84 Cal.App.3d 133 (1978).

As this District has recognized, "a breach of contract claim—including breach of an oral contract—accrues at the time of breach, which then starts the limitations period running." *Creditors Collection Serv. of Sacramento v. Castegnaro*, 17 F. Supp. 2d 1079, 1082 (N.D. Cal. 1998).

SCI's own complaint places the alleged breaches of oral agreements well outside the two-year limitations period. SCI claims that oral agreements were formed and breached between 2017 and 2020 (Hogan Decl. ¶ 11b; Ex. AA, Pages 9, 18, 21-23). These alleged breaches accrued at the time they occurred, making all claims for breaches before January 12, 2021, time-barred under Section 339.

**E. Undisputed Evidence Confirms SCI Had Knowledge of Any Alleged Oral Agreement Breach Long Before the Limitations Period and Never Objected At All and Did Not File.**

The evidence clearly establishes that SCI was aware of the existence and terms of any alleged oral agreements (if they existed, which MPH denies) well before the limitations period expired. SCI's own communications from 2020 and 2022 refer exclusively to the written Agreement as governing the parties' relationship, contradicting SCI's current claim that oral agreements modified or superseded the written Agreement (Hogan Decl. ¶ 11b; Ex. AF, AG). These communications are significant because they demonstrate SCI's knowledge of any alleged oral agreements years before filing suit. Under California law, this knowledge started the limitations clock running, regardless of when SCI claims to have "discovered" the alleged breaches. *See Angeles Chem. Co. v. Spencer & Jones*, 44 Cal. App. 4th 112, 119 (1996) (holding that knowledge of facts, not their legal significance, starts the statute of limitations).

The Ninth Circuit has similarly held that under California law, a plaintiff's knowledge of the facts underlying a claim triggers the limitations period, regardless of when the plaintiff realizes the legal significance of those facts. *See Platt Elec. Supply*, 522 F.3d at 1054. Here, SCI's knowledge of any alleged oral agreements—evidenced by its communications referencing the

Computerlaw Group LLP
www.computerlaw.com℠

1  parties' contractual relationship—triggered the limitations period for any breach claims, rendering

2  claims outside the statutory periods time-barred.

3  **F. The Contractual Six-Month Period is Also a Contractual Time Bar.**

4  Beyond the statutory two-year limitations period, SCI's oral contract claims are

5  independently barred by the Agreement's Section 5.2 six-month contractual period. Agreement

6  (Hogan Decl. ¶ 2; Ex. A, § 5.2).

7  California courts have held that contractual limitations periods apply not only to claims

8  directly based on the written contract but also to related claims, including those based on alleged

9  oral agreements that modify or relate to the written contract. *See Moreno*, 106 Cal. App. 4th at

10  1430. In *Han*, the Ninth Circuit upheld application of a contractual limitations period to claims

11  beyond direct breach of the written agreement, including related oral promises. 73 F.3d at 877.

12  SCI's alleged oral contracts, particularly the fictional "MPH Agreement II," directly relate to the

13  services provided under the written Agreement and therefore fall within the scope of Section 5.2's

14  six-month limitation provision. Because SCI did not file suit within six months of any alleged

15  breach of these purported oral agreements, the claims are time-barred under the contractual

16  limitations period.

17  **G. The Statute of Frauds Bars Any Alleged Oral Agreement; None Can Exist Here**

18  In addition to the limitations bars, SCI's claims for breach of oral agreements are further

19  precluded by the California Statute of Frauds and by the Agreement's integration clause. Section

20  7.5 of the Agreement states:

> This Agreement, and Exhibits hereto and the documents and
> instruments and other agreements among the parties hereto
> referenced herein: (a) constitute the entire agreement among the
> parties with respect to the subject matter hereof and supersede all
> prior agreements and understandings both written and oral, among
> the parties with respect to the subject matter hereto.

24  (Hogan Decl. ¶ 2; Ex. A, § 7.5).

25  Under California law, especially in commercial agreements between merchants, an

26  integration clause precludes consideration of prior or contemporaneous oral agreements that

27  contradict, vary, or add to the terms of the integrated written contract. *Masterson v. Sine*, 68 Cal.

Computerlaw Group LLP
www.computerlaw.com℠

2d 222, 225 (1968). The Ninth Circuit, applying California law, has consistently upheld integration clauses to bar claims based on alleged oral agreements. *See Paracor Fin., Inc. v. Gen. Elec. Capital Corp., 96 F.3d 1151, 1167 (9th Cir. 1996)*, (integration clause barred claims based on alleged oral representations);

    The Agreement's integration clause explicitly supersedes "all prior agreements and understandings both written and oral," precluding SCI's claims based on the fictitious "MPH Agreement II" or other alleged oral agreements. Even if such claims were not time-barred (which they are), they would be unenforceable due to the integration clause and the Statute of Frauds.

**H. SCI's Own Communications Confirm Only One Written Agreement Here.**

    SCI's own communications directly contradict its current claims regarding oral agreements and further demonstrate the time-barred nature of its breach claims. In 2020 and 2022, SCI explicitly referenced the written Agreement as governing the parties' relationship, with no mention of any "Agreement II" or other oral modifications (Hogan Decl. ¶ 11b; Ex. AF, AG). These communications are significant for two reasons:

    1. They confirm SCI's knowledge of the contractual relationship and any alleged breaches years before filing suit, triggering the limitations periods;

    2. They directly contradict SCI's current claims regarding oral agreements, supporting enforcement of the integration clause.

    This District has consistently held that a party's contemporaneous communications acknowledging a written agreement contradict later claims of oral modifications. *See Nevro Corp. v. Bos. Sci. Corp.,* 312 F. Supp. 3d 726, 733 (N.D. Cal. 2018) (party's emails referring to written agreement undermined claims of oral modification). SCI's communications thus reinforce the time-barred nature of its breach claims and the validity of the integration clause.

**III.    THE AGREEMENT'S NOTICE PROVISION PROVIDES A FURTHER INDEPENDENT BAR**

    Beyond the statutory and contractual limitations periods, the integration clause and the Statute of Frauds, SCI's breach claims are further barred by the Agreement's notice provision.

Computerlaw Group LLP
www.computerlaw.com℠

Section 7.9 of the Agreement requires that "[a]ny notice required to be given under this Agreement shall be in writing" and delivered according to specified methods (Hogan Decl. ¶ 2; Ex. A, § 7.9). California courts enforce contractual notice provisions as written. *See Magic Carpet Ride LLC v. Rugger Inv. Grp. L.L.C.*, 41 Cal. App. 5th 357, 364 (2019) (enforcing contractual notice provision); *Cornwell v. Bank of Am. Nat'l Tr. & Sav. Ass'n*, 224 Cal. App. 3d 995, 999 (1990) (same). The Ninth Circuit has similarly upheld contractual notice requirements under California law. *See Brobeck, Phleger & Harrison v. Telex Corp.*, 602 F.2d 866, 873 (9th Cir. 1979).

SCI failed to provide written notice of any alleged breach as required by Section 7.9, further barring its breach claims (Hogan Decl. ¶ 11e). This failure to comply with the contractual notice requirement provides yet another basis for dismissing SCI's time-barred breach claims.

SCI's breach of contract claims are time-barred under multiple independent limitations periods:

1. California's four-year statute of limitations for written contracts (Cal. Code Civ. Proc. § 337), which bars claims for breaches before January 12, 2019;

2. California's two-year statute of limitations for oral contracts (Cal. Code Civ. Proc. § 339), which bars claims for breaches before January 12, 2021;

3. The Agreement's six-month contractual limitations period (§ 5.2), which bars all breach claims not filed within six months of accrual;

4. The Agreement's 30-day acceptance provision (§ 1.2), which established deemed acceptance of all deliverables and associated services and bars all claims altogether.

In addition, SCI's breach claims are further precluded by the Agreement's integration clause (§ 7.5), which supersedes all prior oral agreements, and its notice provision (§ 7.9), which SCI failed to follow. SCI's own communications confirming the parties operated under the written Agreement further contradict its current claims.  SCI could have arbitrated its claims in 2017, 2018, 2019 but it did not. Instead, it accepted discounts and deferrals and had MPH increase staff and produce additional features, functions and improvements.  This is not a software defect case; this is a case where a happy client decided to steal an entire team and then use a lawsuit to "provide cover" and to assert "the best defense is a good offense."  Given these multiple, independent bases for finding SCI's breach claims time-barred, summary judgment on these claims is warranted based

Computerlaw Group LLP
www.computerlaw.com℠

on the limitations periods alone. The fact is that this lawsuit was filed after SCI misappropriated MPH's entire team including all of its trade secret and confidential intellectual property.  How can it not be so given that SCI was seeking pricing reductions for the next (2023) year and never any complaint or other notice about any improper billings in any of the prior 6 years?

## IV.   SCI'S TORT CLAIMS MERELY RESTATE CONTRACT-BASED GRIEVANCES AND ARE BARRED AS A MATTER OF LAW AS WELL.

As a threshold legal matter, this Court must determine whether SCI's claims are fundamentally breaches of contract which SCI attempts to "repackage" as a "fraud" tort or whether there are any genuine independent tort claims supported by actual admissible evidence.  The Initial Disclosures reveal no actual evidence.  In April, 2025, the California Supreme Court clarified in *New England Country Foods, LLC v. VanLaw Food Products, Inc.*, 2025 WL 1190980 (Cal., 2025), that California Civil Code Section 1668 does not preclude "parties from limiting their liability for pure breaches of contract absent a violation of an independent duty that falls within the ambit of section 1668." The Court explained that "[w]here the claims asserted are 'nothing more than a breach of… contractual obligations,' Section 1668 does not apply." *New England Country Foods, LLC v. VanLaw Food Products, Inc.*, 2025 WL 1190980, at *8 (Cal., 2025).

All of SCI's claims stem from the same fundamental contractual allegation—that MPH failed to perform its contractual obligations regarding software delivery. Unlike in *New England Country Foods*, where the defendant allegedly hatched a "backup plan" to intentionally interfere with the plaintiff's customer relationship, MPH's conduct was entirely confined to the scope of the parties' contractual relationship. SCI's alleged damages flow directly from the purported breach of contract, not from any independent tortious conduct. And, nothing otherwise is disclosed in SCI's Initial Disclosures.  Hogan Decl.  ¶ 15; Russo Decl. ¶¶ 5-7.

The California Supreme Court specifically noted that mechanisms exist to ensure "parties cannot proceed in tort for what are essentially breaches of contract, " including the economic loss rule, which bars recovery in tort "unless [the party] can demonstrate harm above and beyond a broken contractual promise." *New England Country Foods*, 2025 WL 1190980, at *8. None are disclosed here.

Here, SCI cannot demonstrate any harm beyond the alleged breach of the 2016 Agreement. The "phantom QA" employee that SCI claims exemplifies fraud was, in fact, Christopher Rosales, billed at a $1,300/month discount (Hogan Decl. ¶ 7). The additional "Software Engineer" discounts saved SCI $425,318 (Hogan Decl. ¶ 9). These business accommodations—which ultimately benefited SCI—cannot transform a contract dispute into a tort claim. The Court must rule on this undisputed fact given SCI's failure to disclose otherwise in Initial Disclosures.

California law enforces integration clauses to bar extrinsic evidence. *Robinson Helicopter Co. v. Dana Corp.*, 34 Cal.4th 979, 993 (2004). Here, SCI's fraud claims rely on alleged misrepresentations directly contradicted by the Agreement's terms (Hogan Decl. ¶ 11). The "fraud" claim is merely a repackaged contract claim, and it is barred by the economic loss rule and the 2016 Agreement's limitation of liability provisions and waiver of consequential and other indirect damages remain fully enforceable. SCI's failure to disclose any form of direct damages or any calculations thereof in its Initial Disclosures bars it from now contesting the lack of any basis for its claims given the parties' written Agreement and the long delay in asserting any claims. No basis exists for going forward with any aspect of this lawsuit and no injunctive relief can possibly be justified nor can any other alleged claim survive.

## CONCLUSION

For all the foregoing reasons, Defendant is entitled to summary judgment as a matter of law on all purported "causes of action. " The Agreement—an integrated, negotiated agreement between merchants. There is no genuine issue for trial, only wasted expense and delay. In today's economy, small businesses like Defendant can ill afford to defend meritless claims through discovery and trial. Granting summary judgment is both legally required and equitable: it spares the parties (and the court) the unnecessary burden and it prevents the undue economic harm that baseless litigation imposes. SCI could have arbitrated its monetary claims in 2017, 2018, 2019, 2020, 2021 or even in 2022 but it cannot receive invoices, make payments, and then hatch a lawsuit in derogation of every aspect of the parties' Agreement to try to justify its raiding and misappropriating of MPH's software team. That is what this case is all about.

Computerlaw Group LLP
www.computerlaw.com℠

Respectfully submitted,

Dated: June 17, 2025

COMPUTERLAW GROUP LLP

By: _____

Jack Russo

Attorneys for Defendant and Counter-

Claimant MPH INTERNATIONAL LLC

Computerlaw Group LLP
www.computerlaw.com℠

Exhibit H

 Outlook

**Redactions .....hardly material...**

**From** Jack Russo <jrusso@computerlaw.com>
**Date** Tue 8/12/2025 10:25 AM
**To** Gary Sedlik <gary@sedlikgroup.com>
**Cc** Linyan Tian <ltian@computerlaw.com>

📎 1 attachment (410 KB)
63_Redacted.pdf;

Gary,

If it helps, here is a graphical version of my point about the secondary and tertiary points that do not materially change the overall MSJ and it really does demonstrate why there was not a single distinction or argument in your opposition papers.

That you acquired some AI tools last Friday that gave you this new report is certainly more than interesting and I suppose the next step is a "materiality analysis". Do you really honestly see materiality from all this?

Please let me know by noon whether anything I have sent early this morning provides a path forward.  Does it?  If not, let me know as I will promptly today turn to the 7-11 motion filed solely by me and you can decide if you oppose.  Thank you for all your continuing cooperation.

Ps. If you think more should be redacted, please let me know as this is certainly what the Court would expect in a good faith process that started yesterday (based on your Friday night notice, my weekend work, and our Zoom call yesterday and the process overnight last night) and early this morning and now.  Thanks!

Best Regards,

Jack Russo**
Managing Partner
Computerlaw Group LLP
Jrusso@computerlaw.com
www.computerlaw.com
https://www.linkedin.com/in/jackrusso
"Entrepreneurs Imagine Better Worlds!"®
Via Siri to expedite (~99% accurate?)
**AMA: https://app.soopra.ai/ideachampion/chat

Exhibit I

 Outlook

**Re: Case Law to Consider at pp.. 644-646**

From  Jack Russo <jrusso@computerlaw.com>
Date  Tue 8/12/2025 11:32 AM
To    Gary Sedlik <gary@sedlikgroup.com>
Cc    Linyan Tian <ltian@computerlaw.com>

For clarification: why then did you ask me to insert text on my position on this point?  I thought I did precisely what you asked.  What text did you expect?

Best Regards,

Jack Russo**
Managing Partner
Computerlaw Group LLP
Jrusso@computerlaw.com
www.computerlaw.com
https://www.linkedin.com/in/jackrusso
"Entrepreneurs Imagine Better Worlds!"®
Via Siri to expedite (~99% accurate?)
**AMA: https://app.soopra.ai/ideachampion/chat

> On Aug 12, 2025, at 1:45 PM, Gary Sedlik <gary@sedlikgroup.com> wrote:
>
> Jack:
>
> Again, with all due respect, consideration and professionalism, I think my client's position on this issue is clear.
>
> As I have now said several times, my client is not willing to execute a stipulation whereby you commit to future negotiations over what you deem to be "reasonable fees" where the actual fees are indisputable and were paid in full.
>
> Best Regards,
>
> Gary Sedlik | Managing Partner | SedlikGroup, P.C. | T: 310-439-9986 | E: gary@sedlikgroup.com
>
> **From:** Jack Russo <jrusso@computerlaw.com>
> **Date:** Tuesday, August 12, 2025 at 10:30 AM
> **To:** Gary Sedlik <gary@sedlikgroup.com>
> **Cc:** Linyan Tian <ltian@computerlaw.com>
> **Subject:** Re: Case Law to Consider at pp.. 644-646
>
> I hear you; any comments on the insert I suggested?  Or did I miss another email?
>
> Best Regards,
>
> Jack Russo**
> Managing Partner
> Computerlaw Group LLP
> Jrusso@computerlaw.com
> www.computerlaw.com
> https://www.linkedin.com/in/jackrusso
> "Entrepreneurs Imagine Better Worlds!"®
> Via Siri to expedite (~99% accurate?)
> **AMA: https://app.soopra.ai/ideachampion/chat
>
>> On Aug 12, 2025, at 12:57 PM, Gary Sedlik <gary@sedlikgroup.com> wrote:
>>
>> Jack:
>>
>> I'm sorry that you are having sleepless nights. There is no part of me that seeks to make this process any more difficult or unpleasant for you or your client than it already is, either personally or professionally. I feel that my client and I have acted professionally, courteously and compassionately in response to an extremely unfortunate but serious situation. We have done everything in our power to try to resolve this issue quickly and efficiently in a way that is fair to all parties.
>>
>> Nevertheless, as I said in my prior communications, I am not going to waste any additional time and money on this issue. I will note, however, that in the very first case listed in the chart of the opinion you sent to me, after the Court issued its Order to Show Cause, counsel who had filed the offending brief "paid opposing counsel's fees for defending the Motions." Even so, the Court still sanctioned counsel *in addition to* payment of the opposing party's legal fees.
>>
>> My client has considered and rejects your offer to donate money to a charity in lieu of compensating it for the legal fees incurred in responding to the motion. That proposal does not compensate my client for the harm caused by your filing of the Corrected MSJ Motion.
>>
>> As I said, I need to move onto other matters.
>>
>> Best Regards,
>>
>> Gary Sedlik | Managing Partner | SedlikGroup, P.C. | T: 310-439-9986 | E: gary@sedlikgroup.com
>>
>> **From:** Jack Russo <jrusso@computerlaw.com>
>> **Date:** Tuesday, August 12, 2025 at 4:09 AM
>> **To:** Gary Sedlik <gary@sedlikgroup.com>

**Cc:** Linyan Tian <ltian@computerlaw.com>
**Subject:** Case Law to Consider at pp.. 644-646

Gary:

It should be obvious to you that this is another sleepless night for me.  I have spent hours and hours reviewing the case law (at no charge to anyone of course) and I found a repeated and clear proportionality principle as shown in the attached case ($5500 sanction) and the table of compiled cases at pp. 644-646 (average sanction well under $5000).  Please read at least that table.

With the above in mind, I have a new idea: I would propose a $20,000 gift paid by me to The Ronald MacDonald House in your client's name and this would all be without prejudice to your client getting his fees/costs as the prevailing party (if he is) at the end of the case and if he is not then he gets an offset/setoff agaivst the fees/costs of my client at that final accounting for the claim you are asserting here.

You may know that I started the Foundation for Creativity in Dispute Resolution. a non-profit (I founded years and years ago) to help foster creative dispute resolution ideas.  This idea arose from discussions with mediators who help the others pro bono (as I do) through the Foundation.

Will you ask your client to consider this?  It is a creative solution and it does help a good cause.  This gift may make a much larger difference to lives than any more time we spend on this.  Think about it (please).


Best Regards,


Jack

 Outlook

---

**Stipulation....**

---

**From** Jack Russo <jrusso@computerlaw.com>
**Date** Tue 8/12/2025 6:30 AM
**To** Gary Sedlik <gary@sedlikgroup.com>
**Cc** Linyan Tian <ltian@computerlaw.com>

📄 1 attachment (66 KB)
2025.08.11 MPH Stipulation Withdraw MSJ FINAL_GSSEdits.docx;

To answer your below question after a bit of sleep and a cup of coffee:

***NOTE: Please insert whether you agree to pay this amount as part of this stipulation or if you wish to contest the amount. Please note that Plaintiff does not agree to conduct further meet and confer regarding whether you believe these amounts are "reasonable" or whether MPH or your firm should or should not be required to pay all or part of the attorney's fees or costs, as this will only result in more unnecessary fees being incurred by SC].***

My insertion would  be:

"Defense counsel personally agrees to reasonably compensate Plaintiff for a reasonable  amount in light of the case law that Plaibtiff's counsel has received from counsel and if the parties cannot reach agreement then the matter will be submitted to the Court or its Magistrate for decision."

Is this acceptable if the gift idea is rejected by your client?  Please let me know asap.


Best Regards,

Jack Russo**
Managing Partner
Computerlaw Group LLP
Jrusso@computerlaw.com
www.computerlaw.com
https://www.linkedin.com/in/jackrusso
"Entrepreneurs Imagine Better Worlds!"®
Via Siri to expedite (~99% accurate?)
**AMA: https://app.soopra.ai/ideachampion/chat

 Outlook

**Case Law to Consider at pp.. 644–646**

| | |
|---|---|
| **From** | Jack Russo <jrusso@computerlaw.com> |
| **Date** | Tue 8/12/2025 4:09 AM |
| **To** | Gary Sedlik <gary@sedlikgroup.com> |
| **Cc** | Linyan Tian <ltian@computerlaw.com> |

📎 1 attachment (633 KB)
In re Martin.pdf;

Gary:

It should be obvious to you that this is another sleepless night for me.  I have spent hours and hours reviewing the case law (at no charge to anyone of course) and I found a repeated and clear proportionality principle as shown in the attached case ($5500 sanction) and the table of compiled cases at pp. 644–646 (average sanction well under $5000).  Please read at least that table.

With the above in mind, I have a new idea: I would propose a $20,000 gift paid by me to The Ronald MacDonald House in your client's name and this would all be without prejudice to your client getting his fees/costs as the prevailing party (if he is) at the end of the case and if he is not then he gets an offset/setoff agaivst the fees/costs of my client at that final accounting for the claim you are asserting here.

You may know that I started the Foundation for Creativity in Dispute Resolution. a non–profit (I founded years and years ago) to help foster creative dispute resolution ideas.  This idea arose from discussions with mediators who help the others pro bono (as I do) through the Foundation.

Will you ask your client to consider this?  It is a creative solution and it does help a good cause.  This gift may make a much larger difference to lives than any more time we spend on this.  Think about it (please).

Best Regards,

Jack

670 B.R. 636
United States Bankruptcy Court,
N.D. Illinois, Eastern Division.

IN RE: Marla C. MARTIN, Debtor.

Case No. 24 B 13368
|
Signed July 18, 2025

**Synopsis**
**Background:** Law firm and attorney representing Chapter 13 debtor were ordered to show cause why they should not be sanctioned for filing a brief containing fake quotations and nonexistent authority manufactured by artificial intelligence (AI), in response to creditor's objection to debtor's proposed plan. Firm withdrew both the offending brief and its application for compensation.

**Holdings:** Addressing matters of first impression for the court, the Bankruptcy Court, Michael B. Slade, J., held that:

[1] attorney violated Bankruptcy Rule 9011 by failing to confirm the existence and validity of the legal authorities on which his brief relied, and

[2] a modest, joint-and-several penalty of $5,500, paid to the Clerk of the Bankruptcy Court, along with a requirement that attorney and another of firm's senior lawyers attend an in-person course on the dangers of AI, constituted the least harsh sanctions appropriate to address counsel's conduct and deter repetition by others similarly situated.

Ordered accordingly.

West Headnotes (13)

**[1]** **Attorneys and Legal Services** 🔑 Use of artificial intelligence

**Bankruptcy** 🔑 Frivolity or bad faith; sanctions

Attorney for Chapter 13 debtor violated Bankruptcy Rule 9011 when, in filing a brief responding to creditor's objection to proposed plan, he failed to confirm the existence and validity of legal authorities cited in the brief, which had been written with the use of artificial intelligence (AI) and which cited four cases for a particular proposition of law, even though none of them existed as alleged in the brief, and included several purported quotations that were not actual statements written by any court. Fed. R. Bankr. P. 9011.

**[2]** **Bankruptcy** 🔑 Frivolity or bad faith; sanctions

Rule 11 of the Federal Rules of Civil Procedure is "essentially identical" to Bankruptcy Rule 9011, for purposes of legal analysis. Fed. R. Civ. P. 11; Fed. R. Bankr. P. 9011.

**[3]** **Attorneys and Legal Services** 🔑 Use of artificial intelligence

At the very least, the duties imposed by Rule 11 of the Federal Rules of Civil Procedure require that attorneys read, and thereby confirm the existence and validity of, the legal authorities on which they rely. Fed. R. Civ. P. 11.

**[4]** **Bankruptcy** 🔑 Frivolity or bad faith; sanctions

**Bankruptcy** 🔑 Examination and Discovery

Sanctions available for violations of Bankruptcy Rule 9011 include a nonmonetary directive, an order to pay a penalty into court, or, in some circumstances, an order directing the violator to pay his or her opponent's attorney fees. Fed. R. Bankr. P. 9011(c)(4).

**[5]** **Attorneys and Legal Services** 🔑 Use of artificial intelligence

**Attorneys and Legal Services** 🔑 Persons liable

**Attorneys and Legal Services** 🔑 Type and Amount

**Bankruptcy** 🔑 Frivolity or bad faith; sanctions

Where attorney for Chapter 13 debtor was found to have violated Bankruptcy Rule 9011 by filing a brief containing fake quotations and nonexistent authority generated by artificial intelligence (AI), without having first reviewed the cited legal authorities, modest, joint-and-several penalty of $5,500, along with requirement that he and another of firm's senior lawyers attend in-person course on dangers of AI, constituted least harsh sanctions that would appropriately address the conduct and deter future, similar misconduct, even though attorney and firm had admitted their misconduct, promised not to repeat it, withdrawn their fee petition, and watched a continuing legal education (CLE) video; attorney's apparently unintentional mistake shattered credibility and imposed many harms, his professed ignorance was troubling since it was well-known in legal community that AI sometimes "hallucinated" and created fake cases, and his conduct reflected lack of care with which case was handled. Fed. R. Bankr. P. 9011, 9011(c)(4).

[6]    **Attorneys and Legal Services**    Use of artificial intelligence

Lawyers have ethical obligations not only to review whatever cases they cite, regardless of whether the cases are obtained through traditional means of legal research or by the use of artificial intelligence (AI), but also to understand developments in technology germane to their practice. U.S.Bankr.Ct.Rules N.D.Ill., Rule 9029-4A; ABA MRPC Rule 1.1.

[7]    **Attorneys and Legal Services**    Use of artificial intelligence

**Attorneys and Legal Services**    Use of artificial intelligence

No lawyer should use any generative artificial intelligence (AI) product to perform legal research without verifying the results.

[8]    **Attorneys and Legal Services**    Use of artificial intelligence

**Attorneys and Legal Services**    Use of artificial intelligence

As relevant to a lawyer's duties with respect to the use of artificial intelligence (AI) platforms to do legal research, unlike the older "predictive" AI, "generative AI" is a machine-learning model that is trained to create new data, rather than making a prediction about a specific dataset; generative AI system is one that learns to generate more objects that look like the data it was trained on.

[9]    **Attorneys and Legal Services**    Use of artificial intelligence

**Bankruptcy**    Frivolity or bad faith; sanctions

Lawyers who blindly rely on generative artificial intelligence (AI) and cite fake cases violate Bankruptcy Rule 9011 and will be sanctioned. Fed. R. Bankr. P. 9011.

[10]    **Bankruptcy**    Attorneys

Every Chapter 13 debtor deserves care and attention from their bankruptcy counsel, even if counsel has a massive docket of cases and even if those cases can be challenging to file and manage.

[11]    **Bankruptcy**    Attorneys

If a law firm does not have the resources to devote the time and energy necessary to shepherd hundreds of Chapter 13 cases at the same time, it should refer matters it cannot handle to other attorneys who can.

[12]    **Bankruptcy**    Procedure

Bankruptcy court is required by the bankruptcy rules to strike an unsigned brief if the attorney who authored it does not sign and re-file it promptly. Fed. R. Bankr. P. 9011(a).

[13]  **Attorneys and Legal Services** 🔑 Persons liable

**Bankruptcy** 🔑 Frivolity or bad faith; sanctions

Absent exceptional circumstances, Bankruptcy Rule 9011 requires that an attorney's law firm be equally responsible for the attorney's misconduct. Fed. R. Bankr. P. 9011(c)(1).

**Attorneys and Law Firms**

Attorneys for debtor, Marla C. Martin: Thomas E. Nield, The Semrad Law Firm, LLC, 11101 S. Western Avenue, Chicago, IL 60643

Attorneys for The Semrad Law Firm, LLC: Patrick Semrad, The Semrad Law Firm, LLC, 11101 S. Western Avenue, Chicago, IL 60643

Attorneys for United States Trustee: Adam Brief, Acting U.S. Trustee, Office of the U.S. Trustee Region 11, 219 South Dearborn, Room 873, Chicago, IL 60604

Attorneys for chapter 13 trustee, Marilyn O. Marshall: O. Anthony Olivadoti, Office of Marilyn O Marshall, 224 S Michigan, Suite 800, Chicago, IL 60603

Attorneys for Creditor, Corona Investments, LLC: Paul M. Bach, Bach Law Offices, Inc., P.O. Box 1285, Northbrook, Illinois 60062

**MEMORANDUM OPINION FINDING VIOLATION OF BANKRUPTCY RULE 9011 AND IMPOSING SANCTIONS**

MICHAEL B. SLADE, UNITED STATES BANKRUPTCY JUDGE

**\*638**  On June 11, 2025, I issued an order directing the Semrad Law Firm, LLC ("Semrad") and Thomas E. Nield to show cause why they should not be sanctioned for filing a brief containing fake quotations and nonexistent authority manufactured by artificial intelligence and why their compensation does not exceed the reasonable value of their services pursuant to 11 U.S.C. § 329. (Dkt. No. 56) Semrad then withdrew the offending brief (*see* Dkt. No. 58

(withdrawing Dkt. No. 51)), and it and Mr. Nield separately responded to my show cause order. (*See* Dkt. Nos. 67, 71) Semrad also withdrew its application for compensation in this case. (*See* Dkt. No. 68) The United States Trustee and Chapter 13 Trustee both argue that I should sanction Semrad and Mr. Nield (*see* Dkt. Nos. 66 and 70) and it is now my duty to address the Show Cause Order.

While I appreciate Mr. Nield's and Semrad's remorse and candor, I find that they both violated Federal Rule of Bankruptcy Procedure 9011. I further find that a modest, joint-and-several sanction of $5,500, paid to the Clerk of the Bankruptcy Court, along with a requirement that Mr. Nield and another senior Semrad attorney attend an upcoming course on the dangers of AI scheduled for the National Conference of Bankruptcy Judges (NCBJ) annual meeting in September, is the least harsh sanction that will appropriately address counsel's conduct and deter future, similar **\*639** misconduct from them and others. My reasons follow.

I.

On September 11, 2024, the Debtor and Semrad entered into this Court's form Court Approved Retention Agreement (CARA). Semrad filed the CARA along with the Debtor's signed voluntary petition under chapter 13 of the Bankruptcy Code and related papers on her behalf the next day. (*See* Dkt. No. 1)

This is the Debtor's eighth bankruptcy case. (*See* Dkt. No. 6) Each of the prior seven cases was dismissed for one reason or another. (*Id.*) Three of the Debtor's prior cases (Case Nos. 18-10082, 16-36239, 07-18870) were dismissed after confirmation because the Debtor failed to make plan payments. The other four (Case Nos. 18-02822, 16-36239, 07-13303, 07-01898) were dismissed before confirmation.

For its part, Semrad is a prolific filer of Chapter 13 cases; a material percentage of my docket consists of cases filed by that firm. And the Debtor and Semrad are very familiar with one another; Semrad had represented the Debtor in three prior bankruptcy cases before this one. Each time Semrad represented the Debtor before this case, the Debtor pursued and confirmed a chapter 13 plan, only to have her case dismissed when she was unable to comply with the plan's requirements. (*See* Case Nos. 18-10082, ECF Nos. 68 & 70; 12-28654, ECF Nos. 55, 56 & 65; 07-18870, ECF Nos. 74 & 75) And in each of those cases, Semrad petitioned for, and

was awarded, attorneys' fees. In total, before this case, the Debtor had paid Semrad $8,958.45 for its services, but she is yet to complete a bankruptcy case successfully to earn a discharge. [1]

This case has had its problems, too. The primary challenge posed by the Debtor's current situation is that she did not pay the real estate taxes owed on her Chicago home between 2012 and 2018. Creditor Corona Investments, LLC acquired rights to those payments and an associated tax lien secured by her home. The Debtor's initial chapter 13 plan proposed a $1,600 monthly plan payment and would have paid Corona $74,735, providing 0% interest. (Dkt. No. 10 §§ 2.1, 3.2) That was obviously wrong, and Corona (since even before my appointment to the bench) objected to the Debtors' initial plan long ago, pointing out the error. (*See* Dkt. No. 14 (*citing* 35 Ill. Comp. Stat. 200/21-75 and *In re LaMont*, 740 F.3d 397, 404 (7th Cir. 2014))

To give the Debtor a fair chance to confirm a plan that could save her home and the substantial equity she has in it, my predecessor and I continued the Debtor's confirmation hearing eight times to facilitate negotiations between her and Corona. (*See* Dkt. Nos. 16, 20, 25, 29, 32, 37, 40, 46) [2] Despite these efforts, after I entered a **\*640** briefing schedule to consider Corona's objection (Dkt. No. 45), and briefs were filed (*see* Dkt. Nos. 49 & 51), I advised Semrad that I could not possibly confirm the then-latest proposed Plan because, even *if* I overruled Corona's objection, the Plan was clearly not feasible: it proposed to pay creditors $2,400 per month (*see* Dkt. No. 43 § 2.1), while the schedules swore that the Debtor's disposable income was only $1,600 per month (*see* Dkt. No. 1, Schedule J, Line 23(c)). When I pointed out that straightforward feasibility problem on June 10, Semrad advised the schedules on file were incorrect and the Debtor had more income than sworn. Which is its own problem. And while Debtor's counsel later filed amended schedules (Dkt. No. 72) and an amended Plan that matched them (Dkt. No. 73), the amended Plan did not comply with an order I had entered that required any amended plan to be signed by both the Debtor and her counsel. (*Compare* Dkt. No. 55 at 2 (order requiring Debtor's signature) *with* (Dkt. No. 73) (amended plan lacking signature))

I required the Debtor's signature on any proposed amended plan for a good reason. On March 6, 2025, Debtor's counsel signed and filed on behalf of the Debtor a proposed Plan that (if confirmed) would have required the Debtor to make monthly plan payments of $2,600 for 60 months and to

provide 18% interest to Corona on its claim. (*See* Dkt. No. 35, §§ 2.1, 3.2) But on April 8, 2025, the Debtor personally appeared in Court (while Mr. Nield appeared via Zoom) and told me that she did not agree with the plan that her counsel had filed—suggesting the plan had been filed without her approval. Then, at the next hearing on June 10, 2025, when I asked Mr. Nield whether the Debtor was on board with a further-amended Plan (a question to which there are only two potential answers, yes or no), he equivocated, said that she "is, in some sense, in agreement with it" because she had made one monthly payment of $2,400 (the revised monthly payment called for in the then-current proposed Plan), while also confirming she had not signed off on the filing of amended schedules that would make that Plan feasible. (*See* Dkt. No. 65 (6/10/25 Hr'g Tr.)) That is why my June 10 order required "that both the Debtor *and* the Debtor's counsel sign any amended plan before it is filed." (*See* Dkt. No. 55 at 2 (emphasis in original)) Unfortunately, neither directive was honored; Semrad filed an amended plan without the Debtor's signature eight days after the deadline. (*See* Dkt. No. 73)

The Plan was finally confirmed earlier this week (*see* Dkt. No. 75), but suffice it to say that I have real concerns about the way that this case has been handled. I expect materially more care from Debtor's counsel. And the Chapter 13 Trustee has expressed broader concerns about Debtor's counsel generally, alleging (among other things) that Semrad often has clients sign blank signature forms, which leads to the filing of inaccurate sworn declarations, and often files cases without possessing (or being able to procure on a timely basis) basic documents necessary to prosecute any Chapter 13 case. (*See* Dkt. No. 69 (Chapter 13 Trustee's Response to Court's Rule to Show Cause))

The Chapter 13 Trustee's allegations are very serious. But I am not taking the allegations into account in this ruling because Semrad did not have an opportunity to respond to them, they relate primarily to the section 329 examination that is unnecessary given Semrad's withdrawal of its fee petition, and the reason for the Order **\*641** to Show Cause was limited to the fake citations in Semrad's response brief. However, the allegations are consistent with my general observation that Semrad should be taking more care when filing and prosecuting Chapter 13 cases than has been shown here.

II.

I described in my Show Cause Order (Dkt. No. 56) the problem that led us here. To summarize: I entered a briefing schedule to help me resolve the dispute between the Debtor and Corona; it required Corona to file a written objection to the proposed plan while giving the Debtor a chance to respond. (Dkt. No. 45) Corona then filed a "kitchen sink" objection, disputing feasibility and challenging the plan treatment offered to it and other creditors. (Dkt. No. 49) The Debtor's response—signed by Mr. Nield and Semrad on her behalf—argued that Corona lacked standing to make any arguments other than disputes over the treatment of Corona's own claim. (*See* Dkt. No. 51)

While the argument that creditors lack standing to complain about the treatment of other creditors if it does not impact the objector directly rang true, the claim that Corona lacked standing to object to *feasibility* did not. So my staff and I began to examine the issue in depth to see if Semrad's argument was supported by the caselaw. We found the following:

| What Counsel's Brief Claimed | What Actually Exists |
|---|---|
| *"In re Montoya*, 341 B.R. 41 (Bankr. D. Utah 2006). The court held that '[a] secured creditor's standing to object to confirmation is limited to issues that affect its rights directly.' Secured creditors cannot object based on disposable income or plan feasibility because those issues do not impact their claims.'" (Dkt. No. 51, at 1-2) | *In re Montoya*, 341 B.R. 41 (Bankr. D. Utah 2006) exists, and the citation is correct. However, not only does the language quoted by counsel not appear anywhere in the court's opinion, but the opinion does not address issues of standing at all. The opinion certainly does not dispute a secured creditor's right to challenge the feasibility of a chapter 13 plan. |
| *"In re Aeger*, 344 B.R. 349 (Bankr. D. Colo. 2006). The court found that secured creditors are 'not entitled to raise objections related to other creditors or the debtor's disposable income.' These objections fall within the purview of the Chapter 13 trustee." (Dkt. No. 51, at 2) | *In re Aeger*, 344 B.R. 349 (Bankr. D. Colo. 2006) does not exist. |
| *"In re Coleman*, 373 B.R. 907 (Bankr. W.D. Wis. 2007). A secured creditor may only object to confirmation where 'the plan proposes to alter the treatment of its secured claim in violation of §1325(a)(5).' Here, there is a limited issue regarding Corona's rights as they pertain to § 1325(a)(5), none of which are brought up in lines 16–20." (Dkt. No. 51, at 2) | *In re Coleman*, 373 B.R. 907 exists, although the case is from the Bankruptcy Court in the Western District of Missouri, not Wisconsin. Again, not only does counsel's quotation not appear in the case at all, the opinion does not discuss the proposition for which it is cited, let alone support it. |
| *"In re Russell*, 458 B.R. 731 (Bankr. E.D. Wis. 2011). The Court said 'A secured creditor's standing is limited to objecting to the treatment of its claim. It lacks standing to object to confirmation based on issues like feasibility or disposable income that do not directly impact its rights.'" (Dkt. No. 51, at 2) | *In re Russell*, 458 B.R. 731, exists, although the case is from the Bankruptcy Court in the Eastern District of Virginia, not Wisconsin, and is from 2010, not 2011. Yet again, the quotation from counsel's brief does not appear anywhere in the court's opinion, and the opinion does not touch on the topic of standing at all. |

In sum, what happened here is that Mr. Nield cited four cases for a proposition of law, but none of them exist as alleged in his brief. Worse still, none of the quotations relied upon in the Semrad brief are actual statements written by any court.

**\*642** I raised the problems created by these apparently fake citations at the hearing on June 10. I asked Mr. Nield directly whether he used some sort of AI to come up with this portion of his brief, and he stated the following: "I think the citation element of these cases, I guess, was – I ran it through AI to some extent, but I didn't think that the citation was wrong." (Dkt. No. 65, 6/10/25 Hr'g Tr. at 20:10-13) I then issued my Show Cause Order (Dkt. No. 56), describing the

problem in detail and directing both Mr. Nield and Semrad to respond.

To his credit, Mr. Nield appears to both understand what he did wrong and to be remorseful for it. He states that he "had never used AI to do any legal research prior to this specific instance," and he "simply entered queries into the program which elicited problems." (Dkt. No. 71 at 2) Mr. Nield then "did not review the relevant, underlying quotes from the opinions cited by the AI program" because he "assumed that an AI program would not fabricate quotes entirely." (*Id.*) Mr. Nield promises that he will never again use an AI program to do legal research "without checking every element of the AI's work product" and advises that he "has self-reported his behavior to the IARDC and is willing to take steps this Court deems necessary to ensure this never happens again." (*Id.* at 3)

For its part, Semrad states that, as a firm, it "strictly prohibits using AI for legal research or the generation of legal citations without manual verification" and that Mr. Nield's use of ChatGPT for this purpose was "outside of the firm's research protocol." (Dkt. No. 67 at 1–2) Semrad does not identify how it communicated that restriction on AI use to its attorneys and staff or what the firm's "research protocol" was prior to this case, but claims to have conducted an internal investigation (of unspecified breadth) which did not reveal other instances of improper AI usage prior to this one. (*Id.* at 2) That said, in recognition of the problem here, Semrad (1) withdrew its request for compensation in this case; (2) created a formal Artificial Intelligence Policy (which went into effect after, and as a result of, this incident); (3) required all attorneys at the firm to complete online CLE training in the "ethical and appropriate use of AI in legal practice"; and (4) offered to reimburse opposing counsel for time reviewing the offending brief. (*Id.* at 2-3)

III.

**[1]**    **[2]**    **[3]**    Federal Rule of Bankruptcy Procedure 9011(b)(2) provides that:

> By presenting to the court a petition, pleading, written motion, or other document—whether by signing, filing, submitting, or later advocating it— an attorney or unrepresented party certifies that, to the best of the person's

knowledge, information, and belief
formed after an inquiry reasonable
under the circumstances ... the claims,
defenses, and other legal contentions
are warranted by existing law or by
a nonfrivolous argument to extend,
modify, or reverse existing law, or to
establish new law.

What happened here does not appear to have been addressed
in a published Bankruptcy Court opinion before, but there is
a body of District Court cases where counsel submitted briefs
containing fake cases or quotations "hallucinated" by AI, and
Federal Rule of Civil Procedure 11 is "essentially identical"
to Bankruptcy Rule 9011. *Baermann v. Ryan (In re Ryan)*, 411
B.R. 609, 613 (Bankr. N.D. Ill. 2009). The holdings of those
District Court cases are both uniform and highly persuasive:
"At the very least, the duties imposed by Rule 11 require
that attorneys read, *and thereby confirm the existence and
validity of*, the **\*643** legal authorities on which they rely."
*Benjamin v. Costco Wholesale Corp.*, No. 24-cv-7399, 779
F.Supp.3d 341, 347 (E.D.N.Y. Apr. 24, 2025) (quoting *Park
v. Kim*, 91 F.4th 610, 615 (2d Cir. 2024) (emphasis added in
*Benjamin*)). [3]  It is undisputed that Mr. Nield did not do so.
Thus, he violated Federal Rule 9011.

 **[4]**  The sanctions available for violations of Rule 9011
include a nonmonetary directive, an order to pay a penalty
into court, or in some circumstances an order directing the
violator to pay his or her opponent's attorneys' fees. *See* Fed.
R. Bankr. P. 9011(c)(4). And where (as here) sanctions are to
be imposed, "[a]bsent exceptional circumstances, a law firm
must be held jointly responsible for a violation committed by
its partner, associate, or employee." Fed. R. Bankr. P. 9011(c)
(1). But sanctions "must be limited to what suffices to deter
repetition of the conduct or deter comparable conduct by
others similarly situated." Fed. R. Bankr. P. 9011(c)(4).

As I advised in my Show Cause Order, courts in similar cases
have issued monetary sanctions of up to $15,000, along with
various non-monetary sanctions. (Dkt. No. 56 at 3) [4]  Below is
a chart detailing the sanctions imposed in some of the recent
similar cases:

**\*644**

| Case | Facts | Sanctions |
|---|---|---|
| *Wadsworth v. Walmart Inc.*, 348 F.R.D. 489 (D. Wyo. 2025) | Plaintiff's counsel filed Motions in Limine citing nine cases; eight did not exist. Following an Order to Show Cause, the attorneys admitted that the cases were hallucinated by an AI platform. The drafter stated that it was his first time using AI in this way and he didn't learn the cases were questionable until the Court asked him to Show Cause.<br><br>After the Order to Show Cause issued, counsel: (1) withdrew the Motions, (2) were forthcoming about the use of AI, (3) paid opposing counsel's fees for defending the Motions, and (4) implemented policies and training to prevent another occurrence. | The Court revoked the drafter's pro hac vice status and imposed a $3,000 fine. The Court also imposed a sanction of $1,000 on each of the two attorneys who signed, but did not draft, the motions (for a total of $5,000 in fines). |
| *Mid Cent. Operating Eng'rs Health & Welfare Fund v. HoosierVac LLC*, No. 24-cv-00326, 2025 WL 574234 (S.D. Ind. Feb. 21, 2025) | Defendant's counsel filed a brief that cited an alleged Seventh Circuit case the magistrate judge could not locate because it was fake. The magistrate judge reviewed counsel's prior submissions and found similar issues in two other briefs. After the magistrate judge issued an Order to Show Cause, the lawyer admitted his error and took CLE courses on AI use. | The magistrate judge recommended that counsel be sanctioned $15,000. The District Court adopted the recommendation but reduced the penalty to $6,000. *Mid Cent. Operating Eng'rs Health & Welfare Fund v. HoosierVac LLC*, No. 24-cv-00326, 25 WL 1511211 (S.D. Ind. May 28, 2025). |

**\*645**

| Case | Facts | Sanctions |
|---|---|---|
| *Mata v. Avianca, Inc.*, 678 F. Supp. 3d 443 (S.D.N.Y. 2023) | Plaintiff's counsel filed an "Affirmation in Opposition" to Defendant's motion, which cited and quoted purported judicial decisions that did not exist.<br><br>After Defendant's counsel pointed out the flaws with Plaintiff's cited case law, Plaintiff's counsel did not withdraw the offending brief or volunteer an explanation to the Court.<br><br>At the hearing on the Court's subsequent Order to Show Cause, authoring counsel revealed that he had used ChatGPT, claiming he had not known that ChatGPT was capable of making up cases, and signing counsel admitted that he reviewed the Affirmation for style but made no inquiry into the author's research, even though the author had no familiarity with the law at issue. | The attorneys were required to send the sanctions opinion, the Affirmation, and the sanctions hearing transcript, with a cover letter, to their client and to each judge falsely identified as the author of a fabricated opinion (and to file copies of the letters sent on the case docket). In addition, the Court imposed a $5,000 joint and several penalty on the attorneys. |
| *Coomer v. Lindell*, Case No. 22-cv-01129, 2025 WL 1865282 (D. Colo. July 7, 2025) | Defense counsel filed a brief that contained erroneous AI-generated citations. They claimed a prior draft had been mistakenly filed, rather than a corrected final version. However, the alleged final version they contended they meant to upload had many of the same erroneous citations, among other deficiencies. The Court also took judicial notice that Defense counsel took steps to correct similar issues in a brief filed before a different federal court just days after it had issued the order to show cause in this matter. | Two lawyers were each ordered to pay $3,000 (for a total of $6,000), and one of the penalties was jointly and severally ordered against the lawyer and his law firm. |
| *Benjamin v. Costco Wholesale Corp.*, No. 24-CV-7399, 2025 WL 1195925 (E.D.N.Y. Apr. 24, 2025) | The Court was unable to locate five out of seven cases cited by Plaintiff's counsel in a reply brief and issued an Order to Show Cause.<br><br>In her Response, Plaintiff's counsel admitted that the five cases did not exist, said she used an AI platform called CharOn, and claimed she failed to sufficiently review the reply before filing it because she was pressed for time. She stated she had never used AI for anything | The Court ordered counsel to identify: (1) the two CLE classes that she already took and whether she was required to pay for them; and (2) the prospective CLE classes she intended to take. After receiving that information, the Court issued a monetary sanction of $1,000. |

**\*646**

| Case | Facts | Sanctions |
|---|---|---|
|  | law related before, and informed the Court that she took and intended to take CLE classes regarding the use of AI in federal court practice. |  |
| *Ramirez v. Humata*, No. 24-CV-242, 2025 WL 1384161 (E.D.N.Y. May 13, 2025)¹ | Four of eight cases cited by Plaintiff's counsel were hallucinated by AI, and the Court issued a Show Cause Order.<br><br>In response, Plaintiff's counsel admitted the error, apologized, and conducted a full internal investigation. | The Court ordered a joint and several penalty of $1,000 on the attorney and her law firm. |

[**Editor's Note:** The preceding image contains the reference for footnote [5]]

 **[5]**  Mr. Nield and Semrad ask me not to sanction them at all given that they have already voluntarily: (1) admitted their misconduct and promised not to do it again; (2) withdrawn any application for compensation in this case; and (3) watched an online CLE video. But while I appreciate their candor and efforts, "[t]here must be consequences." *Ferris v. Amazon.com Servs., LLC*, No. 24-cv-304, 778 F.Supp.3d 879, 882 (N.D. Miss. Apr. 16, 2025). While I believe this mistake was unintentional, a "citation to fake, AI-generated sources ... shatters [ ] credibility" and "imposes many harms." *Kohls v. Ellison*, No. 24-cv-3754, 2025 WL 66514, at *4–5 (D. Minn. Jan. 10, 2025). So the consequences "are steep." *Id.* at *5.

The first reason I issue sanctions stems from Mr. Nield's claim of ignorance—he asserts he didn't know the use of AI in general and ChatGPT in particular could result in citations to fake cases. (Dkt. No. 71 at 3) Mr. Nield disputes the court's statement in *Wadsworth* that it is "well-known in the legal community that AI resources generate fake cases." *Wadsworth v. Walmart Inc.*, 348 F.R.D. 489, 497 (D.Wyo. 2025). Indeed, Mr. Nield aggressively chides that assertion, positing that **\*647** "in making that statement, the *Wadsworth* court cited no study, law school journal article, survey of attorneys, or *any* source to support this blanket conclusion." (Dkt. No. 71 at 3–4, emphasis in Mr. Nield's brief as filed)

I find Mr. Nield's position troubling. At this point, to be blunt, any lawyer unaware that using generative AI platforms to do legal research is playing with fire is living in a cloud. This has been a hot topic in the legal profession since at least 2023, exemplified by the fact that Chief Justice John G. Roberts, Jr. devoted his 2023 annual Year-End Report on the Federal Judiciary (in which he "speak[s] to a major issue relevant to the whole federal court system," Report at 2) to the risks of using AI in the legal profession, including hallucinated case citations.[6]  To put it mildly, "[t]he use of non-existent case citations and fake legal authority generated by artificial intelligence programs has been the topic of many published legal opinions and scholarly articles as of late."[7]  At this point there are *many* published cases on the issue—while only a sampling are cited in this opinion, all but one were issued before June 2, 2025, when Mr. Nield filed the offending reply. *See, e.g.*, Jaclyn Diaz, *A Recent High-Profile Case of AI Hallucination Serves as a Stark Warning*, NPR ILLINOIS (July 10, 2025, 12:49

PM),  https://www.nprillinois.org/2025-07-10/a-recent-high-profile-case-of-ai-hallucination-serves-as-a-stark-warning ("There have been a host of high-profile cases where the use of generative AI has gone wrong for lawyers and others filing legal cases .... It has become a familiar trend in courtrooms across the U.S."). The Sedona Conference wrote on the topic in 2023.[8]  Newspapers, magazines, and other well-known online sources have been publicizing the problem for at least two years.[9]  And on January 1, **\*648** 2025, the Illinois Supreme Court issued a "Supreme Court Policy on Artificial Intelligence" requiring practitioners in this state to "thoroughly review" any content generated by AI.[10]

 **[6]**  Counsel's professed ignorance of the dangers of using ChatGPT for legal research without checking the results is in some sense irrelevant. Lawyers have ethical obligations not only to review whatever cases they cite (regardless of where they pulled them from), but to understand developments in technology germane to their practice.[11]  And there are plenty of opportunities to learn—indeed, the Illinois State Bar Association chose "Generative Artificial Intelligence – Fact or Fiction" as the theme of its biennial two-day Allerton Conference earlier this year, calling the topic "one that every legal professional should have on their radar."[12]  Similar CLE opportunities have been offered across the nation for at least the past two years.

 **[7]**   **[8]**  The bottom line is this: at this point, no lawyer should be using ChatGPT or any other generative AI product to perform research without verifying the results. Period. *See, e.g.*, *Lacey v. State Farm Gen. Ins. Co.*, No. CV 24-5205, 2025 WL 1363069, at *3 (C.D. Cal. May 5, 2025) ("Even with recent advances, no reasonably competent attorney should out-source research and writing to this technology—particularly without any attempt to verify the accuracy of that material."); *Mid Cent. Operating Eng'rs*, 2025 WL 574234, at *2 ("It is one thing to use AI to assist with initial research, and even non-legal AI programs may provide a helpful 30,000-foot view. It is an entirely different thing, however, to rely on the output of a generative AI program without verifying the current treatment or validity—or, indeed, the very existence —of the case presented."). In fact, given the nature of generative AI tools, I seriously doubt their utility to assist in performing accurate research (for **\*649** now). "Generative" AI, unlike the older "predictive" AI, is "a machine-learning model that is trained to *create* new data, rather than making a prediction about a specific dataset. A generative AI system is one that learns to generate more objects that *look like* the

data it was trained on." Adam Zewe, *Explained: Generative AI*, MIT NEWS (Nov. 9, 2023), https://news.mit.edu/2023/explained-generative-ai-1109 (emphasis added). Platforms like ChatGPT are powered by "large language models" that teach the platform to create realistic-*looking* output. They can write a story that reads like it was written by Stephen King (but wasn't) or pen a song that sounds like it was written by Taylor Swift (but wasn't). But they can't do your legal research for you. ChatGPT does *not* access legal databases like Westlaw or Lexis, draft and input a query, review and analyze each of the results, determine which results are on point, and then compose an accurate, Bluebook-conforming citation to the right cases—all of which it would have to do to be a useful research assistant. Instead, these AI platforms look at legal briefs in their training model and then create output that *looks like* a legal brief by "placing one most-likely word after another" consistent with the prompt it received. Brian Barrett, *"You Can't Lick a Badger Twice": Google Failures Highlight a Fundamental AI Flaw*, WIRED (Apr. 23, 2025, 7:44 PM), https://www.wired.com/story/google-ai-overviews-meaning/.

[9]    If anything, Mr. Nield's alleged lack of knowledge of ChatGPT's shortcomings leads me to do what courts have been doing with increasing frequency: announce loudly and clearly (so that everyone hears and understands) that lawyers blindly relying on generative AI and citing fake cases are violating Bankruptcy Rule 9011 and will be sanctioned. Mr. Nield's "professed ignorance of the propensity of the AI tools he was using to 'hallucinate' citations is evidence that [the] lesser sanctions [imposed in prior cases] have been insufficient to deter the conduct." *Mid Cent. Operating Eng'rs*, 2025 WL 574234, at *3.

[10]    [11]    [12]    The second reason I issue sanctions is that, as described above, I also have concerns about the way this particular case was handled. I understand that Debtor's counsel has a massive docket of cases. But every debtor deserves care and attention. Chapter 13 cases can be challenging to file and manage—especially when they involve complexities like those in this case. If a law firm does not have the resources to devote the time and energy necessary to shepherd hundreds of Chapter 13 cases at the same time, it should refer matters it cannot handle to other attorneys who can—lest a search for time-saving devices lead to these kinds of missteps. What I mean to convey here is that while everyone makes mistakes, I expect—as I think all judges do—attorneys to be more diligent and careful than has been shown here. [13]

IV.

The sanctions that I choose "must be limited to what suffices to deter repetition of the conduct or comparable conduct by others similarly situated." Fed. R. Bankr. P. 9011(c)(4). And to be clear, I am *only*  **\*650**  picking sanctions to redress the conduct described in the Order to Show Cause, *not* the further alleged misconduct described in the Chapter 13 Trustee's brief. (*See* Dkt. No. 69 at 3) I agree with the U.S. Trustee that the sanctions within my discretion include an ARDC referral, a monetary sanction, a finding that the compensation to be paid to counsel exceeds the reasonable value of their services per 11 U.S.C. § 329, and/or a non-monetary sanction. Semrad has advised me that it will not seek compensation for this case, so a Section 329 finding is not necessary. And Semrad advises that Mr. Nield has already self-reported to the ARDC, mooting that option, too. What I believe is necessary here, and constitutes the least harsh sanctions appropriate to address the conduct and deter repetition by others similarly situated, has two parts—one monetary and one non-monetary.

[13]    First, I order Mr. Nield and Semrad, jointly and severally, to pay a penalty to the Clerk of the Bankruptcy Court of $5,500. [14]  I seriously considered a larger fine, but after reading their briefs, I believe this sum is sufficient given the candor and remorse both Mr. Nield and Semrad have shown since the Order to Show Cause was issued, the seriousness with which they have addressed the Order already, and the attention they gave the Debtor to confirm the most recent Plan following the June 10 hearing. I view this as a modest sanction, and the next lawyer who does the same thing is warned that he or she will likely see a more significant penalty.

Second, more education (and in-person education) is always better, and I believe additional in-person education is necessary given the conduct here. Fortunately, this year's annual meeting of the National Conference of Bankruptcy Judges (NCBJ) is here in Chicago, making the meeting convenient and not burdensome for local attorneys to attend in person. Even more fortuitously, during the meeting, at 9:00 a.m. on Friday, September 19, 2025, NCBJ will hold a plenary session titled "*Smarter Than Ever: The Potential and Perils of Artificial Intelligence*" to which all registered attendees and their guests are invited. [15]  Mr. Nield, and at least one other senior attorney at the Semrad firm (chosen by Mr. Semrad), are ordered to register for and attend that session of the NCBJ

annual meeting in person. Others reading this opinion are welcome, too.

V.

For the reasons stated here, I will issue a separate order,

1. Finding that Thomas E. Nield and The Semrad Law Firm, LLC, have violated Rule 9011 of the Federal Rules of Bankruptcy Procedure.

2. Imposing sanctions for the violation of Rule 9011:

  a. directing Mr. Nield and Semrad, jointly and severally, to pay a penalty of $5,500 to the Clerk of the Bankruptcy Court within 10 days,

  b. directing Mr. Nield to register and attend in person the NCBJ plenary session on Artificial Intelligence, and

  **\*651** c. directing Semrad to have a second senior attorney register for and attend the NCBJ AI session in person; and

3. Concluding the section 329 examination as moot.

**All Citations**

670 B.R. 636

---

## Footnotes

1   According to the chapter 13 trustee's final report and account filed August 31, 2020, in Case No. 18-10082 (Dkt. No. 72), the trustee paid $894.45 to Semrad through the plan, and the debtor advanced $400 according to the fee application (Dkt. No. 16). According to the chapter 13 trustee's final report and account filed May 16, 2017, in Case No. 12-28654 (Dkt. No. 68), the trustee paid $3,500 to Semrad through the plan, and the debtor advanced $350 according to the fee application (Dkt. No. 14). And according to the chapter 13 trustee's final report and account filed February 24, 2009, in Case No. 07-18870 (Dkt. No. 77), the trustee paid $2,314 to Semrad through the plan, and the debtor advanced $1,500 according to the fee application (Dkt. No. 13).

2   The Chapter 13 Trustee dutifully pointed out the problems with Debtor's counsel's work since the beginning and asked that the case be dismissed last fall. (*See* Dkt. No. 19) My predecessor and I collectively continued the Trustee's motion to dismiss seven times, for the same reason: to give the Debtor every reasonable opportunity to confirm a plan to save her home, if possible. (*See* Dkt. Nos. 21, 27, 31, 39, 42, 48, 54)

3   *See also, e.g., Mid Central Operating Engineers Health & Welfare Fund v. HoosierVac LLC,* No. 24-cv-00326, 2025 WL 574234, at \*3, 5 (S.D. Ind. Feb. 21, 2025) (recommending sanctions for citing authorities "hallucinate[d]" by artificial intelligence in court filings); *Gauthier v. Goodyear Tire & Rubber Co.,* No. 23-CV-281, 2024 WL 4882651, at \*3 (E.D. Tex. Nov. 25, 2024) (imposing sanctions under Fed. R. Civ. Pro. 11(b) for filing a brief that included fake case law generated by artificial intelligence "without reading the cases cited, or even confirming the existence or validity of the cases included"); *Mata v. Avianca, Inc.,* 678 F. Supp. 3d 443, 465 (S.D.N.Y. 2023) (same); *Garner v. Kadince, Inc.,* No. 20250188-CA, 571 P.3d 812, 814 (Utah Ct. App. May 22, 2025) (same).

4   *See also Attaway v. Illinois Dep't of Corr.,* No. 23-cv-2091, 2025 WL 1101398, at \*3 (S.D. Ill. Apr. 14, 2025) ("With the rise of incorrect citations and new emerging technologies, courts have assessed monetary sanctions anywhere from $2,000 to $15,000 for violations similar to Plaintiff's conduct.").

5   I reviewed the unpublished opinions that Mr. Nield referred to in his brief (*see* Dkt. 71 at p. 4-5) and they do not change my thinking in this case. The Memorandum Opinion in *Iron Tax, Accounting & Fin. Sols., LLC v.*

*Story Law Firm, P.L.L.C.*, No. 23-CV-5243 (W.D. Ark. April 8, 2025), ECF No. 49, attached as Exhibit B to Mr. Nield's brief, merely includes a footnote (at page 16, n.2) in resolving summary judgment and *Daubert* motions that flags (presumably for the first time) counsel misciting a few cases, commenting that "short of the use of AI, it is unclear how such errors would slip past a reasonably diligent attorney." That the Court declined to pursue the matter further for reasons unknown does not weigh against imposing sanctions here. In *Araujo v. Wedelstadt*, No. 23-cv-1190 (E.D. Wis. Jan 22, 2025), the offending lawyer realized the errors in his response before the court's consideration and amended the pleading identifying the incorrect citations. *Id.*, ECF Nos. 35, 38. The court's decision (attached as Exhibit C to Mr. Nield's brief, *see* Dkt. 71, Ex. C) calls the use of AI "unacceptable," but let counsel off with only a warning, presumably on account of his rectifying the error early. I also reviewed the transcript that Mr. Nield attached as Exhibit A to his brief, where a court declined to sanction counsel after finding, among other things, that the offending attorney had already experienced "adverse" publicity from his misconduct that "sent the necessary message" not to do it again. Hr'g Tr. at 18:1–4, *Iovino v. Michael Stapleton Associates, Ltd.*, No. 21-CV-64 (W.D. Va. Oct. 30, 2024), ECF No. 204. To me, these outcomes are at the lenient end of a spectrum of various responses a Court can have to this situation. For the reasons I give in this opinion, I believe a modest sanction is appropriate here.

6    *Available at* https://www.supreme court.gov/publicinfo/year-end/2023year-endreport.pdf.

7    *O'Brien v. Flick*, No. 24-61529-CIV, 2025 WL 242924, at *6 (S.D. Fla. Jan. 10, 2025); *see also Willis v. U.S. Bank Nat'l Ass'n*, No. 25-cv-516, ––– F.Supp.3d ––––, ––––, 2025 WL 1408897, at *1 (N.D. Tex. May 15, 2025) ("It is no secret that generative AI programs are known to 'hallucinate' nonexistent cases, and with the advent of AI, courts have seen a rash of cases in which both counsel and *pro se* litigants have cited such fake, hallucinated cases in their briefs.") (quoting *Sanders v. United States*, 176 Fed. Cl. 163, 169 (2025); *Evans v. Robertson*, No. 24-13435, 2025 WL 1483449, at *2 (E.D. Mich. May 21, 2025) (same, with same quote); *Benjamin*, 2025 WL 1195925, at *1 (citing the numerous judicial opinions in recent weeks and months that address the "epidemic" of lawyers citing fake cases after using AI to perform legal research).

8    *See, e.g.*, Hon. Xavier Rodriguez, *Artificial Intelligence (AI) and the Practice of Law*, 24 SEDONA CONF. J. 783, 784, 791 (2023) ("[T]here is a need for education in the legal community to understand errors or 'hallucinations' that may occur in the output of the [large language models] powering these platforms. Attorneys and courts need to be aware of both the benefits and limitations that these AI platforms present."), cited in *Versant Funding LLC v. Teras Breakbulk Ocean Navigation Enters., LLC*, No. 17-CV-81140, 2025 WL 1440351, at *4 (S.D. Fla. May 20, 2025).

9    *See* Nicole Black, *Do NOT, I Repeat, Do NOT Use ChatGPT For Legal Research* (June 22, 2023, 1:47 PM), https://abovethelaw.com/2023/06/do-not-i-repeat-do-not-use-chatgpt-for-legal-research/ (Generative AI tools "are bald-faced liars that pull facts out of thin air ..., including legal cases"); *see also, e.g.*, Benjamin Weiser, *Here's What Happens When Your Lawyer Uses ChatGPT*, N.Y. TIMES (May 27, 2023), https://www.nytimes.com/2023/05/27/nyregion/avianca-airline-lawsuit-chatgpt.html; Larry Neumeister, *Lawyers Submitted Bogus Case Law Created by ChatGPT. A Judge Fined Them $5,000*, ASSOCIATED PRESS (June 22, 2023), https://apnews.com/article/artificial-intelligence-chatgpt-fake-case-lawyersd6ae9fa79d0542db9e1455397aef381c; Erin Mulvaney, *Judge Sanctions Lawyers Who Filed Fake ChatGPT Legal Research*, WALL ST. J. (June 22, 2023), https://www.wsj.com/us-news/judge-sanctions-lawyers-whofiled-fake-chatgpt-legal-research-9ebad8f9; and LegalEagle, *How to Use ChatGPT to Ruin Your Legal Career*, YOUTUBE.COM (June 10, 2023), https://www.youtube.com/watch?v=oqSYIjRYDEM (cited in *Schoene v. Ore. Dep't of Human Servs.*, No. 23-cv-742, 2025 WL 1755839, at *7 n.6 (D. Or. June 25, 2025)); and Lyle Moran, *Lawyer Cites Fake Cases Generated by ChatGPT in Legal Brief*, LegalDive (May 30, 2023), https://www.legaldive.com/news/chatgpt-fake-legal-cases-generative-ai-hallucinations/651557/; Sara Merken, *AI 'Hallucinations' in Court Papers Spell Trouble for Lawyers*, REUTERS (Feb. 18, 2025, 2:55 PM), http://reuters.com/technology/artificial-intelligence/ai-hallucinations-

court-papers-spell-trouble-lawyers-2025-02-18/ (both cited in *Powhatan Cnty. Sch. Bd. v. Skinger*, No. 24cv874, 2025 WL 1559593, at *9 n.7 (E.D. Va. June 2, 2025)).

10    *Available at* https://il courts audio.blob.core.windows.net/antilles-resources/resources/ e43964ab-8874-4b7abe4e-63af019cb6f7/Illinois% 20Supreme% 20Court% 20AI% 20Policy.pdf (Effective Jan. 1, 2025) ("Attorneys, judges, and self-represented litigants are accountable for their final work product. All users must thoroughly review AI-generated content before submitting it in any court proceeding to ensure accuracy and compliance with legal and ethical obligations. Prior to employing any technology, including generative AI applications, users must understand both general AI capabilities and the specific tools being utilized.").

11    *See, e.g.,* ABA Model Rule 1.1, Comment 8, made applicable here by Local Bankruptcy Rule 9029-4A (and applicable to all Illinois lawyers following adoption by the Supreme Court of Illinois), requires lawyers to "keep abreast of changes in the law and its practice, including benefits and risks associated with relevant technology."

12    Mallory P. Sanzeri, *Allerton Conference 2025: Exploring the Future of Law with Artificial Intelligence*, ILLINOIS STATE BAR ASSOCIATION, https://www.isba.org/sections/ai/newsletter/2025/03/allert on conference 2025 exploring the future of law with a (last visited July 17, 2025).

13    Here's another example of what I am talking about: Mr. Nield filed a reasonably compelling brief telling his side of the story (*see* Dkt. No. 71), but he did not sign it. Bankruptcy Rule 9011(a) requires all briefs to be signed and provides that "[t]he court must strike an unsigned document unless the omission is promptly corrected after being called to the attorney's or party's attention." I note this not just to point out another error caused by inattention, but to alert counsel that I am required by the Bankruptcy Rules to strike his brief if he does not sign and re-file it promptly.

14    Bankruptcy Rule 9011 requires that Semrad be equally responsible for Mr. Nield's conduct absent "exceptional circumstances." *See* Fed. R. Bankr. P. 9011(c)(1). I see no such "exceptional circumstances" here and thus a joint-and-several penalty is appropriate.

15    Annual Meeting Schedule, NCBJ, https://ncbj.org/annual-meeting/schedule-events/complete-schedule/.

---

**End of Document**                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.